UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 JAN 19 P 12: 45

U.S. DISTRICT COURT
DISTRICT OF MASS.

05 c 10119 DPW

VINCENT FAGAN and ANTHONY
GIANASCA, Individually and as Putative
Class Representatives,

        Plaintiffs,

      v.

HONEYWELL INTERNATIONAL INC.,

        Defendant.

Civil Action No. _____

RECEIPT # _6/530_
AMOUNT $ _150.00_
SUMMONS ISSUED _N/A_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _MP_
DATE _1/19/05_

## NOTICE OF REMOVAL OF DEFENDANT HONEYWELL INTERNATIONAL INC.

PLEASE TAKE NOTICE that defendant Honeywell International Inc. ("Honeywell")

hereby removes to this Court the state court action entitled *Vincent Fagan and Anthony Gianasca*

*et al. v. Honeywell International Inc.*, Civil Action No. 04-4903, filed in the Superior Court of

Massachusetts, Middlesex County, on November 9, 2004. Pursuant to 28 U.S.C. § 1446(a), a

copy of all process, pleadings, and orders received by Honeywell is being filed with this Notice

at Tab A. In support of removal, Honeywell states as follows:    **MAGISTRATE JUDGE** _JLA_

### GROUNDS FOR REMOVAL

1.     This Court has jurisdiction over this removed action under 28 U.S.C. § 1441

because this action originally could have been filed in this Court under 28 U.S.C. §§ 1331 and

1338(a). More specifically, federal question jurisdiction exists because plaintiff's "right to relief

necessarily depends on resolution of a substantial question" of federal trademark law. *Conroy v.*

*Fresh Del Monte Produce Inc.*, 325 F. Supp. 2d 1049, 1054 (N.D. Cal. 2004) (citing

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988)).

## Federal Question Jurisdiction

2.      This Court has jurisdiction over this proceeding because the validity of Plaintiffs

Vincent Fagan's and Anthony Gianasca's claims require an adjudication of the validity of

Honeywell's federal trademark registration number 1,622,108 for a round thermostat design.

Under 28 U.S.C. § 1338(a), "[t]he district courts shall have original jurisdiction of any civil

action arising under any Act of Congress relating to patents, plant variety protection, copyrights,

and trademarks." It is therefore well established that § 1338(a) confers federal jurisdiction over

claims that (1) arise out of federal patent, plant variety protection, copyright, or trademark law;

or (2) necessitate the resolution of a "substantial question" of federal patent, plant variety

protection, copyright, or trademark law for plaintiff to prevail. *See Christianson*, 486 U.S. at

809.

3.      Any state law claim that requires the adjudication of a substantial question of

federal intellectual property law implicates federal jurisdiction. *Additive Controls &*

*Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 478 (Fed. Cir. 1993) ("Under Texas law,

a business disparagement claim requires plaintiff to prove, as part of its prima facie case, the

falsity of defendant's allegedly disparaging statements. . . . To prove this aspect of its case

(falsity), Adcon must show that its product does not infringe the '318 patent. Thus, Adcon's

right to relief necessarily depends upon resolution of a substantial question of federal patent

law[.]" (citation and footnote omitted)); *Regents of the Univ. of Minn. v. Glaxo Wellcome, Inc.*,

58 F. Supp. 2d 1036, 1038 (D. Minn. 1999) ("Determining whether declaratory relief is

warranted in this case requires an analysis of whether defendant infringed the Vince patents, as

infringement is a necessary precursor to a finding that defendant has breached the parties' license

agreement.").

2

4.    Plaintiffs' claims under chapter 93A of the Massachusetts General Law are predicated on their contention that "Honeywell acquired its trademark [for its round thermostat design] by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO." (Complaint ("Compl.") ¶ 5.) Simply put, the crux of Plaintiffs' lawsuit is that Honeywell used this "improperly" obtained trademark registration and threats of litigation based on its trademark rights in the round thermostat design to obtain or maintain illegally a monopoly of a purported "market" for circular thermostats in the United States, and that, as a result of this illegal monopoly, Plaintiffs and putative class members overpaid for their circular thermostats. (*Id.* ¶¶ 76-78.) In particular, Plaintiffs allege that Honeywell "acquire[d] and maintain[ed] its monopoly [in the circular thermostat market]" by: (1) "threatening and coercing rival thermostat manufacture[r]s into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation"; (2) "deceiving the PTO into believing no competition existed for the [Honeywell Round Thermostat], something Honeywell knew to be false, and thereby securing a registered trademark"; (3) "combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application"; and (4) "purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO." (*Id.* ¶ 77.)

5.    Plaintiffs' claim of anticompetitive conduct by Honeywell wholly turns on their allegations that Honeywell's trademark registration for its round thermostat design is invalid because the registration was improperly obtained. If Honeywell did not commit fraud upon the PTO in obtaining its registration, then Honeywell's actions in protecting its trademark rights would be entirely proper and Plaintiffs would have no basis for their claim. Accordingly, absent

3

a showing that the trademark registration for the round thermostat design was obtained through fraudulent means, Plaintiffs cannot show that Honeywell's efforts to enforce its trademark rights were improper or that it engaged in "sham and baseless trademark infringement litigation." (*Id.* ¶ 77.) Put another way, Plaintiffs must prevail on their challenge to Honeywell's conduct in obtaining its trademark registration for the round thermostat design from the government of the United States if they are to prevail in this litigation.

6.    Accordingly, the Complaint on its face squarely raises a federal question. Challenges to the validity of federal trademark rights and a federal trademark registration implicate federal law just as much as trademark infringement claims do. *Cf. Conroy*, 325 F. Supp. 2d at 1055 ("Challenges to the validity or enforceability of a patent, however, raise a federal question in the same way that an infringement claim otherwise would."); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330 (Fed. Cir. 1998) ("In keeping with our precedent, we treat validity and enforceability the same as infringement. . . . Each of these issues is substantial in the federal scheme, for they are essential to the federally created property right: one determines whether there is a property right, another whether that right is enforceable, and the third what is the scope of that right."). Accordingly, claims that are predicated on a plaintiff's claim of fraud on the PTO necessarily implicate federal jurisdiction under 28 U.S.C. § 1338(a). *See Conroy*, 325 F. Supp. 2d at 1055 ("Throughout the Complaint, Plaintiff has alleged that Defendants committed fraud upon the PTO.. . .Generally, such allegations necessarily involve *questions of patent law, including what information the patent applicant had a duty to disclose and what information was material to the patent application*."(emphasis added)); *see also Coker v. Purdue Pharma Co.*, 314 F. Supp. 2d 777, 782 (W.D. Tenn. 2004) ("The alleged

submission of material misrepresentations to the PTO . . . necessarily involves questions of patent law[.]").

      7.     Similarly, claims of "sham litigation" that are based on allegations that a defendant's trademark registration is invalid also come within the ambit of § 1338(a). *See id.* at 782 (finding that an allegation of sham litigation based on invalid patent necessarily implicated patent law because court was required "to determine whether the targeted litigation was objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits") (quotation omitted). Under First Amendment principles, "[t]hose who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). Petitioning activities – including litigation – are accordingly protected unless they constitute "'a mere sham to cover …an attempt to interfere directly with the business relationships of a competitor.'" *Id.* (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144 (1961))). And a plaintiff can only prevail on a "sham litigation" claim if he or she is capable of demonstrating that the litigation is "objectively baseless." *Id.* at 61 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.") (citation omitted). As such, if a plaintiff's sole theory for why certain litigation was "objectively baseless" is – as is the case here – that the trademark registration on which the litigation was predicated is invalid on the grounds that it was fraudulently obtained, then an adjudication of the relevant trademark registration's validity is a necessary component of the "sham litigation" claim. *Coker*, 314 F. Supp. 2d at 782 ("An evaluation of whether a reasonable litigant could realistically expect success on the merits in Purdue's patent infringement suit against Endo would therefore also necessarily involve resolution of questions of patent law.").

8.    As Defendant is filing this Notice of Removal within 30 days after January 11, 2005, the date on which Honeywell was served with Plaintiff's complaint, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 101 because it is the "district and division embracing the place where such action is pending." *See* 28 U.S.C. § 1441(a).

10.    Honeywell is the only defendant in this action and Honeywell need not obtain the consent of any other party to remove this action.

11.    No previous application has been made for the relief requested herein.

12.    In accordance with 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on counsel for Plaintiff and a copy is being filed with the Clerk of the Superior Court, Middlesex County.

> Respectfully submitted,
> HONEYWELL INTERNATIONAL INC.,
> Defendant,
> By its attorneys,
>
>
> William H. Kettlewell (BBO #270320)
> David M. Osborne (BBO #564840)
> DWYER & COLLORA, LLP
> 600 Atlantic Avenue
> Boston, Massachusetts 02210
> (617) 371-1000
>
> Richard G. Parker
> Ian Simmons
> Benjamin G. Bradshaw
> Charles E. Borden
> O'MELVENY & MYERS LLP
> 1625 Eye Street, NW
> Washington, DC 20006-4001
> (202) 383-5300

Dated:  January 19, 2005

6

## CERTIFICATE OF SERVICE

I certify that on this 19th day of January, 2005, I caused copies of the foregoing NOTICE OF REMOVAL to be served by first-class U.S. mail, postage prepaid on:

Robert J. Bonsignore
Robin Brewer
BONSIGNORE AND BREWER
23 Forest Street
Medford, MA 02155
(781) 391-9496

Jill S. Abrams
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
110 Juniper Street
San Diego, CA 92101-1502
(619) 687-6611

D. Michael Noonan
SHAHEEN & GORDON
P.O. Box 977
140 Washington Street
Dover, NH 03821-0977
(603) 749-5000

David M. Osborne

**EXHIBIT A**

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

............ MIDDLESEX ............ , ss
[seal]

No. 04 - 4903

**Vincent Fagan and Anthony
Gianesca**

., Plaintiff(s)

**v.**

**Honeywell International, Inc.**

, Defendant(s)

*A TRUE COPY ATTEST:*

*DEPUTY SHERIFF*
*Middlesex County*

Honeywell International, Inc.
70 Wells Avenue
Newton, MA 02459

**SUMMONS**

*DATE OF SERVICE 1-11-05*

To the above-named Defendant:

You are hereby summoned and required to serve upon ..... *Robert J. Bonsignore* ...........

........................................ plaintiff's attorney, whose address is *23 Forest St, Medford*

*MA 02155* ............................................, an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at . *Cambridge* ...

............................................................. either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

*Suzanne V. DelVecchio*

Witness, R.............................Esquire, at ...............................................................

the ....................................................... day of ...............................................................

...................., in the year of our Lord ........................................ .

*Edward J Sullivan*
**Clerk**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT DOCKET #:**

**0 4 - 4 9 0 3**

Vincent Fagan and Anthony Gianasca )
Individually and as Putative Class )
Representatives )
                           )
        **Plaintiffs** )
                           )
**v.** )
                           )
**Honeywell International, Inc.** )
                           )
        **Defendant** )

**RECEIVED**

NOV 09 2004

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## COMPLAINT

Plaintiff Vincent Fagan, upon information and belief, brings this Class Action Complaint against Defendants Honeywell International, Inc. (hereinafter individually and/or collectively "Honeywell", "Company" or "Defendant"), on behalf of themselves and all other similarly situated persons residing in the Commonwealth of Massachusetts who suffered similar injury as a result of the Defendant's use or employment of an unfair or deceptive act or practice violative of M.G.L. c. 93A. Plaintiff brings this claim exclusively pursuant to M.G.L. c. 93A and not under sections 4 or 6 of the Clayton Act (15 U.S.C. §§15, 26), or section 1 of the Sherman Act (15 U.S.C. §1) or any other federal statute, regulation, or law.

## JURISDICTION AND VENUE

1.    Brought pursuant to M.G.L. c. 93A, §9(1), this putative class action seeks to recoup economic damages, mandatory minimum statutory compensation for

1

violations of the Massachusetts Consumer Protection Statute M.G.L.93A and to enjoin Honeywell from continuing the illegal business practices described herein

2.    The single count complaint advanced mandates that this action be heard in a Massachusetts state forum.

3.    Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the Commonwealth of Massachusetts. Honeywell sold its circular thermostats to residential customers throughout the Commonwealth of Massachusetts during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.    Named plaintiff's individual damages do not equal or exceed $75,000. Named plaintiff expressly disclaims any individual recovery equal to or in excess of $75,000.

## NATURE AND BACKGROUND OF CASE

5.    Plaintiffs bring this class action lawsuit because Honeywell International, Inc engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Massachusetts. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent

2

the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.     Plaintiff Vincent Fagan and Anthony Gianasca are natural persons and residents of the Commonwealth of Massachusetts. During the class period, plaintiffs and each member of the putative class indirectly purchased in the Commonwealth of Massachusetts Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices.  Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Massachusetts and a purchaser of a round thermostat during the class period.

7.     Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the Commonwealth of Massachusetts.  Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware.  Honeywell has its principal place of business at 70 Wells Avenue, Newton Center, MA 02459

8.     Defendant Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across Massachusetts.

3

9.    Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10.    For purposes of this complaint, the term Defendant shall apply to all Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the Commonwealth of Massachusetts, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11.    Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demand that Honeywell make them known.  Honeywell has failed to address this request.

12.    The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's

4

businesses or affairs. They directly affected members of this Massachusetts consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13.    The Defendants and its co-conspirators fraudulently concealed the acts and practices alleged herein.  Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action exclusively under M.G.L. c. 93A, §2 and §9(2), on behalf of themselves and the following class:

> All similarly situated consumer purchasers residing in the Commonwealth of Massachusetts (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present

15.    The number of potential class members is so numerous that joinder is impracticable.  Plaintiff's claims are typical of those of the class.  Numerous questions of law and fact are common to the class, including, but not limited to:

    a) Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates M.G.L. c. 93A, §2;

    b) Whether Honeywell has engaged, and/or has combined with others to

engage, in conduct that violates M.G.L. c. 93A, §9(3);

c) Whether the pass through overcharge per purchase exceeded $25:

d) Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in the Commonwealth;

e) The existence, duration and illegality of the conduct alleged herein;

f) The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

g) The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

h) Whether the class is entitled to the statutory damages and other relief requested. Whether defendant engaged in monopolization;

i) Whether defendants acted unlawfully as prohibited by M.G.L.93 or otherwise violated the Consumer Protection Act.;

j) The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

k) The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

l)    The appropriate nature of class wide equitable relief.

16.    Plaintiffs, as representatives of the class, will fairly and adequately protect the interests of the class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the class members. They have engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. They likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

7

20.    Additionally, an important public interest will be served by treating the matter as a class action.   The cost to the court system of adjudication of such individualized litigation would be substantial.  Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Massachusetts law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF M.G.L. c. 93A, §2 and §9(3).

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

8

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Massachusetts

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Massachusetts. During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Massachusetts. Another relevant market consists of circular thermostats for residential use in the United States and Massachusetts.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

9

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Massachusetts.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Massachusetts.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

### DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

A.    **Background**

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the

11

HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

## B.    The Rejected 1968 Trademark Application.

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Massachusetts.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged in Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Massachusetts consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation;

14

deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

**D.    The Pattern of Sham and Baseless Litigation**

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

92.     Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.     Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.     However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.     Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.     Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.     As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.     The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.     In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

17

100.   The District Court also commented that:

The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (emphasis added)

## E.   **Deception of the PTO**

101.   In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application").

102.   The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional.

103.   As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

104.   Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT.

105.   Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

106.   Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the <u>utility</u> of the HRT's circular design.

18

107.    When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.    According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.    The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

110.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111.    The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

19

114. As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116. The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117. However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118. Honeywell did not describe the Quad Six Thermostat in the application.

119. The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

120. Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121. The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

122.   The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123.   Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124.   The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125.   Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126.   The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

127.   Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

128.   Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.   If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

130. A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131. However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132. As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133. The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134. The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

135. As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

22

*Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that provided more than the* usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

## F.    The ECO Thermostat.

137.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

138.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.    In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it.    That's simply not right."    Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.   After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.   ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.   The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.   Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

145.   Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.   Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.   The two parties conducted expedited discovery and presented evidence.

148.   The District Court denied Honeywell's motion for preliminary injunction and held that:   1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

24

149.   The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.   The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

151.   The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.   Honeywell appealed the District Court's holding.  The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

153.   As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.   As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of M.G.L. c. 93A, §2 and §9(3).

155.   Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

156.   Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape.  The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of M.G.L. c. 93A, §2 and §9(3).

157.   During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false.  Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading.  The untrue and deceptive statements issued by Honeywell to the PTO were intended by

26

Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

158.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Massachusetts. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of M.G.L. c. 93A, §2 and §9(3).

159.    . Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of M.G.L. c. 93A, §2 and §9(3).

160.    Honeywell maintained its unlawful monopoly in violation of M.G.L.93A§. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

161.    The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal

27

trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of M.G.L. c. 93A, §2 and §9(3).

162.   . Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of M.G.L. c. 93A, §2 and §9(3).

163.   Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of M.G.L. c. 93A, §2 and §9(3).

164.   Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165.   Independent of monopolization or the aforesaid trust, defendants further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166.   Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167.   The deception of the plaintiff and other HRT consumers was in violation of Massachusetts's General Law c.93A.

168.   In addition, Defendant's knowing and willful unfair methods of competition

28

and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and unreasonably restrain trade with regard to the sale of round thermostats in the Commonwealth of Massachusetts in violation of common law and M.G.L. c. 93, §§4, 5, and 6.

169.   Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170.   Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of M.G.L. c. 93A, §2.

171.   By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition.   Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round

thermostats; and restraining trade and preventing competition in the relevant market violative of M.G.L. c. 93A, §2 and §9(3).

172.    Massachusetts indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to Government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of M.G.L. c. 93A, §9(2).

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the Commonwealth and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

177.   If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way.  They are simply unfair methods of competition and unfair or deceptive acts and practices.

### CONSUMER INJURY UNDER M.G.L. C. 93A

178.   Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Massachusetts consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the Commonwealth.

179.   Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180.   As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the

relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

181.    Defendant's control of the round thermostat market in Massachusetts and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

182.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the Commonwealth. This conduct violated M.G.L. c. 93A, §2.

**COUNT I**

**VIOLATIONS OF M.G.L. c. 93A, §2 and §9**

183.    Plaintiffs incorporate herein by reference the allegations contained in the foregoing paragraphs, above.

184.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and

reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of M.G.L. c. 93A, §2.

185.    As a direct and proximate result of Defendant's violations of M.G.L. c. 93A, §2, members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186.    Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of M.G.L. c. 93A.

187.    Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the Commonwealth of Massachusetts. Each consumer class member suffered actual harm in an amount determinable per can purchased.

33

## RELIEF REQUESTED

188.    As a result of defendant's unfair and deceptive conduct, individual Massachusetts consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are therefore entitled to actual damages, interest, attorney fees and costs. In the event that their individual damages are less than $25 each consumer class member is entitled to mandatory minimum statutory damages plus interest, attorney fees and costs. Because their conduct was willful and knowing and they failed to reasonably settle the class is entitled to damages

WHEREFORE, the putative plaintiff class, through its representatives, prays that this Court:

A.    Preliminarily find that pursuant to M.G.L. c. 93A, §9(2), the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such action to the unnamed petitioners in the most effective practicable manner;

B.    Pursuant to M.G.L. c. 93A, §9(2), enter a final finding that the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further

34

order notice of such finding to all members of the class of petitioners in accordance with the law;

C.    In the alternative, preliminarily and finally certify the plaintiff class pursuant to Mass.R.Civ.P. 23;

D.    Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing competition in manufacturing, making, transportation, sale or purchase of round thermostats.

E.    Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of M.G.L. c. 93A, §2;

F.    Award plaintiffs and members of the class their actual damages or in the alternative the statutory damages provided under M.G.L. c. 93A, §9(3) in an amount deemed fair, reasonable and just under the law.

G.    Find that Defendants violated M.G.L. c. 93A, §2 and 93A, §9(3) because the use and employment of the unfair and deceptive act or practice alleged was a willful violation §2 and double or treble any award;

H.    Find that Defendants violated M.G.L. c. 93A, §2 and 93A, §9(3) because their refusal to grant relief upon demand was made in bad faith with knowledge or

35

reason to know that the act or practice complained of violated §2 and double or treble any award;

I.    Allow the class to recover its reasonable attorneys' fees and costs as authorized by M.G.L. c. 93A, §9(4);

J.    Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

K.    Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under M.G.L. c. 93A, §9(1) and/or §9(3), or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future; and

L.    Grant other appropriate equitable relief, including but not limited to disgorgement of profits obtained

Dated: November 9, 2004.                    Respectfully submitted,


The plaintiffs
By their Attorneys

Robert J Bonsignore BBO 547880
Robin Brewer BBO # 639506
Bonsignore and Brewer
23 Forest Street
Medford, Mass. 02155
(781) 391-9496
(781) 391-9496 Fax


36

Jill S. Abrams, Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

THE MOGIN LAW FIRM, P.C.
Daniel J. Mogin
110 Juniper Street
San Diego, CA 92101-1502
Telephone: (619) 687-6611

Shaheen & Gordon
D. Michael Noonan, Esquire
140 Washington Street, 2nd Floor
PO Box 977
Dover, NH 03821-0977
Telephone: (603) 749-5000

⊛JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS
**Vincent Fagan and Anthony Gianasca**

**(b)** County of Residence of First Listed Plaintiff **Middlesex**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
**Robert J. Bonsignore, Bonsignore & Brewer, 23 Forest St., Medford, MA 02155 781-391-9496**

## DEFENDANTS
IN CLERKS OFFICE

**Honeywell International, Inc.**
2005 JAN 19 P 12: 45

County of Residence of First Listed Defendant **Morris County, NJ**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED. DISTRICT OF MASS

Attorneys (If Known)
**William H. Kettlewell, David M. Osborne, Dwyer & Collora, 600 Atlantic Ave., Boston, MA 02210**

05 CV 10119 DPW

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 | Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: **Claim Regarding Federal Trademark Registration**

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
**1/19/05**

SIGNATURE OF ATTORNEY OF RECORD
_/s/_ [signature]

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)  **Vincent Fagan v. Honeywell International, Inc.**

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

- [ ] I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [X] II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, * Also complete AO 120 or AO 121
     740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases

- [ ] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
      315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
      380, 385, 450, 891.

- [ ] IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
      690, 810, 861-865, 870, 871, 875, 900.

- [ ] V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES [ ]   NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
   YES [ ]   NO [X]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES [ ]   NO [X]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES [ ]   NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES [X]   NO [ ]

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division [X]   Central Division [ ]   Western Division [ ]

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division [ ]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES [ ]   NO [X]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME    **David M. Osborne**

ADDRESS    **Dwyer & Collora, 600 Atlantic Ave., Boston, MA  02210**

TELEPHONE NO.    **617-371-1000**

(Coversheetlocal.wpd - 10/17/02)