UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2005 JAN 21 ' P 4: 46
U.S. DISTRICT COURT
DISTRICT OF MASS.

VINCENT FAGAN and ANTHONY
GIANASCA, Individually and as Putative Class
Representatives,

        Plaintiffs,

      v.

HONEYWELL INTERNATIONAL INC.,

        Defendant.

Civil Action No. 05cv10119 DPW

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STAY

On November 18 and 19, 2004, defendant Honeywell International Inc. ("Honeywell") was served with lawsuits in New York (attached at Tab 1) and California (attached at Tab 2) on behalf of statewide classes of indirect purchasers of Honeywell round thermostats. Those complaints asserted that Honeywell had illegally obtained a monopoly over the purported round thermostat market by deceiving the U.S. Patent and Trademark Office ("PTO") into improperly granting Honeywell a trademark for its round thermostat, and claimed that, as a result of Honeywell's alleged anticompetitive conduct, the putative class members had purchased their round thermostats at supracompetitive prices. In subsequent weeks, Honeywell received complaints in Vermont (attached at Tab 3) and Tennessee (attached at Tab 4), and a demand letter in Maine (attached at Tab 5), containing substantially similar allegations and requests for relief. And now plaintiffs Vincent Fagan and Anthony Gianasca have brought a virtually

identical proceeding in Massachusetts, asserting claims on behalf of a putative class of Massachusetts indirect purchasers of Honeywell round thermostats (attached at Tab 6).

Accordingly, in an effort to bring some order to this rapidly expanding quagmire of litigation, Honeywell has filed a motion and supportive filings with the Judicial Panel on Multidistrict Litigation (the "MDL Panel") seeking to transfer all of the pending Honeywell round thermostat-related federal court class actions to a single court for coordinated pretrial proceedings, pursuant to 28 U.S.C. § 1407 (attached at Tab 7 (exhibits omitted)). Honeywell has advised the MDL Panel that this case should be included in any transfer order issued by the MDL Panel (attached at Tab 9). As such, while the MDL Panel is considering the pending motion, the Court should stay this case in order to conserve judicial resources and to avoid the prospect of rulings that may conflict with those of other courts.

### Background

Honeywell developed a mercury-based, electromechanical round thermostat in the early 1940s (the "Honeywell Round Thermostat" or "HRT"). The HRT proved to be a highly successful product. Because the HRT has a distinctive appearance -- and because that appearance has remained essentially the same over the life of the product -- Honeywell sought and obtained a trademark for the HRT in 1988 (the "108 Trademark").

In January 2003, Eco Manufacturing LLC ("ECO") introduced a round thermostat at a trade show that was a virtual replica of the HRT in shape and appearance. Upon learning of ECO's intention to market such a thermostat, Honeywell sent ECO a cease-and-desist letter advising ECO that the ECO round thermostat infringed upon the 108 Trademark. ECO then brought a declaratory judgment action in the Southern District of Indiana, seeking a declaration that the ECO round thermostat did not infringe upon Honeywell's trademarks. *See Eco Mfg.*

*LLC v. Honeywell Int'l Inc.*, 295 F. Supp. 2d 854 (S.D. Ind. 2003). In response, Honeywell moved for a preliminary injunction to prevent ECO from manufacturing the ECO round thermostat.

The district court, however, denied Honeywell's request for a preliminary injunction, and in the process indicated that it believed that the 108 trademark had been improperly granted. *Id.* at 865-68. The district court's decision was subsequently upheld on appeal, *Eco Mfg. LLC v. Honeywell Int'l Inc.*, 357 F.3d 649 (7th Cir. 2003), and the parties ultimately chose to settle the litigation prior to an adjudication on the merits.

Several weeks ago, Honeywell began receiving class action claims from around the country brought by individuals who purchased HRTs for their personal use (*e.g.*, homeowners). These claimants all essentially assert that they purchased their HRTs at supracompetitive prices because Honeywell had obtained an illegal monopoly over the round thermostat market through the use of invalid intellectual property rights. At the moment, Honeywell has been served with complaints asserting statewide class actions in New York, California, Vermont, Tennessee, and Massachusetts, and has received a demand letter asserting a statewide class action in Maine. (*See* Tabs 1-6.) In response to this expanding number of class action suits raising the same issues, Honeywell filed a motion with the MDL Panel on December 17, 2004 (attached at Tab 7), to transfer all pending federal actions against Honeywell to the U.S. District Court for the Southern District of New York for coordinated treatment, and simultaneously filed motions to stay those pending actions until the MDL Panel had reached its decision. Honeywell's motion to stay in the Southern District of New York has already been granted. (*See* Order on Motion to Stay, January 3, 2005 (attached at Tab 8).) Honeywell has advised the MDL Panel that the present action is virtually identical to the other actions that are the subject of the pending MDL

motion (MDL docket no. 1673) and that this case should be included in any transfer order issued by the MDL Panel (attached at Tab 9).

## **Argument**

While the MDL Panel is considering the motion to transfer and coordinate the overlapping and duplicative lawsuits filed against Honeywell (including this one), this Court should stay all proceedings in this case. A stay would ensure consistent treatment of the multiple pending lawsuits and would conserve judicial resources.

The power to stay is well established. It is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *see also* 7B Charles Alan Wright, Arthur R. Miller & Mary Kane, *Federal Practice and Procedure* § 1792, at 293 (2d ed. 1986) ("[W]hen similar actions, either class or individual, are proceeding before several courts, one or more of the tribunals may stay the proceeding before it pending the outcome of the other action."); *Manual For Complex Litigation* § 31.14 (3d ed. 1995) ("[I]n appropriate cases, a judge may order an action stayed pending resolution of a related case in a federal court[.]").

A stay is particularly appropriate when litigants have initiated the MDL process. Cases asserting redundant claims may be transferred by the MDL Panel to a single district for coordinated pretrial proceedings. 28 U.S.C. § 1407(a). Coordination furthers judicial economy and eliminates the potential for conflicting pretrial rulings. *See, e.g. In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51-52 (2d Cir. 1978); *New Mexico State Investment Council v. Alexander*, No. Civ. 04-520, 2004 WL 2697731, at *2 (D.N.M. Sept. 1, 2004) ("Often, deference to the MDL court for resolution of a motion to remand provides the opportunity for the

4

uniformity, consistency, and predictability in litigation that underlies the MDL system."); *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989, 990 (E.D. Wis. 2000); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998); *In re Air Crash off Long Island, N.Y.*, 965 F. Supp. 5, 7 (S.D.N.Y. 1997). These benefits would be lost if individual cases were permitted to proceed while the MDL Panel's decision was pending; in addition, if the MDL Panel does decide to transfer all of the individual cases to a single judge, allowing the cases to proceed individually risks saddling that judge with inconsistent rulings. Indeed, "a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997).[1]

---

[1]     *See also Meyers v. Bayer AG*, 143 F. Supp. 2d 1044, 1053 (E.D. Wis. 2001) (granting stay pending ruling by MDL panel); *Aikins v. Microsoft Corp.*, Civ. A. No. 00-0242, 2000 WL 310391 (E.D. La. Mar. 24, 2000) (same) *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37, 43 (D.D.C. 1999) (same); *American Seafood, Inc. v. Magnolia Processing, Inc.*, Civ. A. Nos. 92-1030, 92-1086, 1992 WL 102762, at *2 (E.D. Pa. May 7, 1992) ("This court has determined that a stay pending the disposition of the JPML motion is appropriate under the circumstances."); *Arthur Magna, Inc. v. Del-Val Fin. Corp.*, Civ. A. No. 90-4378, 1991 WL 13725 (D.N.J. Feb. 1, 1991) (granting stay because it fosters the purpose of the MDL statute to coordinate related litigation); *Portnoy v. Zenith Labs., Inc.*, Civ. A. No. 86-3512, 1987 WL 10236, at *1 (D.D.C. Apr. 21, 1987) (same).

Where a motion to transfer has been filed with the MDL Panel, district courts generally review three factors in deciding whether to stay pending proceedings until the Panel can rule. These factors are: (1) hardship to the moving party if a stay is not granted; (2) potential prejudice to the non-moving party; and (3) the judicial resources that can be saved by avoiding duplicative litigation if the cases are consolidated. *See, e.g., Rivers*, 980 F. Supp. at 1360. Even where a non-moving party claims that a stay will cause delay and prejudice, "there are considerations of judicial economy and hardship to defendants that are compelling enough to warrant such a delay." *Arthur Magna*, 1991 WL 13725, at *1; *see also Meyers*, 143 F. Supp. 2d at 1053 ("Plaintiff for her part contends that if a stay is granted, she 'must endure indefinite delay' while waiting for the JPML to determine whether to transfer this case. . . . My assessment is that the gains in judicial economy from issuing the stay outweigh the burdens to plaintiff."); *Weinke*, 84 F. Supp. 2d at 990 ("Weinke states in conclusory fashion that if this action is not remanded, the action will be 'tied up indefinitely' and subjected to 'prolonged delay and greater geographic disruption' in MDL proceedings (assuming the MDL Panel orders a transfer), and that a stay would 'perpetuate the prejudice to the plaintiff.' These cursory assertions of prejudice do not outweigh the disadvantages of litigating identical claims in a multitude of venues.") (citation omitted).

Without question, a stay is warranted here. First, Honeywell will suffer great hardship if the stay is not granted. Among other things, the discovery necessary to prove the bulk of plaintiffs' claims and defendant's defenses would be overlapping and duplicative. Coordinating the litigation would enable Honeywell to respond to discovery in a comprehensive fashion without having to repeat efforts. "[I]f separate discovery were to go forward, much work would be duplicated." *Arthur Magna*, 1991 WL 13725, at *1. It would also save plaintiffs time and

expense in reviewing and analyzing discovery from defendants, as the work could be done once by a team of plaintiffs' lawyers. Moreover, conflicting rulings by different courts as to the liability of defendants or the type of injunctive relief that could be ordered could harm Honeywell and work contrary to the public interest. *See Aikins*, 2000 WL 310391, at *1 ("[T]he purpose of the JPML is to promote judicial economy and to prevent inconsistent rulings. This case presents questions of fact similar to the other actions pending before the JPML. . . . Consistency and economy are both served by resolution of these issues by a single court after transfer by the JPML."). Similarly, coordinated proceedings would avoid the need for duplicative briefing on the various preliminary motions (*e.g.,* motions to dismiss, etc.) that have been or are likely to be filed in the various actions.

Further, a stay will not prejudice plaintiffs. In fact, plaintiffs stand only to benefit by the streamlined MDL procedure in which the litigation will proceed expeditiously, while making the discovery process more efficient. Indeed, any delay in the preliminary proceedings in this case would be both brief and offset by the benefits of coordinated discovery and motion practice after all of the nearly identical lawsuits are transferred to a single court. *See, e.g., Rivers,* 980 F. Supp. at 1362 (discounting any prejudice to the non-moving party in the time between issuing the stay and the MDL Panel's consideration of the motion).

Lastly, staying the action would also benefit the judicial system and this Court. If this case is ultimately transferred to another court, then "this Court will have needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge." *Rivers*, 980 F. Supp. at 1360. Additionally, "any efforts on behalf of this Court concerning case management will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation." *Id.* at 1360-61. Finally, the Court may issue rulings that conflict with those issued by the many other courts confronted with similar issues arising from this litigation. *See Weinke*, 84 F. Supp. 2d at 990 ("The court concludes that in light of the pending MDL Panel ruling on transfer, this action should be stayed in the interest of judicial economy and to avoid inconsistent results."); *American Seafood*, 1992 WL 102762, at *2 (granting stay, in part, to avoid potential for conflicting rulings). Granting a stay would avoid such a waste of judicial resources.

## Conclusion

For the foregoing reasons, defendant Honeywell respectfully requests this Court to stay all proceedings in this matter pending a ruling from the Judicial Panel on Multidistrict Litigation transferring all litigation related to Honeywell's alleged monopolization of the round thermostat market for coordinated pretrial proceedings before a single judge.

Respectfully submitted,
HONEYWELL INTERNATIONAL INC.,
Defendant,
By its attorneys,

William H. Kettlewell (BBO # 270320)
David M. Osborne (BBO #564840)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, Massachusetts 02210
(617) 371-1000

Richard G. Parker
Ian Simmons
Benjamin G. Bradshaw
Charles E. Borden
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
(202) 383-5300

Dated: January 21, 2005

## CERTIFICATE OF SERVICE

I certify that on this 21st day of January, 2005, I caused copies of the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STAY, to be served by first-class U.S. mail, postage prepaid on:

Robert J. Bonsignore, Esq.
Robin Brewer, Esq.
BONSIGNORE AND BREWER
23 Forest Street
Medford, MA 02155
(781) 391-9496

Jill S. Abrams. Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

Daniel J. Mogin. Esq.
THE MOGIN LAW FIRM, P.C.
110 Juniper Street
San Diego, CA 92101-1502
(619) 687-6611

D. Michael Noonan, Esq.
SHAHEEN & GORDON
P.O. Box 977
140 Washington Street, 2nd Floor
Dover, NH 03821-0977
(603) 749-5000

_____
David M. Osborne

DC1:612472.1

10

C 199—Summons without notice, Supreme Court, personal or substituted service. 1-93

*W. House  11/19/4    11125*

©1993 BY JULIUS BLUMBERG, INC.
PUBLISHER, NYC 10013

# Supreme Court of the State of New York

## County of New York

Index No. 04-603748
Date purchased  11/9/04

THOMAS FULLAM

*Plaintiff(s)*

against

HONEYWELL INTERNATIONAL, INC.

*Defendant(s)*

Plaintiff(s) designate(s)
New York
County as the place of trial.

The basis of the venue is
NY General Business Law
§349 **Summons**

Plaintiff(s) reside(s) at
c/o Abbey Gardy, LLP
212 E. 39th St., NY, NY 10016
County of

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within        days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated,  November 9, 2004

ABBEY GARDY, LLP
Attorney(s) for Plaintiff
Office and Post Office Address
212 E. 39th Street
New York, New York   10016
(212) 889-3700

Defendant's address:

Honeywell International, Inc.
101 Columbia Road
Morristown, New Jersey   07962

NOV 0 9 2004

NEW YORK

NOV 0 9 2004

RECEIVED

NOV 2 3 2004

M. JOHNSON

Index No. 04-603748

**Supreme Court of the State of New York**
County of  New York

THOMAS FULLAM

*Plaintiff(s)*

*against*

HONEYWELL INTERNATIONAL, INC.

*Defendant(s)*

**Summons**

ACTION NOT BASED UPON A
CONSUMER CREDIT TRANSACTION

ABBEY GARDY, LLP

*Attorney(s) for Plaintiff(s)*

*Office, Post Office Address and Tel. No.*

212 E. 39th Street
New York, NY  10016
212-889-3700

| DESCRIPTION USE WITH 1, 2, & 3 | | |
|---|---|---|
| ☐ | ☐ Black Hair | ☐ 51-65 Yrs. |
| | ☐ Brown Hair | ☐ Over 65 Yrs. |
| | ☐ Blonde Hair | ☐ Under 5' |
| | ☐ Gray Hair | ☐ 5'0"-5'3" |
| | ☐ Red Hair | ☐ 5'4"-5'8" |
| | ☐ White Hair | ☐ 5'9"-6'0" |
| | ☐ Balding | ☐ Over 6' |
| ☐ Male | ☐ Mustache | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Beard | ☐ 100-130 Lbs. |
| ☐ White Skin | ☐ Glasses | ☐ 131-160 Lbs. |
| ☐ Black Skin | ☐ 14-20 Yrs. | ☐ 161-200 Lbs. |
| ☐ Yellow Skin | ☐ 21-35 Yrs. | ☐ Over 200 Lbs. |
| ☐ Brown Skin | ☐ 36-50 Yrs. | |
| ☐ Red Skin | | |

Other identifying features:

.........................................
*Print name beneath signature*

*Sworn to before me on*

---

**AFFIDAVIT OF SERVICE**

State of New York, County of                    ss.:

The undersigned, being duly sworn, deposes and says: that deponent is not a party to the action, is over 18 years of age and resides at

That on                    19            at

deponent served the within summons                                        on

                                                                        defendant

**INDIVIDUAL**
☐ 1.  by delivering a true copy of *each* to said defendant personally; deponent knew the person so served to be the person described as said defendant therein.

**CORPORATION**  a                                                corporation.
☐ 2.  by delivering thereat a true copy of *each* to

personally, deponent knew said corporation so served to be the corporation described in said summons as said defendant and knew said individual to be                                        thereof.

**SUITABLE AGE PERSON**
☐ 3.  by delivering thereat a true copy of *each* to
                                                        a person of suitable age and discretion. Said premises is defendant's—actual place of business—dwelling place—usual place of abode—within the state.

**AFFIXING TO DOOR, ETC.**
☐ 4.  by affixing a true copy of *each* to the door of said premises, which is defendant's—actual place of business—dwelling place—usual place of abode —within the state. Deponent was unable, with due diligence, to find defendant or a person of suitable age and discretion thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
☐ 5A.  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known residence, at

and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
☐ 5B.  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class postpaid envelope properly addressed to defendant at defendant's actual place of business, at

In an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

SUPREME COURT, CIVIL BRANCH, NEW YORK COUNTY

INDEX PURCHASE COVER SHEET

INDEX #: ___04-603748___

NATURE OF ACTION OR PROCEEDING (check <u>ONE</u> box only <u>and</u> enter on Index Purchase Form)

## MATRIMONIAL

[ ] Contested    - CM
[ ] Uncontested - UM

## COMMERCIAL

[ ] Contract    -  CONT
[x] Corporate   -  CORP
[ ] Insurance   -  INS
[ ] Other Commercial - OC
    (Other than Contract)
[ ] UCC (including but not
    limited to Sales,
    Negotiable Instruments
    etc.)

## TORTS

[ ] Asbestos      - ASB
[ ] Breast Implant - BI
[ ] Dental Malpractic   -  DM
[ ] Medical/Podiatric Malpractice -MM
[ ] Other Professional Malpractice
                           - OPM
[ ] Motor Vehicle -  MV
[ ] Negligence    -  OTN
[ ] Other Tort    - OT (including
    but not limited to Intentional
    Tort, Environmental, Toxic,
    Airline, Seaman, etc.)
[ ] Products Liablity  -  PL

## REAL PROPERTY

[ ] Condemnation  - COND
[ ] Foreclosure   - FOR
[ ] Landlord/Tenant - ORP
[ ] Other  Real Property-ORP
[ ] Tax Certiorari - TAX

## SPECIAL PROCEEDINGS

[ ] Article 75 (Arbitration) - **ART** 75
[ ] Article 77 (Trusts)      - **ART** 77
[ ] Article 78   - **ART** 78
[ ] Incompetency - INC
[ ] Guardianship - GUARD
[ ] Other Mental Hygiene-MHYG
[ ] Other Special Proceeding - OSP

NEW YORK
COUNTY CLERK'S OFFICE

NOV 0 9 2000

WITH COPY FILED

## OTHER ACTIONS

[ ] Election  - ELEC
[x] Other     - OTH

Check "YES" or "NO" for each of the following questions.

Is this action/proceeding against a

YES  NO
[ ] [x] Municipality:

YES   NO
[ ] [x]  Public Authority:

(specify _____)  (specify _____)

YES  NO
[x] [ ] Does this action/proceeding seek equitable relief?
[ ] [x] Does this action/proceeding seek recovery for personal injury?
[ ] [x] Does this action/proceeding seek recovery for property damage?

B-383

SUPREME COUT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NEW YORK
COUNTY CLERKS OFFICE

NOV 0 9 2004

NOT COMPARED
WITH COPY FILED

THOMAS FULLAM,

           Plaintiff,

           v.

HONEYWELL INTERNATIONAL, INC.,

           Defendant.

Civil Action No. 04–603748

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, by and through counsel, brings this class action lawsuit in response to the illegal, unfair and deceptive business practices in which Honeywell International, Inc ("Honeywell" or the "Company") engaged in connection with the manufacture and sale of its circular thermostats in New York. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (the "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition. Plaintiff now seeks redress for the damage to himself and other purchasers of Honeywell circular thermostats ("HRT") as a result of Honeywell's deceptive practices, and to enjoin Honeywell from continuing the illegal business practices described herein.

JURISDICTION AND VENUE

1.    The claims asserted herein arise under §349 of New York's General Business Law (NY CLS Gen. Bus. §349 (2004)).

2.    This Court has jurisdiction over the subject matter of this action pursuant to §302 of the New York's Civil Practice Law and Rules ("CPLR"). Honeywell sells its circular thermostats to residential customers throughout New York and many of the unlawful acts and transactions alleged herein occurred in this judicial district.

3.    Venue is proper in this judicial district, which plaintiff has chosen pursuant to §509 of the CPLR.

PARTIES

4.    Plaintiff Thomas Fullam is a resident of the State of New York and a purchaser of Honeywell 'round' thermostats (hereinafter referred to as "HRTs")at a supra-competitive price and therefore suffered injury.

5.    Defendant Honeywell is a multifaceted, multinational manufacturer of commercial and household products (including thermostats). According to the Company's website, Honeywell manufactures products for the aerospace, automotive, power generation and chemical industries, including thermostats. It is organized into four main reporting segments:   Aerospace, Automation and Control Solutions, specialty materials and Transportation Systems. Honeywell employs over 100,000 people in 95 countries. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware. Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across New York.

2

CLASS ACTION ALLEGATIONS

6.    Plaintiff brings this action as a class action pursuant to §§ 901, et seq. of the CPLR on behalf of a class the ("Class") consisting of all those who purchased HRTs in New York between June 30, 1986 and the filing of this Action (the "Class Period") for their own use and who were damaged thereby.  Excluded from the Class are the defendant, its officers and directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendant has or had a controlling interest.

7.    Numerosity:  The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of class members is unknown to plaintiffs at this time, based upon the amount of trade and commerce in HRT, plaintiffs are informed and believe that more than 1.5 million HRTS are sold annually in the United States to hundreds of thousands of consumers. Joinder of all members of the Class is not practicable.

8.    Common Questions Predominate:  Common questions lf law and fact exist as to all members of the plaintiff Class and predominate over any questions, which affect only individual members of the class.  These common questions of law and fact include, without limitation:

a    Whether defendants violated New York Business and Professions Law;

b    The effect upon and the extent of injuries sustained by plaintiff and each member of the Class and the appropriate type and/or measure of damages; and

3

c    The appropriate nature of class wide equitable relief.

Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole

9.    Typicality: Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because plaintiff and each member of the Class purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

10.    Adequacy: Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiff resides in New York, is an indirect purchaser of HRT and purchased, in New York, HRT during the Class Period for their own use and not for resale, and thus are adequate representatives of the Class. He has no interests that are adverse to the interests of absent class members. Plaintiff has retained counsel with substantial experience in the prosecution of complex class action antitrust and consumer protection litigation.

11.    Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the monetary injuries suffered by each individual member of the Class may be relatively small, the expenses and burden of

4

individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them. Additionally, an important public interest will be served by addressing the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

12.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## DEFENDANT'S CONTINUING ILLEGAL
## AND DECEPTIVE PRACTICES

13.    Honeywell makes thermostats, among other products. In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT). The HRT is the biggest selling thermostat in the United States. In fact, according to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world." Honeywell has sold more than 85 million HRTs and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million. Honeywell ahs spent over $70 million to advertise HRT. The HRT is the only circular thermostat sold in New York. Honeywell has a 100% monopoly over circular thermostats in New York. Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market so that the only round thermostat consumers could purchase would be the HRT, causing them to spend far more that if Honeywell had not squelched all competition in the round thermostat market.

14.    Honeywell represents that it is "the world's leading manufacturer of thermostats". Thermostats are distinct from other types devices used for controlling air temperature in homes. Electromechanical thermostats are not electronic and are not programmable.

15.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference. According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world" and "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for." On May, 19 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

16.    As a result of the acts and practices complained of herein, Honeywell has acquired and maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and New York.

17.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT and spent more than $70 million to advertise HRT.

18.    Current annual sales of HRTS are approximately 1.5 million to 2.5 million units, or $40 million.

19.    The HRT is virtually the only circular thermostat sold in New York. Honeywell has a 100% monopoly over circular thermostats in the United States and New York. A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is due to its absolute monopolization of the circular thermostat market.

6

distinguish a specific product from others in the market place or in trade. However, with a few exceptions (not relevant to the HRT), functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large. Functionality is especially critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights. Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

26.     The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent). The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

27.     Honeywell appealed the examiner's decision. The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark. The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be

8

produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

28.    Therefore, by the end of the 1970, neither patent nor trademark protected the HRT and over Honeywell's objections, the law had declared an end to Honeywell's monopoly of circular style thermostats.  Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in New York.  Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").  In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").  In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").    In 2003, a company called ECO Manufacturing ("ECO")  introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

C.    Honeywell engaged in deceptive business practices to illegally monopolize the market for circular thermostats.

29.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive business practices with the intent to acquire and maintain its monopoly on the relevant market. Those practices have inured to the detriment of Plaintiff and the Class The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be

9

false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

30.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the relevant market and caused the price of its HRTs to be inflated, thereby harming those persons or entities, including Plaintiff and the members of the Class, who purchased HRTs during that period. As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at inflated prices throughout the relevant market during the Class Period.

31.    Rival thermostat manufacturer (ECO who Honeywell has also attempted to coerce into not competing in the circular thermostat market) has described to the media how Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    The Pattern of Sham and Baseless Litigation

32.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell. However, Honeywell owned

no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968. Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat. Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market. Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

33.    Honeywell learned of the competing Hunter Fan Thermostat in 1986. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell. Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat. Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987. However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968. Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark

11

functionality of the HRT. Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

38.    Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design. When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970. According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application. The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

39.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats). The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

40.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition. Honeywell

13

thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

41.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985. The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark. However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company. Honeywell did not describe the Quad Six Thermostat in the application. The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application. Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

42.    The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market. The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the relevant market and keep the PTO from learning of such competition during the 108 Trademark Application.

14

43. Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending. Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application). The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

44. Pursuant to the 108 Trademark Application, Honeywell published the application for opposition. Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections. If no opposition is filed within a designated period of time (e.g. one month) the application is registered. A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats. However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB. As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

45.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition .The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.  As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.  Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:
>
> > *Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that* provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

46.    The TTAB granted the 108 Trademark Application in 1988.

F.    The ECO Thermostat.

16

47.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat"). The ECO Thermostat is circular and would compete with the HRT in the relevant market. ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs. In May 2003, Daniels was quoted in the Indianapolis Business Journal as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

48.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement. ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell. The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation"). Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured. Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses. Two of the statutory defenses available to

17

incontestability are functionality and fraudulent procurement of a trademark registration. The two parties conducted expedited discovery and presented evidence.

49.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

50.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970. The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

51.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with

18

the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

52.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked. As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

## COUNT I

### (for violations of §349
### New York's General Business Law)

53.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

54.    As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of §349 of New York's General Business Law.

55.    Honeywell coerced rival thermostat manufacturers into not competing with the HRTs by threatening such rivals with sham trademark infringement litigation. Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as

Honeywell intended, allowed Honeywell to monopolize the relevant market and charge high prices for HRTs and was in violation of §349 of New York's General Business Law.

56.    During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

57.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in New York. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats and violated §349 of New York's General Business Law.   Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application process that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.   The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the

20

Relevant Market, all in violation of §349 of New York's General Business Law. Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of §349 of New York's General Business Law.

58.     Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of §349 of New York's General Business Law.

59.     Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

60.     Independent of monopolization or the aforesaid trust, defendants further engaged in business acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

61.     Honeywell misled plaintiff and other purchasers of HRTs in the Relevant Market, in that said purchasers believed the prices they paid for the HRTs were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein. The deception of the plaintiff and other HRT consumers was in violation of §349 of New York's General Business Law.

62.     Pursuant to the provisions §349 of New York's General Business Law plaintiff seeks: 1) to recover the actual damages sustained by plaintiff (plus interest) and

each member of the proposed Class, from defendant Honeywell; 2) injunctive relief to prevent Honeywell from continuing the violations of §349 of New York's General Business Law as alleged herein; and 3) reasonable costs and attorney fees.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and plaintiff's counsel as Lead Counsel under §§ 901 and 902 of the CPLR;

Awarding plaintiff and members of the proposed Class damages in the manner described above;

Granting appropriate equitable relief, including but not limited to restitution and enjoining the defendant from further illegal activity;

Awarding to plaintiff reasonable costs and attorney fees; and

Such other and further relief as is just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: November 9, 2004

ABBEY GARDY, LLP

By: _____
Jill S. Abrams, Esq.
Stephen T. Rodd, Esq.
Henry J. Young, Esq.
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700

22

Dan Mogin, Esq.
The Mogin Law Firm, P.C.
110 Juniper Street
San Diego, CA 92101
Telephone: 619-687-6611

Robert J. Bonsignore, Esq.
Bonsignore & Brewer
23 Forest Street
Medford, MA 02155
Telephone: 781-391-9400

Attorneys for Plaintiff

SUPREME COURT, CIVIL BRANCH, NEW YORK COUNTY

INDEX PURCHASE COVER SHEET

INDEX #: _____

NATURE OF ACTION OR PROCEEDING (check ONE box only and enter on Index Purchase Form)

MATRIMONIAL

[ ] Contested   - CM
[ ] Uncontested - UM

COMMERCIAL

[ ] Contract   -  CONT
[x] Corporate  -  CORP
[ ] Insurance  -  INS
[ ] Other Commercial - OC
    (Other than Contract)
[ ] UCC (including but not
    limited to Sales,
    Negotiable Instruments
    etc.)

TORTS

[ ] Asbestos       -  ASB
[ ] Breast Implant -  BI
[ ] Dental Malpractic   -  DM
[ ] Medical/Podiatric Malpractice -MM
[ ] Other Professional Malpractice
                               - OPM
[ ] Motor Vehicle -  MV
[ ] Negligence    -  OTN
[ ] Other Tort    -  OT (including
    but not limited to Intentional
    Tort, Environmental, Toxic,
    Airline, Seaman, etc.)
[ ] Products Liability  -  PL

REAL PROPERTY

[ ] Condemnation  - COND
[ ] Foreclosure   - FOR
[ ] Landlord/Tenant - ORP
[ ] Other  Real Property-ORP
[ ] Tax Certiorari - TAX

SPECIAL PROCEEDINGS

[ ] Article 75 (Arbitration) - ART 75
[ ] Article 77 (Trusts)      - ART 77
[ ] Article 78    - ART 78
[ ] Incompetency  - INC
[ ] Guardianship  - GUARD
[ ] Other Mental Hygiene-MHYG
[ ] Other Special Proceeding - OSP

OTHER ACTIONS

[ ] Election - ELEC
[x] Other    - OTH

Check "YES" or "NO" for each of the following questions.

Is this action/proceeding against a

YES  NO                              YES   NO
[ ] [x]  Municipality:              [ ]   [x]   Public Authority:

(specify _____)  (specify _____)

YES  NO
[x] [ ] Does this action/proceeding seek equitable relief?
[ ] [x] Does this action/proceeding seek recovery for personal
        injury?
[ ] [x] Does this action/proceeding seek recovery for property
        damage?

B-383



**CORPORATION SERVICE COMPANY**

6Z

# Notice of Service of Process

RXT / ALL
**Transmittal Number: 3759411**
**Date Processed: 11/18/2004**

Primary Contact:     Meg  Johnson-Law Dept- AB-2
                     Honeywell International Inc.
                     101 Columbia Rd.
                     Morristown, NJ 07962

| | |
|---|---|
| **Entity:** | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc |
| **Title of Action:** | Brian Brock vs. Honeywell International, Inc |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court:** | San Francisco County Superior Court , California |
| **Case Number:** | CGC-04-436205 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 11/18/2004 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | Daniel J Mogin |
| | 619-687-6611 |

RECEIVED

NOV 2 3 2004

M. JOHNSON

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It
does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscinfo.com

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

HONEYWELL INTERNATIONAL, INC. and DOES 1 - 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

BRIAN BROCK, on behalf of himself and all others similarly situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.   Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
   Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

San Francisco Superior Court
400 McAllister Street
San Francisco, California 94102

CASE NUMBER:
*(Número del Caso):*  - 0 4 - 4 3 6 2 0 5

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Daniel J. Mogin/ THE MOGIN LAW FIRM, P.C.
110 Juniper Street/ San Diego, CA 92101

Telephone: (619) 687-6611

DATE:          NOV 1 0 2004      GORDON PARK-LI     Clerk, by _____ MARY ANN MORAN _____ , Deputy
*(Fecha)*                                          *(Secretario)*                                                    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* HONEYWELL INTERNATIONAL, INC.

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

American LegalNet, Inc. | www.USCourtForms.com

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, state bar number, and address):*
Daniel J. Mogin (SBN 95624)/ THE MOGIN LAW FIRM, P.C.
110 Juniper Street
San Diego, CA 92101
TELEPHONE NO.: (619) 687-6611          FAX NO.: (619) 687-6610
ATTORNEY FOR *(Name):* Plaintiffs Brian Brock, et al.

FOR COURT USE ONLY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME:

CASE NAME:
Brock, et al. v. Honeywell International, Inc., et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: CGC - 04 - 436205 |
|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE:<br>DEPT.: |

*All five (5) items below must be completed (see instructions on page 2).*

**1.** Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
☑ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

**2.** This case ☑ is ☐ is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☐ Large number of separately represented parties
b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. ☑ Substantial amount of documentary evidence
d. ☐ Large number of witnesses
e. ☑ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. ☑ Substantial post-judgment judicial supervision

**3.** Type of remedies sought *(check all that apply):*
a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☑ punitive

**4.** Number of causes of action *(specify):* 3

**5.** This case ☑ is ☐ is not a class action suit.

Date: November 8, 2004

Daniel J. Mogin
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

American LegalNet, Inc.
www.USCourtForms.com

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

Page 1 of 2

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers**

If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must check **five** items on the sheet. In item 1, you must check **one box** for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

**To Parties in Complex Cases**

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)*(08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation(14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential.)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rule 1800-1812)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Toxic Tort/Environmental (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Tax
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief from Late
Claim
Other Civil Petition

CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

1    Daniel J. Mogin (95624)
     Lisa J. Frisella (216504)
2    Chad M. McManamy (225205)
     THE MOGIN LAW FIRM, P.C.
3    110 Juniper Street
     San Diego, CA 92101-1502
4    Telephone: (619) 687-6611
     Facsimile: (619) 687-6610
5

6    Stephen T. Rodd
     Jill S. Abrams
7    Henry J. Young
     ABBEY GARDY, LLP
8    212 East 39th Street
     New York, New York 10016
9    Telephone: (212) 889-3700
     Facsimile: (212) 684-5191
10

11 Attorneys for Plaintiff Brian Brock
     and the Proposed Plaintiff Class
12 (Additional Counsel Appear on Signature Page)

13

14        SUPERIOR COURT FOR THE STATE OF CALIFORNIA

15             COUNTY OF SAN FRANCISCO

16                (UNLIMITED JURISDICTION)

17

| | |
|---|---|
| 18   BRIAN BROCK, on behalf of himself and all others similarly situated, | Case No. |
| 19 | |
| 20         Plaintiffs, | **CGC - 04 - 436205** |
| 21       v. | <u>CLASS ACTION</u> |
| 22   HONEYWELL INTERNATIONAL, INC. and DOES 1-100, inclusive, | **COMPLAINT** [Cartwright Act, Common Law Monopolization and Unfair Competition Law] |
| 23 | |
| 24        Defendants. | **JURY TRIAL DEMAND** |

25

26        Plaintiff BRIAN BROCK, on behalf of himself and all others similarly situated, and
27 demanding trial by jury, complain and allege upon information and belief as follows:
28 ///

---

CLASS ACTION COMPLAINT                  1

---

CASE MANAGEMENT CONFERENCE SET

PLAN I    APR 1 5 2005   9:00 AM

DEPARTMENT 212

ENDORSED
FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

2004 NOV 10   AM 11: 22

GORDON PARK-LI, CLERK

BY: MARY ANN MORAN
Deputy Clerk

## SUMMARY OF CASE

1. Plaintiffs bring this Cartwright Act (Bus. & Prof. Code Section 16700, et seq.) Unfair Competition Law (Bus. & Prof. Code Section 17200, et seq.) and Common Law Monopolization case individually and as a class action on behalf of a consumer or end-user class consisting of all persons who purchased, in California, for their own use and not for resale Honeywell International, Inc. ("Honeywell") circular thermostats, known as "rounds," indirectly from defendants during the Class Period (as defined below).

2. Honeywell has engaged in anticompetitive practices to exclude potential competitors from manufacturing and selling circular thermostats. Honeywell misrepresented that it had a proper trademark for the thermostats and engaged in a pattern of threatening rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell had acquired its trademark by deceiving the U.S. Patent Office (the "PTO") and withholding material information from the PTO. Honeywell also made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions taken to suppress competition.

3. Honeywell thereby monopolized virtually 100% of the market for circular thermostats in the United States, including in California, and sold those thermostats at artificially inflated or supra-competitive prices.

4. Honeywell's practices only recently came to light as a result of a rival manufacturer's legal challenge to Honeywell's round thermostat trademark, resulting in and a judicial finding of Honeywell's unlawful acts.

5. Plaintiffs seek redress for the injury to their business or property and to all other similarly situated purchasers of Honeywell circular thermostats, and to enjoin Honeywell from continuing the illegal business practices described herein.

///

CLASS ACTION COMPLAINT                    2

**DEFINITIONS**

6.    References made herein to any business entity include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of that entity.

7.    As used herein, "Honeywell Round Thermostats" or "HRT" means circular thermostats produced by Honeywell that are round in shape, have a circular base, a round convex cover and round dial in the center of the cover, including, but not limited to, what is currently referred to as the T87 model.

8.    As used herein, "person" or "persons" have the same meaning as set forth in Business and Professions Code sections 16702 and 17201.

9.    As used herein, "Honeywell" means defendant Honeywell International, Inc. and each of its successors, predecessors, divisions, subsidiaries and affiliates.

**JURISDICTION AND VENUE**

10.    The claims asserted herein arise under §16700, *et seq.* of the Cartwright Act for treble damages, attorney's fees and other relief pursuant to California Business & Professions Code Section 16750(a).

11.    Plaintiffs' claims also arise and are brought pursuant to Business and Professions Code Sections 17203 and 17204 for restitution, disgorgement and other remedial and equitable remedies as a result of defendants' unlawful, unfair or fraudulent business practices alleged herein, as prohibited by Business and Professions Code Section 17200 *et. seq.*, the Unfair Competition Law ("UCL"). Defendant's violations of the UCL include business acts and practices constituting violations of the UCL that are distinct and independent of the violations of the Cartwright Act.

12.    Plaintiffs' claims also arise and are brought for violations of the common law of monopolization for injunctive relief, compensatory and punitive damages.

13.    This Court has jurisdiction over the subject matter of this action pursuant to Business & Professions Code Section §16750(a) (Cartwright Act) and Business & Professions Code Section §17203 (UCL). Jurisdiction may also be exercised over defendant by virtue of the California long-arm statute, Code of Civil Procedure Section 410.10. Defendant's

CLASS ACTION COMPLAINT                    3

1  anticompetitive acts, practices, policies and facilitating devices as alleged herein occurred within

2  the State of California and affected commerce therein.

3       14.  Defendant resides or is found, or its agents reside or are found, within this county.

4       15.  This complaint is not based on federal law and does not arise under, or relate to

5  federal law and plaintiff's right to relief does not depend upon resolution of any substantial

6  questions of federal law.  The amount in controversy for each named class representative does

7  not exceed $75,000.

8       16.  Venue is proper in this judicial district pursuant to Business and Professional Code

9  Section 16750(a) and Sections 395(a) and 395.5 of the California Code of Civil Procedure.

10 Honeywell maintains significant corporate offices in San Diego, California and the illegal acts

11 and transactions alleged herein had a direct or indirect effect on consumers within the State of

12 California.  As a result of the sale of circular thermostats to consumers throughout the State of

13 California, defendant obtained the benefit of the laws of the State of California and the California

14 market for circular thermostats.

15

16                                          **PARTIES**

   **Plaintiffs**

17

18      17.  Plaintiff Brian Brock is a resident of the State of California who, during the Class

19 Period, indirectly purchased Honeywell 'round' thermostats, for their own use and not for resale,

20 paying supra-competitive prices and thereby suffering injury.  The damages or losses as to each

21 plaintiff individually do not exceed $75,000, however calculated, and no federal questions are

22 asserted herein.

   **Defendants**

23

24      18.  Defendant Honeywell International, Inc. is a multinational diversified technology

25 and manufacturing company, involved in aerospace, control, sensing and security technologies

26 for buildings, homes and industry, automotive products, specialty chemicals, fibers, and

27 electronic and advanced materials, including thermostats which are organized into four main

28 reporting segments: Aerospace, Automation and Control Solutions, Specialty Materials and

   Transportation Systems.  Honeywell maintains significant corporate offices in the State of

1  California, is the largest seller of thermostats in the United States and sells approximately 1.5

2  million HRT in the United States annually.

3      19. The true names and capacities, whether individual, corporate, associate,

4  representative, or otherwise of defendants named herein as DOES 1-100 are unknown to

5  plaintiffs at this time, and they are therefore sued by such fictitious names pursuant to Code of

6  Civil Procedure section 474. Plaintiffs will amend this Complaint to allege the true names and

7  capacities of DOES 1 through 100 when plaintiffs know them. Each of DOES 1-100 is in some

8  manner legally responsible for the violations of law alleged herein.

9  ## AGENCY, JOINT VENTURE, ALTER EGO AND CO-CONSPIRATORS

10      20. Each of the defendants named herein, including DOES 1-100, acted as the agent,

11  joint venturer, alter ego, or co-conspirator of or for the other defendants, named or unnamed,

12  with respect to the acts, violations, and common course of conduct alleged herein.

13      21. The acts charged in this Complaint as having been accomplished by defendant and

14  the DOE defendants were authorized, ordered, ratified or accomplished by their officers, agents,

15  employees, or representatives, while actively engaged in the management of the defendants'

16  businesses or affairs.

17

18  ## CLASS ACTION ALLEGATIONS

19      22. Plaintiffs bring this action, on behalf of themselves and all others similarly situated,

20  as a class action pursuant to section 382 of the California Code of Civil Procedure. The class

21  (hereinafter "Plaintiff Class"), which plaintiffs seek to represent, is composed of and defined as

22  follows:

23      All persons residing in California who purchased Honeywell round

24  thermostats, indirectly from defendants, in California from June 30, 1986, through the date of Class Notice (hereinafter "Class Period") for their own use and not for resale. Specifically

25  excluded from the Plaintiff Class are the defendants herein; officers, directors, or employees of any defendants; any entity in

26  which any defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any defendant. Also

27  excluded are any federal, state or local governmental entity, and any judge, justice, or judicial officer presiding over this matter and

28  the members of their immediate families and judicial staffs.

CLASS ACTION COMPLAINT     5

23. This action has been brought and may properly be maintained as a class action, pursuant to the provisions of Code of Civil Procedure section 382 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

24. Numerosity: The Plaintiff Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of class members is unknown to plaintiffs at this time, based upon the amount of trade and commerce in HRT, plaintiffs are informed and believe that more than 1.5 million HRTS are sold annually in the United States to hundreds of thousands of consumers. Joinder of all members of the Plaintiff Class is not practicable.

25. Common Questions Predominate: Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions which affect only individual members of the class. These common questions of law and fact include, without limitation:

a.    Whether defendants violated California Business and Professions Code section 16720;

b.    Whether defendant engaged in monopolization;

c.    Whether defendants violated the Unfair Competition Law;

d.    The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understands, trusts and course of conduct alleged herein;

e.    The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

f.    The appropriate nature of class wide equitable relief.

Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole.

26. Typicality: Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because plaintiffs and each member of the Plaintiff Class purchased, indirectly, HRT, for

1   their own use and not for resale, paying supra-competitive prices and suffering injury thereby as
2   a result of defendants' common course of conduct in violation of law as alleged herein.
3       27.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the members
4   of the Plaintiff Class.  Plaintiffs reside in California, are indirect purchasers of HRT and
5   purchased, in California, HRT during the Class Period for their own use and not for resale, and
6   thus are adequate representatives of the Plaintiff Class.  They have no interests that are adverse to
7   the interests of absent class members.  Plaintiffs have retained counsel with substantial
8   experience in the prosecution of complex class action antitrust and consumer protection
9   litigation.
10      28.  Superiority: A class action is superior to other available means for the fair and
11  efficient adjudication of this controversy since individual joinder of all members of the Plaintiff
12  Class is impracticable.  Class action treatment will permit a large number of similarly situated
13  persons to prosecute their common claims in a single forum simultaneously, efficiently, and
14  without the unnecessary duplication of effort and expense that numerous individual actions
15  would engender.  Furthermore, as the monetary injuries suffered by each individual member of
16  the class may be relatively small, the expenses and burden of individual litigation would make it
17  difficult or impossible for members to individually redress the wrongs done to them.
18  Additionally, an important public interest will be served by addressing the matter as a class
19  action.  The cost to the court system of adjudication of such individualized litigation would be
20  substantial.  Individualized litigation would also present the potential for inconsistent or
21  contradictory judgments.
22      29.  Plaintiffs are unaware of any difficulties that are likely to be encountered in the
23  management of this action that would preclude its maintenance as a class action.

## RELEVANT MARKET AND DEFENDANTS' MONOPOLY POWER

25      30.  One Relevant Market consists of electromechanical thermostats for residential use in
26  the United States and California.  Another relevant market consists of circular thermostats for
27  residential use in the United States and California.

CLASS ACTION COMPLAINT       7

31.   Honeywell represents that it is "the worlds leading manufacturer of thermostats". Thermostats are distinct from other types devices used for controlling air temperature in homes. Electromechanical thermostats are not electronic and are not programmable.

32.   Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.  According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world" and "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for." On May, 19 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC,  a rival of  manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

33.   As a result of the acts and practices complained of herein, Honeywell has acquired and maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and California.

34.   The HRT is the biggest selling thermostat in the United States.  Honeywell has sold more than 85 million HRT and spent more than $70 million to advertise HRT.

35.   Current annual sales of HRTS are approximately 1.5 million to 2.5 million units, or $40 million.

36.   The HRT is virtually the only circular thermostat sold in California.  Honeywell has a 100% monopoly over circular thermostats in the United States and California.  A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is due to its absolute monopolization of the circular thermostat market.

///

///

///

///

**DEFENDANTS' CONTINUING ILLEGAL,
UNFAIR, AND MONOPOLISTIC PRACTICES**

A.    **Background**

37.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

38.    Honeywell has worked hard to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

39.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent"). According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

40.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent"). The HRT Design Patent expired in 1970.

B.    **The Rejected 1968 Trademark Application.**

40.    In 1968, prior to the expiration of the HRT Design Patent, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

41.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition. A trademark can be any word, name, symbol, device, slogan or package design (or combination of these) which serves to identify and distinguish a specific product from others in the market place or in trade. However, with a few exceptions (not

1    relevant to the HRT), functional or utilitarian characteristics cannot be trademarked because of
2    the benefit they offer to the public at large. Honeywell's trademark application was found futile
3    due to the functional qualities of the HRT's circular shape and by the Company's receipt of the
4    HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

5         42.    The PTO's examining attorney denied the HRT Trademark Application
6    reasoning that trademark protection would improperly extend the monopoly enjoyed by
7    Honeywell (via the HRT Design Patent). The examining attorney declared that an extension of
8    Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent
9    law."

10        43.    Honeywell appealed the examiner's decision.    The appellate body, the
11   Trademark Trial and Appeal Board (the "TTAB"), declared that the circular shape of the HRT
12   was functional and therefore could not be protected by trademark.

13   C.    **Exclusionary Acts**

14        44.    Therefore, by the end of the 1970s, neither patent nor trademark protected the
15   HRT. Following the end of the Honeywell monopoly, thermostat manufactures other than
16   Honeywell sought to compete in the circular thermostat market, including in California.

17             a.    Between 1969 and 1979, a company called Penn Controls manufactured
18   and sold a thermostat with a circular and convex cover that closely resembled the HRT
19   (the "Penn Controls Round Thermostat").

20             b.    In 1985, a company called Quad Six began manufacturing and selling a
21   circular thermostat that was designed to be compatible with the base of the HRT (the
22   "Quad Six Round Thermostat").

23             c.    In 1986, a company called the Hunter Fan Company began manufacturing
24   and selling a circular thermostat (the "Hunter Fan Round Thermostat").

25             d.    In 2003, a company called ECO Manufacturing introduced a circular
26   thermostat that does not use mercury (the "ECO Round Thermostat").

27

28

CLASS ACTION COMPLAINT                         10

45.    Since the beginning of the Class Period, Honeywell has engaged in anticompetitive practices to acquire and maintain its monopoly in the circular thermostat market, including:

    a.    threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation;

    b.    deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark;

    c.    combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and

    d.    purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

46.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition and caused the price of its HRT to be inflated, thereby harming those persons or entities, including plaintiffs and the proposed Class, who purchased HRT during that period. As a result of Honeywell's illegal deceptive business practices, Honeywell has: 1) excluded competitors from the circular thermostat market; and 2) sold the HRT at supra-competitive prices during the Class Period.

47.    QUAD SIX: As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Round Thermostat that was designed to be compatible with the base of the HRT. The Quad Six Round Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT. In 1985, Honeywell threatened Quad Six with expensive litigation and claimed that Quad Six violated trademark rights owned by Honeywell. However, Honeywell owned no trademark rights in the circular shape of the HRT and its attempts to register such rights had been rejected in 1968. And, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT due to its functionality. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six

CLASS ACTION COMPLAINT                                    11

1  with expensive trademark infringement litigation should Quad Six continue to sell the Quad Six

2  Round Thermostat. Shortly thereafter in late 1985 Honeywell and Quad Six entered into

3  negotiations that resulted in Honeywell's acquisition of Quad Six which removed the Quad Six

4  Round Thermostat from the market. Honeywell concealed information from the TTAB that

5  Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell

6      48.    HUNTER FAN: Honeywell learned of the competing Hunter Fan Round

7  Thermostat in 1986. The Hunter Fan Round Thermostat had the same purpose as the HRT, was

8  interchangeable with the HRT and competed with the HRT. Honeywell sent a 'cease and desist'

9  letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Round Thermostat infringed

10  on trademark rights owned by Honeywell. Honeywell also threatened Hunter Fan with

11  expensive litigation unless it ceased to market the Hunter Fan Round Thermostat. Hunter Fan

12  and Honeywell then exchanged terse letters concerning the Hunter Fan Round Thermostat until

13  sometime near the end of 1987. However, Honeywell knew that it owned no trademark rights in

14  the circular shape of the HRT and that its attempts to register such rights had been rejected in

15  1968. Honeywell also knew that because the circular shape of the HRT was functional,

16  Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the

17  HRT. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened

18  Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with

19  its plans to produce the Hunter Fan Round Thermostat.

20      49.    As was intended by Honeywell, by coercing rival thermostat manufacturers into

21  not competing in the circular thermostat market, Honeywell was able to monopolize that market

22  and sell HRT at supra-competitive prices.

23      50.    The coercion of Quad Six and Hunter Fan, as described above, prevented

24  competition in the sale of circular thermostats and formed part of a pattern of sham and baseless

25  litigation against rival thermostat manufacturers who attempted to compete against Honeywell.

26  In subsequent court proceedings, the District Court for the Southern District of Indiana ("District

27  Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the

28  intimidating power of Honeywell in the market." The District Court also commented that:

---

CLASS ACTION COMPLAINT                    12

1

2

3

4

The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (Emphasis added.)

5

**D.    <u>Deception of the PTO</u>**

6

7    51.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108

8    Trademark Application"). The PTO's examining attorney denied the 1986 application holding

9    that the circular shape of the HRT was functional. As described above, functional or utilitarian

10   characteristics of a product are virtually certain never to secure trademark protection because of

11   the benefit they offer to the public at large.

12   52.    Honeywell appealed the denial of its application to the TTAB, and submitted

13   materially false and misleading information to the TTAB concerning the functionality of the

14   HRT. Relying on the false and misleading information supplied to it by Honeywell, the TTAB

15   approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the

16   "108 Trademark").

17   53.    Honeywell's 108 Trademark Application was severely hampered by the

18   Company's previous receipt of the HRT Utility Patent, which emphasized the <u>utility</u> of the

19   HRT's circular design. When applying for the 108 Trademark, Honeywell stressed to the PTO

20   that no competitor had utilized a circular design for thermostats, despite being able to do so since

21   the expiration of the HRT Design Patent in 1970. According to papers filed in subsequent

22   litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this

23   unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this

24   round design for their thermostats during the many years after the patent and the filing of this

25   application. The fact that competitors have not used this design and have not been hampered in

26   their competition with [Honeywell] is convincing proof of the non-functionality [sic] of

27   [Honeywell's] thermostat design."

28   54.    Honeywell also misrepresented to the PTO that the Company had entered into no

"settlement agreements" with competitors involving circular shaped thermostats (which would

CLASS ACTION COMPLAINT                    13

1 | demonstrate a desire by competitors to manufacture such thermostats).  The TTAB relied on
2 | Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

3 | 55.  Contrary to its representations to the TTAB, as described above, Honeywell knew
4 | of competing circular thermostats at the time of the 108 Trademark Application, and had entered
5 | into an agreement with a rival manufacturer to suppress competition.  Honeywell thus deceived
6 | the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of
7 | competition in the circular thermostat market.

8 | 56.  Pursuant to the 108 Trademark Application, Honeywell published the application
9 | for opposition.  Pursuant to patent and trademark law, a proposed trademark is published in a
10 | recognized journal to solicit objections.  If no opposition is filed within a designated period of
11 | time (e.g. one month) the application is registered.  A major competitor of Honeywell, Emerson
12 | Electric objected to the 108 Trademark application and offered to inform the TTAB of
13 | competing circular thermostats existing in the marketplace and of evidence it had that Honeywell
14 | had threatened competitors with litigation if they marketed competing circular thermostats.
15 | However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric
16 | would not offer its testimony to the TTAB.  As part of the agreement with Honeywell, Emerson
17 | Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not
18 | consider the evidence initially offered by Emerson Electric.

19 | 57.  As the District Court of Indiana found in subsequent trademark litigation:

It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

1
2
3
4
5
6
7
8
9
10
11

*Despite the apparent availability of the rounded thermostat cover since that time [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

12    E.    **The ECO Thermostat.**

13        58.    ECO introduced the ECO Round Thermostat at a trade show in January 2003.
14    Eco expected to sell ECO Round Thermostats for approximately 50% of the price of the HRT,
15    but with more technology and without the environmentally unsound mercury utilized in the
16    HRT.

17        59.    After Honeywell learned of the ECO Round Thermostat, Honeywell threatened to
18    sue ECO for trademark infringement.  ECO filed an action in the District Court seeking a
19    declaration that the ECO Thermostat would not infringe on any trademark rights that might be
20    owned by Honeywell (the "ECO Litigation").  Honeywell responded by seeking a preliminary
21    injunction to prevent the ECO Thermostat from being manufactured.  Honeywell contended that
22    they had a registered U.S. trademark, the 108 registration had become "incontestable", and that is
23    to say the trademark had been registered in the federal system for a period of five years and
24    therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject
25    to certain statutory defenses.  Two of the statutory defenses available to incontestability are
26    functionality and fraudulent procurement of a trademark registration.

27        60.    The District Court denied Honeywell's motion for preliminary injunction and held
28    that:

CLASS ACTION COMPLAINT                                    15

a.    the circular shape of the HRT was functional and could not be protected by a valid trademark;

b.    the circular shape of the HRT was the subject of a long expired utility patent; and

c.    ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

61.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970. The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

62.    The District Court was highly critical of Honeywell and declared that the Company had:

a.    made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark;

b.    issued information to the TTAB related to Quad Six Round Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression";

c.    made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and

d.    used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

63.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that

1  functional aspects of a product cannot be trademarked.  As a result of the findings of the federal

2  courts, the matter of Honeywell's trademark rights, if any, have been determined and such that

3  plaintiff's right to relief does not depend upon resolution of any substantial questions of federal

4  law.

5      64.    As stated above, Honeywell has acquired and maintained their monopoly through

6  pervasive practices of misrepresenting its patent and trademark rights and instituting or

7  threatening to institute sham and baseless legal proceedings foo the purpose of excluding rivals

8  form the thermostat markets.

9      65.    Defendants and others engaged in a concert of action, combination, trust,

10  agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the

11  prices of circular thermostats at supra-competitive levels.

12      66.    Independent of monopolization or the aforesaid trust, defendants further engaged

13  in business acts and practices that were unlawful, unfair or deceptive and inured consumers by

14  limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

15  ### THE INJURY TO COMPETITION AND CONSUMERS

16      67.    Honeywell's conduct harmed consumers because consumers were forced to pay

17  supra-competitive prices and their choices were limited.

18  ### VIOLATIONS ALLEGED

19  ### FIRST CAUSE OF ACTION

20  **Violations of the Cartwright Act,**

21  **California Business & Professions Code §16720, *et seq.***

22  **(Against All Defendants)**

23      68.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 67 above, as

24  fully set forth herein.

25      69.    Beginning at a time presently unknown to plaintiffs, and continuing thereafter to

26  the present, defendant and others presently unknown entered into and engaged in a continuing

27  unlawful trust in restraint of the trade and commerce described above in violation of California

28  Business and Professions Code section 16720.

    70.    The aforesaid violations of California Business and Professions Code section

1   16720 consisted, without limitation, of a continuing combination, trust, agreement,
2   understanding, and concert of action among the defendants, and others, concerning the sale or
3   distribution of thermostats including circular thermostats, in California.

4       71.    For the purpose of forming and effectuating the aforesaid unlawful trust, the
5   defendants and others have done those things to which they agreed, combined, and conspired as
6   described herein.

7       72.    The aforesaid unlawful trust has had the following effects, among others,
8   including the effects described above:

9           a.    Competition in the sale of thermostats, including circular thermostats, has
10  been suppressed, restrained, or eliminated;

11          b.    Prices of thermostats, including circular thermostats paid by plaintiffs and
12  other members of the Plaintiff Class have been raised, fixed, maintained, and stabilized at
13  artificial and non-competitive levels.

14      73.    During the period covered by this Complaint, plaintiffs and the other members of
15  the Plaintiff Class purchased thermostats, including circular thermostats, indirectly from the
16  defendants.  By reason of the alleged violations of the antitrust laws, plaintiffs and other
17  members of the Plaintiff Class paid more for thermostats, including circular thermostats than
18  they would have paid in the absence of the illegal trust, have had their choices limited and, as a
19  result, have been injured in their business and property and have suffered damages in an amount
20  according to proof at trial.

21                      **SECOND CAUSE OF ACTION**
22

23                  **Common Law Monopolization**
                   **(Against All Defendants)**

24      74.    Plaintiffs incorporate by reference and reallege paragraphs 1-67 above, as though
25  fully set forth herein.

26      75.    Defendants, through the exercise of monopoly power, have engaged in acts and
27  practices as described above without justification that operate to exclude competition in the
28  thermostat and circular thermostat markets and to acquire, maintain, and increase their monopoly

power. Both the purpose and the effect of these acts and practices have been to restrain competition in the relevant markets for thermostats and circular thermostats, thereby enabling Honeywell to maintain a monopoly of that market and to charge supra-competitive prices.

76.    By engaging in such acts of exclusion, defendants have engaged in unlawful monopolization.

77.    These exclusionary acts and practices lack legitimate business justification, are not reasonably necessary to further any legitimate procompetitive purpose, and impair competition in an unnecessarily restrictive way.

78.    The defendants' exclusionary and restrictive practices described herein have caused significant harm to class members by increasing the prices they have paid for thermostats including circular thermostats above competitive levels and by denying them a free choice in a competitive market. As a result of the exclusionary and restrictive practices it has imposed on others, including those described herein, defendants have succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled the defendants to price their circular thermostats virtually without regard to the prices of competing products. Distributors and contractors have passed these monopoly prices on to consumers, including particularly to the class members.

79.    As a direct and proximate result of defendants' acts of monopolization as alleged herein, plaintiffs and the members of the Plaintiff Class have suffered actual damages in an amount to be proven at trial.

80.    Defendants' acts of monopolization as described herein were intended to monopolize and suppress competition in the relevant markets and to injure consumers. Defendants' acts of monopolization were and included acts of fraud, malice and oppression and were done with conscious disregard of the rights upon consumers, including plaintiffs and the Plaintiff Class. Accordingly, an award of punitive damages is justified in order to make an example of defendants, to punish defendants, and to deter defendants, and others, from engaging in the same or similar conduct. Plaintiffs, and the members of the Plaintiff Class, seek an award

of punitive damages in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

### Unfair Competition Law
California Business & Professions Code §17200, *et seq.*
(Against all Defendants)

81.    Plaintiffs incorporate by reference and reallege paragraphs 1-80 above, as though fully set forth herein.

82.    This Complaint is filed and these proceedings are instituted, pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution, and other available remedies from defendants for acts and business practices, as alleged herein, in violation of section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

83.    The conduct alleged herein violates California Business and Professions Code Section 17200. Independent of the other violations of law alleged herein, the acts and business practices described herein constituted and constitute a common course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200, *et seq.*, including, but in no way limited to, the following:

A.    <u>Unlawful</u>:

    1.    violations of California Business and Professions Code section 16720, *et seq.*;

    2.    violations of the Sherman and Clayton Acts; and

    3.    violations of section 5 of the Federal Trade Commission Act (15 U.S.C., §45(a)); and

B.    <u>Unfair</u>:

    1.    incipient violation of antitrust law;

    2.    violation of the spirit of antitrust laws because the effects are the same as or comparable to violation of the antitrust laws;

    3.    threat or harm to competition and consumers.

1

C.    Fraudulent:

2

1.    false and deceptive statements to rivals regarding the validity of

3

trademarks and associated rights;

4

2.    false and deceptive statements to the United States PTO and the

5

TTAB.

6

84.    Plaintiffs and the Plaintiff Class are entitled to full restitution and other equitable

7

remedies as a result of such business acts or practices.

8

**PRAYER FOR RELIEF**

9

WHEREFORE, plaintiffs pray:

10

1.    This Court certify the Plaintiff Class;

11

2.    This Court declare that defendants have engaged in combinations of capital, skill

12

and acts with others constituting a trust for the purpose of creating or carrying out

13

restrictions in trade or commerce, limiting and reducing the production and

14

increasing the price of merchandise or a commodity, and preventing competition

15

in manufacturing, making, transportation, sale or purchase of merchandise,

16

products, or a commodity, in violation of the common law (monopoly), the

17

Cartwright Act (California Business and Professions Code section 16720 *et seq.*)

18

and unfair competition and unlawful and unfair business acts and practices in

19

violation of the California Unfair Competition Act (California Business and

20

Professions Code section 17200 *et seq.*);

21

3.    On the First Cause of Action (Cartwright Act): Plaintiffs and the members of the

22

Class recover their actual damages, in an amount to be determined at trial, and

23

said amount be trebled pursuant to California Business and Professions Code

24

section 16750;

25

4.    On the Second Cause of Action (Monopolization): Plaintiffs and the members of

26

the Class recover their actual damages, in an amount to be determined at trial, and

27

punitive damages in an amount to be determined at trial;

28

5.    On the Third Cause of Action (Unfair Competition Law): This Court order

CLASS ACTION COMPLAINT                                21

1  defendants to make full restitution to the class members who have been and
2  continue to be injured by defendants' violations of section 17200, pursuant to
3  Business and Professions Code section 17203 and section 17204;

4  6.  That the sale of thermostats including circular thermostats not be in a manner that
5  tends to lessen competition or create a monopoly;

6  7.  That defendants be ordered to engage in other remedial actions due to their unfair
7  competition pursuant to California Business and Professions Code sections 17203
8  and 17204;

9  8.  That plaintiffs and the members of the Class recover their reasonable attorneys'
10  fees and costs of suit;

11  9.  That plaintiffs and the members of the Class recover pre-judgment and post-
12  judgment interest on the above sums at the highest rate allowed by law; and

13  10.  That plaintiffs and the members of the Class be granted such other and further
14  relief as this Court deems to be just and equitable.

15  Dated: November 8, 2004                    Respectfully submitted,

16

17                                      Daniel J. Mogin (95624)
                                       Lisa J. Frisella (216504)
18                                      Chad M. McManamy (225205)
                                       THE MOGIN LAW FIRM, P.C.
19                                      110 Juniper Street
20                                      San Diego, CA 92101
                                       Telephone: (619) 687-6611
21                                      Facsimile: (619) 687-6610

22                                      By: _____
23                                          Daniel J. Mogin

24                                      Stephen T. Rodd
                                       Jill S. Abrams
25                                      Henry J. Young
26                                      ABBEY GARDY, LLP
                                       212 East 39th Street
27                                      New York, New York 10016
                                       Telephone: (212) 889-3700
28                                      Facsimile: (212) 684-5191

CLASS ACTION COMPLAINT                    22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robin E. Brewer (161502)
BONSIGNORE & BREWER
770 L Street, Suite 1200
Sacramento, CA 95814
Telephone: (916) 442-6902
Facsimile: (916) 442-7734

Attorneys for Plaintiff Brian Brock
and the Proposed Plaintiff Class

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: November 8, 2004

Respectfully submitted,

Daniel J. Mogin (95624)
Lisa J. Frisella (216504)
Chad M. McManamy (225205)
THE MOGIN LAW FIRM, P.C.
110 Juniper Street
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610

By: _____
Daniel J. Mogin

Stephen T. Rodd
Jill S. Abrams
Henry J. Young
ABBEY GARDY, LLP
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

Robin E. Brewer (161502)
BONSIGNORE & BREWER
770 L Street, Suite 1200
Sacramento, CA 95814
Telephone: (916) 442-6902
Facsimile: (916) 442-7734

Attorneys for Plaintiff Brian Brock
and the Proposed Plaintiff Class

CLASS ACTION COMPLAINT

24

CASE NUMBER: CGC-04-436205  BRIAN BROCK VS. HONEYWELL INTERNATIONAL, INC. et

## NOTICE TO PLAINTIFF

This case is assigned to Plan I.  A Case Management Conference is set for:

DATE:     APR-15-2005

TIME:     9:00AM

PLACE:    Department 212
          400 McAllister Street
          San Francisco, CA  94102-3680

All parties must appear and comply with Local Rule 3.

CRC 212 (g)(1) requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management conference. (CRC 212 (b)(2))

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 3)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for civil matters; each program is described below:

1) Judicial arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

ADR-1  7/03  (bc)

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

## Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

ADR-I   7/03  (bc)

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

### Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

### Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## *Voluntary Early Mediation*   *(effective 9/2/03)*

The Voluntary Early Mediation program is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties.  It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process.  Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers.  The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Voluntary Early Mediation program rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-8913

## *Judicial Mediation*

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

ADR-1  7/03  (bc)

### Cost

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Voluntary Early Mediation program provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

ADR-I  7/03  (bc)

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $200 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 982-1600.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution Coordinator,
400 McAllister Street, Room 103
San Francisco, CA   94102
(415) 551-3870

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

ADR-I  7/03  (bc)

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
400 McAllister Street, San Francisco, CA  94102-4514

|  |  |
|---|---|
| Plaintiff<br><br>v.<br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE<br>DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐ **Private Mediation**    ☐ **Voluntary Early Mediation**    ☐ **Judicial Mediation**
☐ **Binding arbitration**                                         Judge _____
☐ **Non-binding judicial arbitration**                           Judge _____
☐ **BASF Early Settlement Program**
☐ **Other ADR process (describe)** _____

**Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

_____

_____

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

☐  *Additional signature(s) attached*

**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

ADR-2  7/02

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, bar number, and address):* | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO. :              FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**

Date:                   Time:                Dept.:              Div.:              Room:

Address of court *(if different from the address above):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐ This statement is submitted by party *(name):*
   b. ☐ This statement is submitted jointly by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):*
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not):*
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*
      (3) ☐ have had a default entered against them *(specify names):*
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(describe, including causes of action):*

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [New July 1, 2002]
**CASE MANAGEMENT STATEMENT**
Cal. Rules of Court,
rule 212

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial   ☐ a nonjury trial    *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐ Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not  provided the ADR information package identified in rule 201.9 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*



Superior Court of California
County of San Francisco

# Voluntary Early Mediation Program

## Introducing a new court alternative dispute resolution program providing three hours of free mediator time

The Voluntary Early Mediation Program (VEM) is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF). It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements and have agreed to provide one hour of preparation and two hours of session time at no charge. While the goal of the program is to provide service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

After submission of the signed Stipulation to Alternative Dispute Resolution form included in the court ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, a mediator, qualified in the appropriate area of law will be assigned from the list of court approved mediation providers. Parties will be provided with a biography and fee schedule of the assigned mediator. Should the mediator be unacceptable to the parties, another will be assigned, until one is found that is agreeable to all parties. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected.

A copy of the Voluntary Early Mediation Program Procedures can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-982-1600 for a copy.

Superior Court Alternative Dispute Resolution
400 McAllister, Rm. 103, San Francisco, CA 94102
(415)551-3876

# Alternative Dispute Resolution (ADR) Information Package

# You Don't Have to Sue ---

# Here are some other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint. (CRC 201.9(c))

**Superior Court of California**
**County of San Francisco**

ADR-1  7/03  (bc)

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can be speedier.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can permit more participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR can be flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

# Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.



# Superior Court of California
## County of San Francisco

## Judicial Mediation Pilot Program

Introducing a new court alternative dispute resolution
program that provides judicial mediation of complex civil cases

    The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable Paul H. Alvarado | The Honorable James J. McBride |
| The Honorable Ellen Chaitin | The Honorable Kevin M. McCarthy |
| The Honorable John J.Conway | The Honorable John E. Munter |
| The Honorable Robert L. Dondero | The Honorable Charlene Padovani Mitchell |
| The Honorable Ernest H.Goldsmith | The Honorable A. James Robertson, II |
| The Honorable Patrick J. Mahoney | The Honorable Alex Saldamando |
| The Honorable Tomar Mason | The Honorable Lillian K. Sing |
| | The Honorable James L. Warren |

    Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

07/31/03

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.  The party or parties are willing to participate in *(check all that apply):*

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 1612)

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 1612)

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify):*

  e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

  f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

  g. ☐ This case is exempt from judicial arbitration under rule 1600.5 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

  a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

  b. Reservation of rights: ☐ Yes ☐ No

  c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

  a. ☐ There are companion, underlying, or related cases.

    (1) Name of case:

    (2) Name of court:

    (3) Case number:

    (4) Status:

    ☐ Additional cases are described in Attachment 14a.

  b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

| PLAINTIFF/PETITIONER: | CASE NUMBER: | |
|---|---|---|
| DEFENDANT/RESPONDENT: | | |

17. **Discovery**
   a. [ ] The party or parties have completed all discovery.
   b. [ ] The following discovery will be completed by the date specified *(describe all anticipated discovery):*
      Party                    Description
                                                                        Date

   c. [ ] The following discovery issues are anticipated *(specify):*

18. **Economic Litigation**
   a. [ ] This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
   b. [ ] This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

19. **Other issues**
   [ ] The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

20. **Meet and confer**
   a. [ ] The party or parties have met and conferred with all parties on all subjects required by rule 212 of the California Rules of Court *(if not, explain):*

   b. After meeting and conferring as required by rule 212 of the California Rules of Court, the parties agree on the following *(specify):*

21. **Case management orders**
   Previous case management orders in this case are *(check one):* [ ] none  [ ] attached as Attachment 21.

22. Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ▶  _____
        (TYPE OR PRINT NAME)                      (SIGNATURE OF PARTY OR ATTORNEY)

_____          ▶  _____
        (TYPE OR PRINT NAME)                      (SIGNATURE OF PARTY OR ATTORNEY)
                                              [ ] Additional signatures are attached

$6^2$



CORPORATION SERVICE COMPANY'

# Notice of Service of Process

**RLG / ALL**
Transmittal Number: 3797234
Date Processed: 12/16/2004

Primary Contact:    Meg  Johnson-Law Dept- AB-2
Honeywell International Inc.
101 Columbia Rd.
Morristown, NJ 07962

| | |
|---|---|
| **Entity:** | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc. |
| **Title of Action:** | Alfred T. Wright vs. Honeywell International, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Trademark / Copyright / Patent |
| **Court:** | Orange Superior Court , Vermont |
| **Case Number:** | 201-11-04 Oecv |
| **Jurisdiction Served:** | Vermont |
| **Date Served on CSC:** | 12/15/2004 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | D. Michael Noonan, Esq. |
| | 603-749-5000 |

**RECEIVED**

DEC 1 7 2004

**M. JOHNSON**

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

STATE OF VERMONT
Orange, ss

SUPERIOR COURT

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

Civil Action, Docket Number _201-11-04 Oecv_

Alfred T. Wright, Plaintiff
P.O. Box 166
S. Strafford, VT  05070
     County of Orange

vs.

Honeywell International, Inc.
101 Columbia Road
Morristown, NJ  07962
     County of Morris

To the above-named Defendant:

     You are hereby summoned and required to serve upon D.
Michael Noonan, Esquire, plaintiff's attorney, whose address
is P.O. Box 977, 140 Washington St., Dover, NH  03821-0977, an
answer to the complaint which is herewith served upon you,
within 20 days after service of this summons upon you,
exclusive of the day of service.  If you fail to do so,
judgment by default will be taken against you for the relief
demanded in the complaint.  Your answer must also be filed
with the court.  Unless otherwise provided in Rule 13(a), your
answer must state as a counterclaim any related claim which
you may have against the plaintiff, or you will thereafter be
barred from making such claim in any other action.  **YOUR
ANSWER MUST STATE SUCH A COUNTERCLAIM WHETHER OR NOT THE
RELIEF DEMANDED IN THE COMPLAINT IS FOR DAMAGE COVERED BY A
LIABILITY INSURANCE POLICY UNDER WHICH THE INSURER HAS THE
RIGHT OR OBLIGATION TO CONDUCT THE DEFENSE.**  If you believe
that the plaintiff is not entitled to all or part of the claim
set forth in the complaint, or if you believe that you have a

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

counterclaim against the plaintiff, you may wish to consult an
attorney.  If you feel that you cannot afford to pay an
attorney's fee, you may ask the clerk of the court for
information about places where you may seek legal assistance.

Date: 11-10-04

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH  03821-0977
(603) 749-5000

Served on ___12-15-04_____
                                    Date

_____
Deputy Sheriff

STATE OF VERMONT

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

Orange County, ss.                                                Superior Court

| | |
|---|---|
| Alfred T. Wright, on behalf of himself and all others similarly situated,<br>        Plaintiffs | )<br>)<br>)<br>) |
| v. | )<br>)<br>)<br>) |
| Honeywell International, Inc.<br>        Defendant | )<br>)<br>) |

Civil Action, Docket # _201-11-04 Oecv_
COMPLAINT & REQUEST FOR
JURY TRIAL

## COMPLAINT

Plaintiff, upon information and belief, brings this Class Action Complaint against Defendant Honeywell International, Inc. (hereinafter individually and/or collectively "Honeywell", "Company" or "Defendant"), on behalf of himself and all other similarly situated persons residing in the State of Vermont who suffered similar injury as a result of Defendants' violations of the Vermont Consumer Fraud Act, (VCFA), 9 V.S.A. s. 2451 et seq. Each Plaintiff expressly disclaims any damages in excess of $75,000 and expressly places a nominal value of under $25.00 on the actual loss per purchase that they suffered. Plaintiffs bring this claim exclusively under 9 V.S.A s. 2451 et seq. and not under either § 4 and/or 6 of the Clayton Act, 15 U.S.C. §15 and/or §26 or §1 of the Sherman Act, 15 U.S.C. §1. or any other federal statute, regulation, or law.

## JURISDICTION AND VENUE

1.      Brought pursuant to 9 V.S.A. s. 2451 et seq. this putative class action

I

seeks recoupment of economic damages and nominal damages under 9 V.S.A. s. 2451 et seq. and to enjoin Honeywell from continuing the illegal business practices described herein.

2.      The single count complaint advanced mandates that this action be heard in a Vermont state forum.

3.      Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the State of Vermont. Honeywell sold its circular thermostats to residential customers throughout the State of Vermont during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.      Named plaintiff's individual damages do not equal or exceed $75,000. Each Plaintiff expressly disclaims any damages in excess of $75,000 and expressly places a nominal value of under $25.00 on the actual loss per purchase that they suffered.

## NATURE AND BACKGROUND OF CASE

5.      Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Vermont.   Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market.  However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S.

2

Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6. Plaintiff Alfred Wright is a natural person and resident of the State of Vermont. During the class period, plaintiff and each member of the putative class indirectly purchased in the State of Vermont Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices. Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Vermont and a purchaser of a round thermostat during the class period.

7. Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the State of Vermont. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware. Honeywell has places of business at La Motte and Colchester Vermont.

8. Defendant Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across Vermont.

3

9.    Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10. For purposes of this complaint, the term Defendant shall apply to all Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the State of Vermont, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11. Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demanded that Honeywell make them known. Honeywell has failed to address this request.

12. The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's

4

businesses or affairs. They directly affected members of this Vermont consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13. The Defendants and its co-conspirators fraudulently concealed the acts and practices alleged herein. Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14. Plaintiff brings this action exclusively under 9 V.S.A. s. 2451 et seq. on behalf of himself and the following class:

All similarly situated consumer purchasers residing in the State of Vermont (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present.

15. The number of potential class members is so numerous that joinder is impracticable. Plaintiff's claims are typical of those of the class. Numerous questions of law and fact are common to the class, including, but not limited to:

a. Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 et seq. ;

b. Whether Honeywell has engaged, and/or has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 et seq.

5

   c.  Whether the pass through overcharge per purchase exceeded $25:

   d.  Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in the State of Vermont;

   e.  The existence, duration and illegality of the conduct alleged herein;

   f.  The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

   g.  The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

   h.  Whether the class is entitled to the statutory damages and other relief requested. Whether defendant engaged in monopolization;

   i.  Whether defendants acted unlawfully as prohibited by 9 V.S.A. s. 2451 et seq.;

   j.  The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

   k.  The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

   l.  The appropriate nature of class wide equitable relief.

6

16.   Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the class members. He has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. He likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.   Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendants' common course of conduct in violation of law as alleged herein.

18.   Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.   Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.   Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such individualized litigation

7

would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Vermont law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF 9 V.S.A. s. 2451 ET SEQ.

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

27.    In the 1940s, when the Company was known as the Minneapolis

8

Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Vermont.

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Vermont.  During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

### RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Vermont. Another relevant market consists of circular thermostats for residential use in the United States and Vermont.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

9

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

10

A.    **Background**

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

11

The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

**B.    The Rejected 1968 Trademark Application.**

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

12

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had

13

come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Vermont.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

## Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Vermont consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something

14

Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    The Pattern of Sham and Baseless Litigation

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

15

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

16

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

97.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

17

98.    The District Court also commented that:

The evidence before this court also shows that <u>whenever</u> Honeywell
learned that a competitor was selling or planned to sell a round
thermostat, it responded with threats of expensive litigation, and it
managed to eliminate the competing design either by settlements or by
buying the competitor outright.  (emphasis added)

E.    <u>Deception of the PTO</u>

99.    In 1986, Honeywell again attempted to register a trademark for its HRT

(the "108 Trademark Application").

100.    The PTO's examining attorney denied the 1986 application holding that

the circular shape of the HRT was functional.

101.    As described above, functional or utilitarian characteristics of a product

are virtually certain never to secure trademark protection because of the benefit they

offer to the public at large.

102.    Honeywell appealed the denial of its application to the TTAB, and

submitted materially false and misleading information to the TTAB concerning the

functionality of the HRT.

103.    Relying on the false and misleading information supplied to it by

Honeywell, the TTAB approved the 108 Trademark Application and registered the

trademark for the HRT in 1988 (the "108 Trademark").

104.    Honeywell's 108 Trademark Application was severely hampered by the

Company's previous receipt of the HRT Utility Patent, which emphasized the <u>utility</u> of

the HRT's circular design.

18

105.   When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

106.   According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

107.   The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

108.   Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

109.   The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

110.   Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

111.   Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

19

112. As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

113. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

114. The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

115. However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

116. Honeywell did not describe the Quad Six Thermostat in the application.

117. The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

118. Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

119. The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

20

120.    The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

121.    Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

122.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

123.    Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

124.    The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

125.    Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

126.    Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

127.    If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

21

128.   A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

129.   However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

130.   As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

131.   The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

132.   The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

133.   As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

22

*Despite the apparent availability of the rounded
thermostat cover since that time [1976], an availability
that provided more than the usual degree of certainty
that the design did not enjoy either patent or
trademark protection, the Examining Attorney has
been unable to provide evidence of the use of a
rounded circular cover configuration by any party
other than applicant and its related companies.* On
the contrary, applicant has provided extensive
evidence of its competitors' various thermostat
designs, and in none of the various catalogues and
other literature are there any thermostats having a
circular cover. *The mere fact that the number of
alternative designs is limited is not a per se bar to the
registration of a particular configuration, but must be
viewed in the context of the entire record presented.*

134.   The TTAB granted the 108 Trademark Application in 1988.

F.   **The ECO Thermostat.**

135.   Eco Manufacturing LLC ("ECO") is a company developing a new
thermostat that does not utilize mercury to determine room temperature (the "ECO
Thermostat").

136.   The ECO Thermostat is circular and would compete with the HRT in the
relevant market.

137.   ECO introduced the ECO Thermostat at a trade show in January 2003.
ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs
competition for the HRTs.

138.   In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as
saying, "Right now, if you want to get a circular thermostat, you are going to get the
technology that was on your grandfather's wall, and you are going to have to pay a
premium price to get it.  That's simply not right."  Daniels expects to sell ECO

23

Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

139.   After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

140.   ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

141.   The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

142.   Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

143.   Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

144.   Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

145.   The two parties conducted expedited discovery and presented evidence.

146.   The District Court denied Honeywell's motion for preliminary injunction and held that:  1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a

24

long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

147.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

148.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

149.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

150.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

25

151.   As a result of the findings of the federal courts; the matter of Honeywell's trademark rights, if any, have been determined such that Plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

152.   As described above, defendant Honeywell engaged in illegal, unfair and deceptive practices to suppress the competition in the relevant market in violation of 9 V.S.A. s. 2451 et seq.

153.   Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

154.   Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape.  The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of 9 V.S.A. s. 2451 et seq.

155.   During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading.  The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

156.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Vermont.    The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of 9 V.S.A. s. 2451 et seq.

157.    Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of 9 V.S.A. s. 2451 et seq. .

158.    Honeywell maintained its unlawful monopoly in violation of 9 V.S.A. s. 2451. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT. ·

159.    The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of 9 V.S.A. s. 2451 et seq.

27

160.    Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of 9 V.S.A. s. 2451 et seq.

161.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of 9 V.S.A. s. 2451 et seq.

162.    Defendant and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

163.    Independent of monopolization or the aforesaid trust, Defendant further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

164.    Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

165.    The deception of the Plaintiff and other HRT consumers was in violation of 9 V.S.A. s. 2451 et seq.

166.    In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and unreasonably

28

restrain trade with regard to the sale of round thermostats in the State of Vermont in violation of common law and 9 V.S.A. s. 2451 et seq.

167. Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

168. Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of 9 V.S.A. s. 2451 et seq.

169. By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of 9 V.S.A. s. 2451 et seq.

170. Vermont indirect consumer purchasers of round thermostats have suffered

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

171.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of 9 V.S.A. s. 2451 et seq.

172.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

173.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the State of Vermont and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

174.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

175.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably

30

necessary to further any legitimate pro competitive purpose and impair competition in

an unnecessarily restrictive way. They are simply unfair methods of competition and

unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER 9 V.S.A. S. 2451 ET SEQ.

176. Defendant's unfair methods of competition and unfair and deceptive acts

and practices described herein have caused significant harm to the Vermont consumer

class members by violating and invading legally protected rights and interests,

increasing the price they had to pay for Defendant's round thermostats above

competitive levels, denying them a free choice in a competitive market, and limiting the

product choice available to consumer class members in the State of Vermont.

177.   Defendant's acts and practices as referred to herein reduced or eliminated

consumer choice among competing round thermostats, foreclosed access to better

designed round thermostats manufacturers to compete, increased barriers to entry into

the relevant round thermostats market, imposed a barrier to competitors attempts to

introduce innovation and resulted in loss of competition.

178.   As a result of the numerous unfair methods of competition and unfair and

deceptive acts and practices it has imposed on others, including, but not limited to,

those described herein, Defendant has also succeeded in raising and reinforcing

barriers to market entry so as to forestall the development of actual competition in the

relevant markets. The resultant monopoly power has enabled Defendant to price its

round thermostats virtually without regard to the prices of competing products.

Distributors and retailers of Defendant's round thermostats have passed these

monopoly prices onto consumers, including particularly to the class members.

31

179. Defendant's control of the round thermostat market in Vermont and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

180.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State of Vermont. This conduct violated 9 V.S.A. s. 2451 et seq.

## COUNT I

### VIOLATIONS OF 9 V.S.A. S. 2451 ET SEQ.

181. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 180 above.

182.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round

32

thermostats, all in violation of 9 V.S.A. s. 2451 et seq.

183. As a direct and proximate result of Defendant's violations of 9 V.S.A. s. 2451 et seq. members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

184. Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of 9 V.S.A. s. 2451 et seq.

185. Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Vermont. Each consumer class member suffered actual harm in an amount determinable per purchase.

## RELIEF REQUESTED

186. As a result of defendant's unfair and deceptive conduct, individual Vermont consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are

33

J.    Grant other appropriate equitable relief, including but not limited to

disgorgement of profits obtained.

Respectfully submitted,

Alfred T. Wright, on behalf of himself and
All others similarly situated,
By their Attorneys,

*D. Michael Noonan*

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH 03821-0977
(603) 749-5000

36

STATE OF VERMONT

Orange County, ss.                                                          Superior Court

Alfred T. Wright, on behalf of          )
himself and all others similarly         )
situated,                                        )
          Plaintiffs                            )
                                                   )
v.                                                 )     Civil Action, Docket # 201-11-04 Oecv
                                                   )     FIRST AMENDED COMPLAINT &
Honeywell International, Inc.            )     REQUEST FOR JURY TRIAL
          Defendant                          )

## FIRST AMENDED COMPLAINT

Plaintiff, upon information and belief, brings this Class Action Complaint against
Defendant Honeywell International, Inc. (hereinafter individually and/or collectively
"Honeywell", "Company" or "Defendant"), on behalf of himself and all other similarly
situated persons residing in the State of Vermont who suffered similar injury as a result of
Defendants' violations of the Vermont Consumer Fraud Act, (VCFA), 9 V.S.A. s. 2451 et
seq. Each Plaintiff expressly disclaims any damages in excess of $75,000. Plaintiffs bring
this claim exclusively under 9 V.S.A s. 2451 et seq. and not under either § 4 and/or 6 of the
Clayton Act, 15 U.S.C. §15 and/or §26 or §1 of the Sherman Act, 15 U.S.C. §1. or any
other federal statute, regulation, or law.

## JURISDICTION AND VENUE

1.       Brought pursuant to 9 V.S.A. s. 2451 et seq. this putative class action
seeks recoupment of damages under 9 V.S.A. s. 2451 et seq. and to enjoin Honeywell from
continuing the illegal and deceptive business practices described herein.

2.       The single count complaint advanced mandates that this action be heard

1

in a Vermont state forum.

3.    Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the State of Vermont. Honeywell sold its circular thermostats to residential customers throughout the State of Vermont during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.    Named plaintiff's individual damages do not equal or exceed $75,000. Each Plaintiff expressly disclaims any damages in excess of $75,000.

## NATURE AND BACKGROUND OF CASE

5.    Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Vermont.  Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO.  Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.  Plaintiff Alfred Wright is a natural person and resident of the State of

2

Vermont.  During the class period, plaintiff and each member of the putative class indirectly purchased in the State of Vermont Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices.  Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests.

7.  Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the State of Vermont. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware.  Honeywell has places of business at La Motte and Colchester, Vermont.

8.     Defendant Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across Vermont.

9.     Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats.  Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

<u>CO-CONSPIRATORS</u>

10.  For purposes of this complaint, the term Defendant shall apply to all

3

Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the State of Vermont, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11. Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demanded that Honeywell make them known. Honeywell has failed to address this request.

12. The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's businesses or affairs. They directly affected members of this Vermont consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13. The Defendants and its co-conspirators fraudulently concealed the acts

4

and practices alleged herein. Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action exclusively under 9 V.S.A. s. 2451 et seq. on behalf of himself and the following class:

> All similarly situated consumer purchasers residing in the State of Vermont (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present.

15.    The number of potential class members is so numerous that joinder is impracticable. Plaintiff's claims are typical of those of the class. Numerous questions of law and fact are common to the class, including, but not limited to:

    a.  Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 et seq. ;

    b.  Whether Honeywell has engaged, and/or has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 et seq.

    c.  Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in the State of Vermont;

    d.  The existence, duration and illegality of the conduct alleged herein;

5

e.  The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

f.  The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

g.  Whether the class is entitled to the statutory damages and other relief requested.

h.  Whether defendant engaged in monopolization;

i.  Whether defendants acted unlawfully as prohibited by 9 V.S.A. s. 2451 <u>et</u> <u>seq.</u>;

j.  The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

k.  The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

l.  The appropriate nature of class wide equitable relief.

16.  Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of Plaintiff are coincident with, and not antagonistic to, those of the class members. He has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. He likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

6

17.     Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendants' common course of conduct in violation of law as alleged herein.

18.     Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.     Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.     Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.     Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the

7

Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Vermont law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF 9 V.S.A. s. 2451 ET SEQ.

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Vermont.

8

30.     Honeywell has acquired and maintained a monopoly over circular thermostats in Vermont.   During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.     Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Vermont. Another relevant market consists of circular thermostats for residential use in the United States and Vermont.

32.     Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.     Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.     Electromechanical thermostats are not electronic and are not programmable.

35.     Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.     According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.     According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.     On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.     The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

9

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United States and Vermont.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

### A.    Background

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

10

49.   Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.   Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.   In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.   The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.   The HRT Utility Patent expired in 1963.

54.   According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.   Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.   The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."   The HRT Utility Patent expired in 1963.

55.   In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.   The HRT Design Patent expired in 1970.

**B.    The Rejected 1968 Trademark Application.**

57.   In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

11

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

12

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Vermont.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

13

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Vermont consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

14

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    **The Pattern of Sham and Baseless Litigation**

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

15

88.    Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

16

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

100.    The District Court also commented that:

The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (emphasis added)

E.    Deception of the PTO

101.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application").

102.    The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional.

103.    As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

104.    Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT.

105.    Relying on the false and misleading information supplied to it by

17

Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

106. Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.

107.    When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.    According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.    The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

110.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111. The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

18

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

114.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116.    The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117.    However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118.    Honeywell did not describe the Quad Six Thermostat in the application.

119.    The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

120.    Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121.    The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

19

122.   The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123.   Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124.   The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125.   Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126.   The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

127.   Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

128.   Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.   If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

20

130.    A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131.    However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132.    As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134.    The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

135.    As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.    Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

21

*Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that provided* more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

**F.    The ECO Thermostat.**

137.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

138.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.    In May 2003, Daniels was quoted in the Indianapolis Business Journal as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats

22

for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.    The federal court action was captioned, <u>Eco Manufacturing LLC, v. Honeywell International, Inc.</u>, Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

145.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.    The two parties conducted expedited discovery and presented evidence.

148.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility

23

patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

151.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

24

153.   As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that Plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.   As described above, defendant Honeywell engaged in illegal, unfair and deceptive practices to suppress the competition in the relevant market in violation of 9 V.S.A. s. 2451 et seq.

155.   Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

156.   Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of 9 V.S.A. s. 2451 et seq.   157.   During   the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers

25

would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

158.   The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Vermont. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of 9 V.S.A. s. 2451 et seq.

159.   Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of 9 V.S.A. s. 2451 et seq.

160.   Honeywell maintained its unlawful monopoly in violation of 9 V.S.A. s. 2451. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

161.   The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of 9 V.S.A. s. 2451 et seq.

26

162.    Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of 9 V.S.A. s. 2451 et seq.

163.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of 9 V.S.A. s. 2451 et seq.

164.    Defendant and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165.    Independent of monopolization or the aforesaid trust, Defendant further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166.    Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167.    The deception of the Plaintiff and other HRT consumers was in violation of 9 V.S.A. s. 2451 et seq.

168.    In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and

27

unreasonably restrain trade with regard to the sale of round thermostats in the State of Vermont in violation of common law and 9 V.S.A. s. 2451 et seq.

169. Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170. Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of 9 V.S.A. s. 2451 et seq.

171. By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of 9 V.S.A. s. 2451 et seq.

172. Vermont indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive

28

agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of 9 V.S.A. s. 2451 et seq.

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the State of Vermont and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

177.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any

29

legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way. They are simply unfair methods of competition and unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER 9 V.S.A. S. 2451 ET SEQ.

178. Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Vermont consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Vermont.

179.  Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180.  As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

30

181. Defendant's control of the round thermostat market in Vermont and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

182. Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State of Vermont. This conduct violated 9 V.S.A. s. 2451 et seq.

COUNT I

VIOLATIONS OF 9 V.S.A. S. 2451 ET SEQ.

183. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 182 above.

184. Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of

31

9 V.S.A. s. 2451 et seq.

185. As a direct and proximate result of Defendant's violations of 9 V.S.A. s. 2451 et seq. members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186. Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of 9 V.S.A. s. 2451 et seq.

187. Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Vermont. Each consumer class member suffered actual harm in an amount determinable per purchase.

## RELIEF REQUESTED

188. As a result of defendant's unfair and deceptive conduct, individual Vermont consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are therefore entitled to actual damages, interest, attorney fees and costs. Because their conduct was

32

willful and knowing and they failed to reasonably settle the class is entitled to damages

WHEREFORE, the putative plaintiff class, through its representatives, prays that this Court:

A. Preliminarily find that pursuant to Vermont Rule of Civil Procedure 23 and 9 VSA 2451 et seq., the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such action to the unnamed petitioners in the most effective practicable manner;

B.     Pursuant to Vermont Rule of Civil Procedure 23 and 9 VSA 2451, et seq., enter a final finding that the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such finding to all members of the class of petitioners in accordance with the law;

C.     Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing

33

competition in manufacturing, making, transportation, sale or purchase of round thermostats.

D.      Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of 9 V.S.A. s. 2451 et seq. ;

E.      Award plaintiffs and members of the class their damages provided under 9 V.S.A. s. 2461 et seq. in an amount deemed fair, reasonable and just under the law.

F.      Find that Defendants violated 9 V.S.A. s. 2451 et seq. because the use and employment of the unfair and deceptive act or practice alleged was a willful, wanton or malicious violation and treble any award;

G.      Allow the class to recover its reasonable attorneys' fees and costs as authorized by 9 V.S.A. s. 2461;

H.      Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

I.      Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under 9 V.S.A. s. 2461 et seq. or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future and;

J.      Grant other appropriate equitable relief, including but not limited to disgorgement of profits obtained.

34

Respectfully submitted,

Alfred T. Wright, on behalf of himself and
All others similarly situated,
By their Attorneys,

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH 03821-0977
(603) 749-5000

35



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

/ ALL
Transmittal Number: 3822065
Date Processed: 01/04/2005

Primary Contact:     Meg  Johnson-Law Dept- AB-2
                     Honeywell International Inc.
                     101 Columbia Rd.
                     Morristown, NJ 07962

| | |
|---|---|
| Entity: | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| Entity Served: | Honeywell International, Inc. |
| Title of Action: | R. Sadler Bailey vs. Honeywell International, Inc. |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Other |
| Court: | Circuit Court for Thirtieth Judicial District at Memphis , Tennessee |
| Case Number: | CT-007218-04 |
| Jurisdiction Served: | Tennessee |
| Date Served on CSC: | 01/04/2005 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Plaintiff's Attorney : | R. Christopher Gilreath |
| | NA |
| Customer Message: | Summons lists Circuit Court for theTwentieth Judicial District at Memphis. Class Action Complaint lists Circuit Court for the Thirtieth Judicial District at Memphis, Shelby County. |

RECEIVED

JAN 6 - 2005

M. JOHNSON

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

# CIRCUIT COURT OF TENNESSEE
## 140 Adams Ave., Memphis Tennessee 38103
## FOR THE TWENTIETH JUDICIAL DISTRICT AT MEMPHIS
## SUMMONS IN CIVIL ACTION

NO. CT-002218-04 AD DAMNUM    $_____    AUTO ____ OTHER____

R. Sadler Bailey
_____
_____

**PLAINTIFF**

Home Address
6256 Poplar Ave., Memphis, TN 38119
Business Address

vs.

Honeywell International, Inc.
a Delaware Corporation
_____

**DEFENDANT**

Home Address
Corporation Service Co., 2908 Poston Ave., Nashville, TN 37203
Business Address

TO THE DEFENDANT(S): _Honeywell International, Inc. through its registered agent for service of process, Corporation Service Co., 2908 Poston Ave., Nashville, TN 37203_

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on R. Christopher Gilreath Plaintiff's attorney, whose address is 6256 Poplar Avenue, Memphis, Tennessee 38119, telephone (901) 680-9777 within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service.

If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk
~~KENNY ARMSTRONG, Clerk & Master~~

TESTED AND ISSUED _Dec. 22, 2004_    By _____, D.C.

## TO THE DEFENDANT(S):

NOTICE: Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you m ay wish to seek the counsel of a lawyer.

## COST BOND

I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs not to exceed $500.00 in this court which may at any time be adjudged against the plaintiff in the event said plaintiff shall not pay the same.

Witness My Hand this _21st_ day of _December_ , 20 _04_    _R. Christoph Gilreath_
Certification when applicable    Surety

I, JIMMY MOORE, Clerk & Master
of the Circuit Court, Shelby County,
Tennessee, certify this to be a true and
accurate copy as filed this _____
JIMMY MOORE, Clerk & Master

By: _____, D.C.

I, KENNY ARMSTRONG, Clerk of the Chancery
Court, Shelby County, Tennessee, certify
this to be a true and accurate copy as filed
this _____
KENNY ARMSTRONG, Clerk & Master

By: _____, D.C.

IN THE CIRCUIT COURT OF TENNESSEE FOR THE THIRTIETH JUDICIAL
DISTRICT AT MEMPHIS, SHELBY COUNTY

R. SADLER BAILEY, Individually
and on behalf of all others
similarly situated,

        Plaintiffs,

       **JURY DEMANDED**

v.

       No. _C7-007215-04_

HONEYWELL INTERNATIONAL, INC.,

        Defendants.

---

## CLASS ACTION COMPLAINT

---

    Plaintiff R. Sadler Bailey brings this Class Action Complaint against Defendants

Honeywell International, Inc. (hereinafter individually and/or collectively "Honeywell",

"Company" or "Defendant"), on behalf of himself and all other similarly situated persons

residing in the State of Tennessee who suffered similar injury as a result of the

Defendant's use or employment of an unfair or deceptive act or practice violative of

either the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.* or the

Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 *et seq.* by engaging

in a continuing combination and conspiracy in an unreasonable restraint of trade or

commerce in the Tennessee thermostat market. Plaintiff brings this claim exclusively

pursuant to Tennessee law, and not under sections 4 or 6 of the Clayton Act (15 U.S.C.

§§15, 26), or section 1 of the Sherman Act (15 U.S.C. §1) or any other federal statute,

regulation, or law.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 *et seq.* and the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*  This putative class action seeks to recoup economic damages, mandatory minimum statutory compensation for violations of these Tennessee statutes and to enjoin Honeywell from continuing the illegal business practices described herein.

2.      Plaintiffs claims also arise from Tennessee common law for restitution, disgorgement, money had and received, and other remedial and equitable remedies as a result of Defendant's unlawful, unfair or fraudulent practices prohibited by or contrary to Tennessee law.  Plaintiffs' state law causes of action are not federally preempted.

3.      Defendant's actions and conduct mentioned herein occurred within the State of Tennessee and affected commerce therein.

4.      This complaint is not based on federal law and does not arise under, or relate to federal law, and Plaintiffs' right to relief does not depend on any resolution of any substantial questions of federal law.  Each Plaintiff's individual damages do not equal or exceed $75,000.

## NATURE AND BACKGROUND OF CASE

5.      Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Tennessee.  Honeywell

2

misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.    Plaintiff R. Sadler Bailey is a natural persons and resident of the State of Tennessee. During the class period, plaintiffs and each member of the putative class indirectly purchased in the State of Tennessee Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices. Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Massachusetts and a purchaser of a round thermostat during the class period.

7.    Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the Commonwealth of

3

Massachusetts. Honeywell's headquarters are located in Morristown, New Jersey and the

Company is incorporated in the State of Delaware. Honeywell has as it's principal place

of business and may be served through it's agent for service of process at Corporation

Service Company, 2908 Poston Avenue, Nashville, TN 37203.

8.    Defendant Honeywell is the largest seller of thermostats in the United

States. Its circular thermostats are sold and used in residences across Tennessee.

9.    Defendant Honeywell operates exclusively through its wholly owned

subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the

acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of

Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10.    For purposes of this complaint, the term Defendant shall apply to all

Defendants and their agents, servants, officers, parent companies, partners, subsidiaries,

alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive

acts referenced herein. Each transacted business in the State of Tennessee, benefitted

from our laws, and or caused loss or damage though its acts or omissions. Each conducts

business here on a regular basis and derives substantial revenues from services rendered

or goods used or consumed.

11.    Various other persons and entities may have participated as co-

conspirators with Honeywell and may have performed acts and made statements in

furtherance of the combinations in restraint of trade, unfair methods of competition, and

4

unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity.

12.    The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's businesses or affairs. They directly affected members of this Tennessee consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13.    The Defendants and its co-conspirators fraudulently concealed the acts and practices alleged herein. Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action pursuant to the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*, the Tennessee Consumer Protection Act, Tenn.

5

Code Ann. §§ 47-18-101 *et seq.*, Tennessee common law, and Rule 23 of the Tennessee Rules of Civil Procedure on behalf of himself and the following proposed class:

> All similarly situated consumer purchasers residing in the State of Tennessee (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present.

15.    The number of potential class members is so numerous and geographically dispersed that joinder is impracticable. The exact number of proposed class members is unknown to Plaintiff at the present time.

16.    Plaintiff's claims are typical of those of the class. Plaintiff and all other proposed class members purchased the same product from Defendant and sustained damages in the same way arising out of Defendants' uniform course of wrongful conduct, *i.e.* they have paid and continue to pay an artificial premium for Defendants' round thermostat resulting from Defendants' illegally perpetuated monopoly, unfair and deceptive conduct in the manipulation of the thermostat market.

17.    Numerous questions of law and fact are common to the class, including, but not limited to:

a)    Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates Tenn. Code Ann. § 47-25-101;

b)    Whether Honeywell has engaged, and/or has combined with others to engage, in conduct that violates Tenn. Code Ann. § 47-25-102;

6

    c)      Whether Honeywell has engaged in conduct that violates Tenn. Code Ann. § 47-18-104;

    d)      Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in Tennessee;

    e)      The existence, duration and illegality of the conduct alleged herein;

    f)      The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

    g)      The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein;

    h)      Whether the class is entitled to the statutory damages and other relief requested;

    i)      The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

    j)      The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

    k)      The appropriate nature of class wide equitable relief.

    16.      Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of plaintiff are coincident with, and not

antagonistic to, those of the class members. Plaintiff has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. They likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.    Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such

individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.     Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Tennessee law.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

24.     More than 1.5 million HRTS are sold annually in the United States.

25.     The HRTs are sold to hundreds of thousands of consumers.

26.     Honeywell manufactures thermostats, among other products.

9

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Massachusetts

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Massachusetts. During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

31.    Honeywell controls two relevant markets. One relevant market consists of electro mechanical thermostats for residential use in the United States and Tennessee. Another relevant market consists of circular thermostats for residential use in the United States and Tennessee.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electro mechanical thermostats are not electronic and are not programmable.

10

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electro mechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Tennessee.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Tennessee.

11

42.    The HRT is the biggest selling thermostat in the United States.  Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electro mechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

A.    **Background**

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

12

50. Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51. In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53. The HRT Utility Patent expired in 1963.

54. According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

55. In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56. The HRT Design Patent expired in 1970.

13

**B.**    __The Rejected 1968 Trademark Application.__

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

14

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Tennessee.

15

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat"). Hunter is a corporation with its principal headquarters in Shelby County, Tennessee.

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Tennessee consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be

16

false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

## D.    The Pattern of Sham and Baseless Litigation

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

18

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of

19

litigation as "aggressive lawyering" which reflected, "the intimidating power of
Honeywell in the market."

100.    The District Court also commented that:

> The evidence before this court also shows that <u>whenever</u>
> Honeywell learned that a competitor was selling or planned
> to sell a round thermostat, it responded with threats of
> expensive litigation, and it managed to eliminate the
> competing design either by settlements or by buying the
> competitor outright.  (emphasis added)

## E.    Deception of the PTO

101.    In 1986, Honeywell again attempted to register a trademark for its HRT
(the "108 Trademark Application").

102.    The PTO's examining attorney denied the 1986 application holding that
the circular shape of the HRT was functional.

103.    As described above, functional or utilitarian characteristics of a product
are virtually certain never to secure trademark protection because of the benefit they offer
to the public at large.

104.    Honeywell appealed the denial of its application to the TTAB, and
submitted materially false and misleading information to the TTAB concerning the
functionality of the HRT.

105.    Relying on the false and misleading information supplied to it by
Honeywell, the TTAB approved the 108 Trademark Application and registered the
trademark for the HRT in 1988 (the "108 Trademark").

20

106.    Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.

107.    When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.    According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.    The fact that competitors have not used this design and have not been hampered in their competition with Honeywell is convincing proof of the non-functionality of Honeywell's thermostat design."

110.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111.    The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

21

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

114.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116.    The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117.    However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118.    Honeywell did not describe the Quad Six Thermostat in the application.

119.    The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

22

120.    Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121.    The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

122.    The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123.    Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125.    Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126.    The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

23

127.    Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

128.    Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.    If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

130.    A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131.    However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132.    As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134.    The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

24

135.    As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.  Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

>> *Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that provided* more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

## F.    The ECO Thermostat.

137.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

25

138.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.    In May 2003, Daniels was quoted in the Indianapolis Business Journal as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.    The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

26

145.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.    The two parties conducted expedited discovery and presented evidence.

148.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

27

151.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.    Honeywell appealed the District Court's holding.  The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

153.    As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.    As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

155.    Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

28

156.     Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

157.     During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

158.     The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Massachusetts. The PTO relied on Honeywell's deceitful statements when granting

29

approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

159.  . Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

160.  Honeywell maintained its unlawful monopoly in violation of Tenn. Code Ann. § 47-25-101 and Tenn. Code Ann. § 47-25-102. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

161.  The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. §47-25-102, and Tenn. Code Ann. § 47-18-104.

162.  .Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

30

163. Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

164. Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165. Independent of monopolization or the aforesaid trust, defendants further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166. Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167. The deception of the plaintiff and other HRT consumers was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

168. In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress

31

competition, and unreasonably restrain trade with regard to the sale of round thermostats in the State of Tennessee in violation of common law and Tenn. Code Ann. § 47-25-101 and § 47-25-102.

169.    Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170.    Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

171.    By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

32

172.    Tennessee indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to Government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of Tenn. Code Ann. § 47-25-101, § 47-25-102, and § 47-18-104.

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the state of Tennessee and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

33

177.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way.  They are simply unfair methods of competition and unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER THE TENNESSEE CONSUMER PROTECTION ACT

178.    Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Tennessee consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Tennessee.

179.    Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180.    As a result of the numerous unfair methods of competition and willful, unfair and deceptive acts and practices it has imposed on others, including, but not

34

limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

181.    Defendant's control of the round thermostat market in Tennessee and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits. Defendant's conduct as described herein has been willful and knowing.

182.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in Tennessee. This conduct violated Tenn. Code Ann. § 47-18-104.

## VIOLATIONS OF THE TENNESSEE TRADE PRACTICES ACT

183.    Plaintiff incorporates herein by reference the allegations contained in the foregoing paragraphs, above.

35

184.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the state of Tennessee; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

185.    As a direct and proximate result of Defendant's violations of Tenn. Code Ann. §§ 47-25-101 and 102, members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186.    Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq..

187.    Those upon whom Defendant has imposed these restrictive arrangements

36

and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Tennessee. Each consumer class member suffered actual harm in an amount determinable per can purchased.

## RELIEF REQUESTED

188.    As a result of defendant's unfair and deceptive conduct, individual Tennessee consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are therefore entitled to actual damages, interest, attorney fees and costs.

WHEREFORE, the putative plaintiff class, through its representatives, prays that this Court:

A.    This court certify the Plaintiff Class;

B.    Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing

37

competition in manufacturing, making, transportation, sale or purchase of round thermostats.

C.     Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104.

D.     Award plaintiffs and members of the class their actual damages or in the alternative the statutory damages in an amount deemed fair, reasonable and just under the law.

E.     Find that Defendants violated the Tennessee Consumer Protection Act because of the willful or knowing use and employment of unfair and deceptive acts or practices and award treble damages, attorneys' fees, and costs, pursuant to Tenn. Code Ann. § 47-18-109;

F.     Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

G.     Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under Tenn. Code Ann. § 47-18-108, or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future; and

38

H.    Grant other appropriate equitable relief, including but not limited to disgorgement of profits obtained, for money had and received, or any other general relief deemed proper by the Court.


R. CHRISTOPHER GILREATH (18667)
SIDNEY W. GILREATH (2000)
Gilreath & Associates
6256 Poplar Avenue
Memphis, TN 38119


Robert J Bonsignore BBO 547880
Robin Brewer BBO # 639506
Bonsignore and Brewer
23 Forest Street
Medford, Mass. 02155
(781) 391-9496

Jill S. Abrams, Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

THE MOGIN LAW FIRM, P.C.
Daniel J. Mogin
110 Juniper Street
San Diego, CA 92101-1502
Telephone: (619) 687-6611

*Attorneys for Plaintiffs*

39

## SHAHEEN & GORDON
### PROFESSIONAL ASSOCIATION

RECEIVED
DEC 0 1 2004
M. JOHNSON

November 18, 2004

**ATTORNEYS AT LAW**

William H. Shaheen †

Steven M. Gordon

Eugene A. DiMariano Jr. ††

D. Michael Noonan ᵥ

Arpiar G. Saunders Jr. **

Lucy J. Karl †††

Paul W. Hodes **

Sean T. O'Connell *

Sanford Roberts *

Karyn P. Forbes *

William E. Christie **

Christine M. Craig ***

Vera B. Buck

Nancy L. Ball

Laurie B. Rilee * ††

Timothy M. Harrington ***

James D. Rosenberg **

*Of Counsel*
Richard Sigel

 * also admitted in Maine
 ** also admitted in Massachusetts
 *** also admitted in Maine & Massachusetts
 ᵥ also admitted in Maine, Massachusetts
    and Vermont

 † also admitted in Mississippi
 †† also admitted in California
 ††† also admitted in Illinois

**VIA CERTIFIED MAIL RETURN/RECEIPT REQUESTED NO.** _____

Honeywell International, Inc.
World Headquarters
101 Columbia Road
Morristown, NJ 07962
Phone: (973) 455-2000
Fax: (973) 455-4807

Re:  Maine Indirect Purchaser Pre- Consumer Class Action Demand
     Pursuant to 5 M.R.S.A. § 213- Honeywell Round Thermostats

Dear Sir or Madam:

This office represents putative class representative John McKinnon and other similarly situated Maine consumer purchasers of Honeywell round thermostats in their claim for damages and/or injunctive relief against you. This Maine consumer class advances its claims exclusively under 5 M.R.S.A. § 205 *et seq.* Demand is made for a reasonable offer of settlement.

During the class period, Honeywell International, Inc. (and others known at this time only to Honeywell) willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices (inclusively referred to hereinafter as "wrongful", "unlawful", and/or "unfair") including but not limited to those referenced or related to those referenced in this demand. In sum, the purpose and effect of your unlawful conduct was to artificially maintain supra competitive prices for the Honeywell round thermostat and to wrongfully maintain an unlawful monopoly.

The putative class representative and each similarly situated Maine consumer was similarly harmed when they purchased Honeywell International, Inc. ("Honeywell") circular thermostats, known as "rounds (hereinafter "HRT" or "rounds" or "Honeywell round") at an unlawfully created and/or maintained supra competitive price during the years 1985 through this date (hereinafter the "class period").

**PLEASE REPLY TO:**

P.O. Box 977
140 Washington Street,
Second Floor
Dover, NH 03821-0977
(603) 749-5000

Toll Free Number:

1-800-451-1002

Fax:

(603) 749-1838

Web Address:
www.shaheenandgordon.com

Concord, NH
(603) 225-7262

Additional Offices located in:
Portsmouth, NH
(603) 431-0992

York, ME
(207) 351-1122

November 19, 2004
Page 2

Page Two
November 19, 2004

This correspondence is tendered as a demand for class wide relief. The putative plaintiffs bring this action on behalf of themselves and all other similarly situated Maine consumers. Each class member suffered under $75,000 in damages. Each class member demands his or her actual damages per Honeywell "round" thermostat purchased. Based on the information we have been able to review to date and in the spirit of compromise, we demand $6.00 to $8.00 per "Honeywell round" thermostat purchased in the State of Maine during the class period plus the cost of notice and claims processing.

While we have made a demand for relief on behalf of the putative class representatives and each member of the putative class for their actual damages, we recognize that the exact amount of the overcharge remains in your exclusive possession and control. The information that would allow us to determine for ourselves the exactly to the penny the amount of the overcharge resulting from your unfair methods of competition and/or unfair and/or deceptive acts and/or practices, remains in your exclusive possession and control. This demand for a reasonable offer of settlement is based on what we know at this time.

If you believe our assessment of the overcharge is incorrect or otherwise decline to tender a responsive offer, we request that you provide accompanying factual data supporting your offer of settlement or refusal to make any offer. This may include but not be limited to sales, profit margin and product pricing information. We expressly assure you we will agree to a reasonable request for confidentiality and hereby extend our written offer to maintain the confidentiality of any such supporting documentation that you provide.

Should you not accept our offer of settlement within 30 days, or in the alternative fail to tender a reasonable offer, we expressly advise you in advance that we will effectively revoke this offer of settlement and confidentiality and immediately file suit.

This correspondence should be considered a formal demand made pursuant to 5 M.R.S.A. § 213. The information we have been able to obtain so far supports the claim of the putative plaintiff class that each member wrongly had their choices limited, suffered injury and was forced to pay supra-competitive prices

November 19, 2004
Page 3

Page Three
November 19, 2004

You are and were at all times relevant to our complaints, an organization and/or combination with dominance in the market, which used its power to control prices to the public harm. Your combination made use of acts and practices that were so extensive and unified with respect to a commodity that their purpose and tendency was to control marketing, control the available supply at the point of sale, restrain trade, suppress competition and unfairly and deceptively acquire and/or sustain dominance in the marketplace and to secure power to regulate supply, to fix prices and/or to control prices to the detriment of the consuming public, causing them actual harm.

Your unlawful, unfair and deceptive acts and practices had the purpose, tendency, and effect of restraining or monopolizing trade or business. Upon information and belief, your unfair methods of competition and unfair and/or deceptive acts or practices have included communications and meetings in which you agreed to eliminate competition by, among other things, maintaining a monopoly in and allocating markets for round thermostats.

If Honeywell continues or in the future engages in such unfair methods of competition and unfair and deceptive acts and practices and/or combinations to restrain competition in the relevant market so as to perpetuate a monopoly, the harm caused to members of this putative class will, at once, be grave and irreparable. The complained of exclusionary restrictions were and are not reasonably necessary to further any legitimate pro-competitive purpose and impair competition in an unnecessarily restrictive way. We are therefore demanding that you agree to never again engage in the unlawful, unfair, or deceptive conduct complained of herein. Your failure to respond with a reasonable offer of settlement in this regard will require us to seek related injunctive and or other equitable relief.

You have reason to know that the conduct we complain of was violative of Chapter 10 and 10 M.R.S.A 1211 *et seq.* There is little doubt that you will be found to have acted willfully and/or knowingly in violation of Chapter 10. A refusal to tender a reasonable offer of settlement to a class of persons who suffered monetary losses and other damages as a result of conduct that you have reason to know violated Chapter 10 will support a claim for damages, attorney's fees, costs and interest. Should you not tender a reasonable offer, we will seek damages, attorney fees and costs *See* 5 M.R.S.A. s. 213.

November 19, 2004
Page 4


Page Four
November 19, 2004

## DEFINITION OF THE CLASS

The putative Plaintiffs bring this action under Chapter 10 and Maine Rule of Civil Procedure 23 on behalf of themselves and the following class:

> All resident consumer purchasers in the State of Maine (excluding governmental entities, defendants, and subsidiaries and affiliates of defendants) who indirectly purchased from the Defendants, for their own use and not for resale, Honeywell International, Inc. (Honeywell) circular thermostats known as rounds between January 1, 1985 and the present. Each similarly situated consumer was overcharged or otherwise suffered similar injury as a result of your unfair methods of competition and unfair and deceptive acts and practices.

## PARTIES

The putative class representatives and members of the putative class indirectly purchased Honeywell circular thermostats ("rounds") manufactured and sold by Honeywell during the relevant time period. The "rounds" they purchased in the State of Maine were sold at prices that were artificially inflated as a direct and proximate result of your unfair methods of competition and unfair and deceptive acts and practices. They were also wrongfully denied the benefits of a free and open competitive marketplace.

Defendant Honeywell International, Inc. is a multinational diversified technology and manufacturing company involved in aerospace, control, sensing and security technologies for buildings, homes and industry, automotive products, specialty chemicals, fibers, and electronic and advanced materials including thermostats which are organized into four main reporting segments: Aerospace, Automation and control Solutions, Specialty Materials and Transportation Systems. Honeywell maintains at least one office in the State of Maine and is the largest seller of thermostats in the United States and sells approximately 1.5 million HRT in the State annually.

For purposes of this demand, the term Honeywell shall apply to all defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators

November 19, 2004
Page 5

Page Five
November 19, 2004

Various other persons and entities have participated as co-conspirators with Honeywell and have performed acts and made statements in furtherance of the combinations in restraint of trade and unfair business practices alleged herein. At this point, only the Defendants know their exact identity and Plaintiffs demand that you make them known.

The unfair and deceptive acts and practices charged in this demand pursuant to Chapter 10 were perpetrated by Honeywell and were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of the Defendants' businesses or affairs.

## RELEVANT MARKET AND MONOPOLY POWER

As established in the *ECO* action and as otherwise documented in Honeywell internal documentation, Honeywell had monopoly power and the extensive and unified position of such dominating influence to suppress competition, regulate supply, and/or to fix prices to the detriment of the consuming public and the power to control prices to the public harm in the relevant market of round thermostats. It also combined and acted to destroy the trade or business of another engaged in selling goods and of attempting to and creating a monopoly. Honeywell, through its unfair methods of competition and unfair and deceptive acts and practices, has exercised monopoly power in the relevant market throughout the class period.

## NATURE OF THE ACTION

1)    Background

In the 1940's when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT). Since that time Honeywell has worked hard to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT. In 1946 Honeywell was issued a United States Utility Patent for its HRT (the" HRT Utility Patent").

According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Honeywell repeatedly had its patent application rejected.

November 19, 2004
Page 6

Page Six
November 19, 2004

2)    HRT Utility Patent

After multiple rejections of its patent application Honeywell secured the HRT Utility Patent. In advocating for the approval of its patent application Honeywell stressed to the PTO the utility of the HRT's circular design including its lack of protruding edges and the ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape "provided great utility from a safety standpoint". The HRT Utility Patent expired in 1963.

3)    Design Patent

In 1956 Honeywell secured a design patent for the HRT (the "HRT Design Patent"). The HRT design patent expired in 1970.

In 1968, prior to the expiration of the HRT Design Patent, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application"). Honeywell's trademark application was found futile due to the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

4)    End of 1970's Brings Competition to Circular Thermostat Market

By the end of the 1970's neither patent nor trademark protected the HRT. Following the end of the Honeywell monopoly, thermostat manufacturers other than Honeywell sought to compete in the circular thermostat market including in Maine. For example:

a.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Round Thermostat") but was not compatible.

b.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Round Thermostat").

c.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Round Thermostat").

d.    In 2003, a company called ECO Manufacturing introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat").

November 19, 2004
Page 7

Page Seven
November 19, 2004

5)    Honeywell's Willful and Knowing Unfair and Deceptive Acts and/or Practices and/or Unfair Methods of Competition

Since the beginning of the Class Period, Honeywell has engaged in willful and knowing unfair and deceptive acts and practices and/or unfair methods of competition to acquire and maintain its monopoly in the circular thermostat market, including but not limited to those relating to their:

a.    threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation;

b.    deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark;

c.    combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and

d.    purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

6)    The Quad Six Competition

In 1985 Quad Six began manufacturing and selling the Quad Six Round Thermostat that was designed to be compatible with the base of the HRT. The Quad Six Round Thermostat had the same purpose as the HRT. The Quad Six Round Thermostat was interchangeable with the HRT.

The Quad Six Round Thermostat competed with the HRT in 1985. In response to lawful competition, Honeywell threatened Quad Six with expensive litigation and claimed that Quad Six violated trademark rights owned by Honeywell. This conduct was unfair and deceptive and an unfair method of competition because at that time Honeywell owned no trademark rights in the circular shape of the HRT. In fact, Honeywell's attempts to register such rights had been rejected in 1968.

Further, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT due to its functionality. Nevertheless, as part of its pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six continue to sell the Quad Six Round Thermostat.

November 19, 2004
Page 8

Page Eight
November 19, 2004

Shortly thereafter in late 1985 Honey well and Quad Six entered into negotiations. The result of the negotiations was <u>Honeywell's acquisition of Quad Six.</u> Honeywell then removed the Quad Six Round Thermostat from the market. This unfair and deceptive act and practice which eliminated Honeywell's competition was uniformly applied as to each consumer member of the class and caused similar injury to each.

7)    <u>Concealment at the TTAB Constitutes Further Violations of Chapter</u>

<u>10</u>

In carrying out its willful and knowing unfair and deceptive acts and practices and/or unfair methods of competition, Honeywell concealed information from the TTAB that Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell.

8)    <u>The Hunter Fan Competition</u>

Honeywell faced another competitor-the Hunter Fan Round Thermostat- in 1986. Like the Quad Six Round Thermostat, the Hunter Fan Round Thermostat had the same purpose as the HRT and was interchangeable with the HRT. The Hunter Fan Round Thermostat competed with the HRT for several years including but not limited to 1986-87.

On June 30, 1986, Honeywell sent a 'cease and desist' letter to Hunter Fan insisting that the Hunter Fan Round Thermostat infringed on trademark rights owned by Honeywell. Adopting the same approach it used against QUAD SIX, Honeywell threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Round Thermostat. Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Round Thermostat until sometime near the end of 1987. During this time Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968. Honeywell also knew it had no opportunity to legally obtain trademark rights in the circular shape of the HRT. This was true at least in part because the circular shape of the HRT was functional. Nevertheless, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Round Thermostat.

10)    <u>Findings of Trial Court Precludes Raising of Certain Defenses</u>

In subsequent court proceedings, the District Court for the Southern District of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market." The District Court also commented that:

November 19, 2004
Page 9

Page Nine
November 19, 2004

"The evidence before this court also shows that
<u>whenever</u> Honeywell learned that a competitor was
selling or planned to sell a round thermostat, it
responded with threats of expensive litigation, and it
managed to eliminate the competing design either by
settlements or by buying the competitor outright.
(Emphasis added.)"

11)    <u>Knowing and Willful Deception of the PTO Further Violation of</u>

<u>Chapter 10</u>

In 1986, Honeywell again attempted to register a trademark for its
HRT (the "108 Trademark Application"). The PTO's examining attorney
denied the 1986 application holding that the circular shape of the HRT was
functional. Functional or utilitarian characteristics of a product are virtually
certain never to secure trademark protection.

Functional or utilitarian characteristics of a product are virtually
certain never to secure trademark protection because of the benefit they offer
to the public at large. Honeywell appealed the denial of its application to the
TTAB. In doing so it submitted materially false and misleading information to
the TTAB concerning the functionality of the HRT. Relying on the
information supplied to it by Honeywell, the TTAB approved the 108
Trademark Application and registered the trademark for the HRT in 1988.

Included in the information Honeywell submitted to the TTAB in
support of its 108 Trademark Application was information found to be
materially false and misleading. Honeywell's 108 Trademark Application was
severely hampered by the Company's previous receipt of the HRT Utility
Patent, which emphasized the utility of the HRT's circular design.

When applying for the 108 Trademark, Honeywell stressed to the PTO
that no competitor had utilized a circular design for thermostats, despite being
able to do so since the expiration of the HRT Design Patent in 1970.
Honeywell knowingly lied in its submission.

Honeywell made knowing misstatements of fact to the TTAB that,
"Competitors have been free to copy this unprotected round thermostat design
for sixteen years...but that no-one in the trade adopted this round design for
their thermostats during the many years after the patent and the filing of this
application. The fact that competitors have not used this design and have not

November 19, 2004
Page 10


Page Ten
November 19, 2004

been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design." Notably, these documents were advanced against Honeywell in subsequent litigation.



Honeywell also knowingly and willfully misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats.

The TTAB relied on Honeywell's materially false and deceptive comments when it granted the 108 Trademark. Contrary to its representations to the TTAB, as described above, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition. Honeywell's deception of the TTAB was an unfair and deceptive business practice and an unfair method of competition violative of Chapter 10. Honeywell deceived the TTAB into believing the *complete* absence of competition in the circular thermostat market and the TTAB thus granted approval of the 108 Trademark.

Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections. If no opposition is filed within a designated period of time (e.g. one month) the application is registered. Pursuant to the 108 Trademark Application, Honeywell published the application for opposition. A major competitor of Honeywell, Emerson Electric, objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

At that time Honeywell did not disclose to the TTAB any previous competing thermostats, the threatened litigation, or that it had entered into an agreement with Emerson Electric to keep secret the details underlying the broad allegations.

Pursuant to the eventual agreement, Emerson Electric would not offer its testimony to the TTAB. As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

12)     District Court Findings Preclude Certain Defenses

November 19, 2004
Page 11


Page Eleven
November 19, 2004


As the District Court of Indiana found in subsequent trademark litigation:

"It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the 108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.

Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

*Despite the apparent availability of the rounded thermostat cover since that time* [1976]*, an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

November 19, 2004
Page 12

Page Twelve
November 19, 2004

13)    The ECO Thermostat Litigation

ECO introduced the ECO Round Thermostat at a trade show in January 2003. Eco expected to sell ECO Round Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT. After Honeywell learned of the ECO Round Thermostat, Honeywell threatened to sue ECO for trademark infringement. ECO filed an action in the District Court seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell (the "ECO Litigation"). Honeywell responded by seeking a preliminary injunction to prevent the ECO Thermostat from being manufactured.

Honeywell contended that they had a registered U.S. trademark and that the 108 registration had become "incontestable" Honeywell stated their position that the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration. The District Court denied Honeywell's motion for preliminary injunction and held that:

a.    the circular shape of the HRT was functional and could not be protected by a valid trademark;

b.    the circular shape of the HRT was the subject of a long expired utility patent; and

c.    ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had:

a.    granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest);

November 19, 2004
Page 14

Page Fourteen
November 19, 2004

Honeywell's willful and knowing conduct: 1) excluded competitors from the circular thermostat market; and 2) sold the HRT at supra-competitive prices during the Class Period. These unfair and deceptive acts and practices and/or unfair methods of competition caused each member of the putative class to suffer similar injury. Honeywell's pattern of sham and baseless litigation constitutes willful and knowing unfair and deceptive acts and practices and/or unfair methods of competition violative of Chapter 10. As was intended by Honeywell, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, they were able to monopolize that market and sell HRT at supra-competitive prices.

The willful and knowing unfair and deceptive acts and practices and/or unfair methods of competition including the coercion of Quad Six and Hunter Fan described above prevented competition in the sale of circular thermostats. It constituted a component of Honeywell's willful and knowing pattern of sham and baseless litigation, instituted for reasons violative of Chapter 10 against rival thermostat manufacturers who attempted to compete against it.

Honeywell has acquired and maintained their monopoly through pervasive practices of misrepresenting its patent and trademark rights and instituting or threatening to institute sham and baseless legal proceedings fro the purpose of excluding rivals form the thermostat markets. You and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

Independent of unlawful monopolization or the aforesaid trust, defendants further engaged in unlawful, unfair or deceptive acts and practices that uniformly injured the putative class representatives and the consumer class members. In addition to your deliberate misrepresentations that resulted in an invasion of their legally protected interests, you caused them further economic harm by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

## SIMILAR INJURY TO COMPETITION AND CONSUMERS

Honeywell's conduct resulted in similar harm to each similarly situated consumer class member because each was forced to pay supra-competitive prices and each had their choices limited. Plaintiffs here allege consumer harm and seek recovery for all damages that flow from all the harm to consumers in the State of Maine.

November 19, 2004
Page 15

Page Fifteen
November 19, 2004

## UNFAIR METHODS OF COMPETITION AND UNFAIR
## AND DECEPTIVE ACTS AND PRACTICES

If you agree to the acts, practices and methods of competition alleged and dispute only the time frame we base our claim on or the allegations that they were unfair, deceptive or unlawful, please act to narrow the issues in dispute or otherwise reasonably respond.

Upon information and belief, the Defendants and their co-conspirators had the purpose and effect of fixing prices, unlawfully maintaining a monopoly in the market for round thermostats discouraging competition, acting to substantially lessen competition, tending to create a monopoly, allocating market share, and engaging in other unfair methods of competition and unfair and/or deceptive acts or practices, and otherwise acting in violation of Chapter 10 as described herein.

Our claims arise from your long-running conspiracy that we believe began no later than January 1, 1985 and continues until present. Your actions were designed to and /or had the effect of inflating the prices of round thermostats, sold indirectly to the Plaintiffs and other purchasers in the State of Maine. You thus caused each consumer class member to suffer actual harm in an amount determinable per round thermostat purchased.

It is important to note that under Maine's law, if you are found to have violated Chapter 10 you will be forced to pay the actual damages or restitution to each class member as well as attorney's fees and costs. We have expressly accepted that you are in exclusive possession and control of the data required to determine to the penny the nature and extent of the claims and which documents establish or evidence the same. We take the time to point out the limited relevance of this sometimes advantage in other less consumer friendly jurisdictions. Be clear that your unfair methods of competition and unfair and/or deceptive acts or practices in violation of Chapter 10 include monopolization, attempted monopolization, and making material misrepresentations.

The charged unfair methods of competition and unfair and/or deceptive acts or practices consist, upon information and belief, of a continuing agreement, understanding, and concert of action among you and your co-conspirators, the substantial terms of which were to unlawfully maintain a monopoly in and engage in other unfair methods of competition and unfair and/or deceptive acts or practice with regard to the sale of round

November 19, 2004
Page 16

Page Sixteen
November 19, 2004

thermostats in the State of Maine.  Such conduct included communications and meetings in which you agreed to eliminate competition among other things by unlawfully maintaining a monopoly and allocating markets for round thermostats and unfairly charging supra competitive prices.

Your actions served to control substantially the entire market for round thermostats. You carried out your wrongful conduct in such an effective way that you created and/or maintained an unlawful monopoly, suppressed competition, and unreasonably restrained trade in violation of the common law, Chapter 10, and 10 M.R.S.A 1101 *et seq.*

You cannot dispute that you made material misrepresentations to the government in seeking patent and trademark approval or that you acted unfairly or deceptively in keeping competitors products from consumers or that this conduct resulted in the higher the price that consumers paid for HRT's.

Please provide an explanation in writing if you contest these allegations. Please do the same if you deny that you had substantial market power.

## CONSUMER INJURY UNDER CHAPTER 10

Honeywell's exclusionary and restrictive practices described herein have caused significant harm to class members by increasing the price they have paid for round thermostats above competitive levels, and/or by denying them a free choice in a competitive market. Each is entitled to actual damages, restitution or other equitable relief and will be entitled to attorney fees and costs if you do not take action to reasonably settle this claim. *See* 5 M.R.S.A. s. 213. Your methods of unfair competition and unfair and deceptive acts or practices were willful and/or knowing.

As a result of the numerous methods of unfair competition and unfair and deceptive acts and/or exclusionary and restrictive practices it has imposed on others, including those described herein, Honeywell has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

November 19, 2004
Page 17


Page Seventeen
November 19, 2004


The resultant monopoly power has enabled Honeywell to eliminate product choice to consumers in the State and price its products unfairly and deceptively and virtually without regard to the prices of competing products. Distributors and retailers of Honeywell's round thermostats have passed these monopoly prices on to the class members. Each consumer was caused to suffer actual harm in the amount we can now estimate to be in excess of $1.

Honeywell's supra competitive prices and extraordinary profits are not the result of superior products or competition on the merits. Rather, Honeywell has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in the series of described unfair methods of competition and unfair and deceptive exclusionary acts and restrictive practices, with the purpose and effect of restraining and preventing competition, unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State.

## CONCLUSION

Beginning in early 1985 and continuing to the present, Honeywell has engaged in unfair methods of competition and unfair and deceptive combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of HRT's; and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Honeywell to perpetuate its monopoly. This directly resulted in financial harm to consumers.

As a direct and proximate result of Honeywell's unfair and deceptive combinations and contracts to restrain trade and to monopolize the relevant markets, members of the class have suffered economic injury, have suffered the invasion of legally protected interests, and have otherwise been deprived of the benefits of free and fair competition on the merits.

Honeywell's conduct in engaging in unfair and deceptive combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market, all constitute and were willfully and knowingly carried out.

November 19, 2004
Page 18

Page Eighteen
November 19, 2004

The acts constitute unfair and deceptive competition and unfair and deceptive business acts and practices within the meaning, intent and interpretation of Chapter 10.

Honeywell, through the described unfair methods of competition and unfair and deceptive acts and practices has exercised unlawful monopoly power, has imposed upon consumer class members a variety of unfair and deceptive restrictive agreements, and imposed other practices that operated to exclude competition in the round thermostat and to reinforce your monopoly position.

Your acts and practices taken together with your unsuccessful appeal of the judgment in the *ECO* case establish willful and knowing conduct. A refusal to tender an offer of settlement subsequent to this demand will entitle the class to attorney fees and costs. You are presented here with an opportunity to tender a reasonable offer of settlement within 30 days.

## RELIEF REQUESTED

Plaintiffs demand that the Defendants extend an offer to purchasers of round thermostats sold in the State of Maine during the class period. In the alternative, demand is made that the Defendants tender an offer of class damages in an amount deemed fair, reasonable and just under the law, together with an offer to pay Plaintiffs' reasonable attorneys' fees and costs.

Pursuant to Chapter 10, demand is also made that you respond directly to the following inquiries. Please state:

a)    Whether Honeywell admits it has engaged in, and has combined with others to engage in, conduct that violate Chapter 10;

b)    Whether Honeywell admits its unfair methods of competition and unfair and deceptive acts and practices have caused the alleged legally cognizable injury to the class, by increasing the prices the class members have paid for moist snuff above the prices that would have prevailed in a competitive market and limited product choice to consumers in the State;

c)    The nature of and duration of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

d)    The nature of and extent of injuries sustained by the class you concede; and

November 19, 2004
Page 19


Page Nineteen
November 19, 2004

e)    The appropriate measure of damages for those injuries you are willing to offer.

We are making this demand based upon information and belief. You are being provided with an opportunity, in good faith and/or with knowledge that the acts and practices we complain of violated Chapter 10, to grant relief to the class and/or make a reasonable offer in response to our demand for relief.

Sincerely,

D. Michael Noonan
mnoonan@shaheengordon.com

DMN/pk

**TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER**

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

............MIDDLESEX............ , ss
[seal]

No.  04-4903

Vincent Fagan and Anthony
Gianesca
v.
Honeywell International, Inc.

. , Plaintiff(s)

, Defendant(s)

A TRUE COPY ATTES:

DEPUTY SHERIFF
Middlesex County

DATE OF SERVICE  1-11-05

Honeywell International, Inc.
70 Wells Avenue
Newton, MA  02459

**SUMMONS**

To the above-named Defendant:

You are hereby summoned and required to serve upon ...... _Robert J. Bonsignore_ ......

.............................................. plaintiff's attorney, whose address is _23 Forest St, Medford_

_MA 02155_......................................, an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at _Cambridge_

.................................................................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio Esquire, at ......................................................................

the .................................................... day of ..............................................................

....................., in the year of our Lord .......................................... .

_Edward J Sullivan_

Clerk

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
   for each defendant, each should be addressed to the particular defendant.

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
DOCKET #:**

**0 4 - 4 9 0 3**

Vincent Fagan and Anthony Gianasca)
Individually and as Putative Class )
Representatives )
)
    Plaintiffs )
)
v. )
)
Honeywell International, Inc. )
)
    Defendant )

RECEIVED

NOV 09 2004

SUPERIOR COURT · CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## COMPLAINT

Plaintiff Vincent Fagan, upon information and belief, brings this Class Action

Complaint against Defendants Honeywell International, Inc. (hereinafter individually

and/or collectively "Honeywell", "Company" or "Defendant"), on behalf of themselves

and all other similarly situated persons residing in the Commonwealth of Massachusetts

who suffered similar injury as a result of the Defendant's use or employment of an unfair

or deceptive act or practice violative of M.G.L. c. 93A. Plaintiff brings this claim

exclusively pursuant to M.G.L. c. 93A and not under sections 4 or 6 of the Clayton Act

(15 U.S.C. §§15, 26), or section 1 of the Sherman Act (15 U.S.C. §1) or any other

federal statute, regulation, or law.

## JURISDICTION AND VENUE

1.      Brought pursuant to M.G.L. c. 93A, §9(1), this putative class action seeks

to recoup economic damages, mandatory minimum statutory compensation for

l

violations of the Massachusetts Consumer Protection Statute M.G.L.93A and to enjoin Honeywell from continuing the illegal business practices described herein

2.      The single count complaint advanced mandates that this action be heard in a Massachusetts state forum.

3.      Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the Commonwealth of Massachusetts. Honeywell sold its circular thermostats to residential customers throughout the Commonwealth of Massachusetts during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.      Named plaintiff's individual damages do not equal or exceed $75,000. Named plaintiff expressly disclaims any individual recovery equal to or in excess of $75,000.

## NATURE AND BACKGROUND OF CASE

5.      Plaintiffs bring this class action lawsuit because Honeywell International, Inc engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Massachusetts. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent

2

the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.    Plaintiff Vincent Fagan and Anthony Gianasca are natural persons and residents of the Commonwealth of Massachusetts.  During the class period, plaintiffs and each member of the putative class indirectly purchased in the Commonwealth of Massachusetts Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices.  Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Massachusetts and a purchaser of a round thermostat during the class period.

7.    Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the Commonwealth of Massachusetts.  Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware.  Honeywell has its principal place of business at 70 Wells Avenue, Newton Center, MA 02459

8.    Defendant Honeywell is the largest seller of thermostats in the United States.  Its circular thermostats are sold and used in residences across Massachusetts.

3

9.    Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

### CO-CONSPIRATORS

10.    For purposes of this complaint, the term Defendant shall apply to all Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the Commonwealth of Massachusetts, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11.    Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demand that Honeywell make them known. Honeywell has failed to address this request.

12.    The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's

4

businesses or affairs. They directly affected members of this Massachusetts consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13.    The Defendants and its co-conspirators fraudulently concealed the acts and practices alleged herein.  Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action exclusively under M.G.L. c. 93A, §2 and §9(2), on behalf of themselves and the following class:

> All similarly situated consumer purchasers residing in the Commonwealth of Massachusetts (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present

15.    The number of potential class members is so numerous that joinder is impracticable.  Plaintiff's claims are typical of those of the class.  Numerous questions of law and fact are common to the class, including, but not limited to:

a) Whether Honeywell has engaged, and has combined with others to

engage, in conduct that violates M.G.L. c. 93A, §2;

b) Whether Honeywell has engaged, and/or has combined with others to

engage, in conduct that violates M.G.L. c. 93A, §9(3);

c) Whether the pass through overcharge per purchase exceeded $25:

d) Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in the Commonwealth;

e) The existence, duration and illegality of the conduct alleged herein;

f) The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

g) The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

h) Whether the class is entitled to the statutory damages and other relief requested. Whether defendant engaged in monopolization;

i) Whether defendants acted unlawfully as prohibited by M.G.L.93 or otherwise violated the Consumer Protection Act.;

j) The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

k) The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

6

l)    The appropriate nature of class wide equitable relief.

16.    Plaintiffs, as representatives of the class, will fairly and adequately protect the interests of the class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the class members. They have engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. They likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

7

20.    Additionally, an important public interest will be served by treating the matter as a class action.    The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Massachusetts law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF M.G.L. c. 93A, §2 and §9(3).

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

8

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Massachusetts

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Massachusetts. During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Massachusetts. Another relevant market consists of circular thermostats for residential use in the United States and Massachusetts.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

9

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Massachusetts.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Massachusetts.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

### A.    Background

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the

HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

## B.    The Rejected 1968 Trademark Application.

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

12

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

13

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Massachusetts.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged in Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Massachusetts consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation;

14

deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    **The Pattern of Sham and Baseless Litigation**

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

16

92.     Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.     Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.     However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.     Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.     Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.     As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.     The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.     In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

17

107.   When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.   According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.   The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

110.   Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111.   The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.   Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

113.   Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

*Despite the apparent availability of the rounded thermostat cover since that time [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.   The TTAB granted the 108 Trademark Application in 1988.

## F.   The ECO Thermostat.

137.   Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

138.   The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.   ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.   In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it.  That's simply not right."  Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

23

141.   After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.   ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.   The federal court action was captioned, <u>Eco Manufacturing LLC, v. Honeywell International, Inc.</u>, Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.   Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

145.   Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.   Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.   The two parties conducted expedited discovery and presented evidence.

148.   The District Court denied Honeywell's motion for preliminary injunction and held that:   1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.   The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.   The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

151.   The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.   Honeywell appealed the District Court's holding.  The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

25

153.  As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.  As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of M.G.L. c. 93A, §2 and §9(3).

155.  Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

156.  Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape.  The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of M.G.L. c. 93A, §2 and §9(3).

157.  During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false.  Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading.  The untrue and deceptive statements issued by Honeywell to the PTO were intended by

26

trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of M.G.L. c. 93A, §2 and §9(3).

162.    .  Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of M.G.L. c. 93A, §2 and §9(3).

163.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark.  Honeywell's purchase of Quad Six was therefore in violation of M.G.L. c. 93A, §2 and §9(3).

164.    Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165.    Independent of monopolization or the aforesaid trust, defendants further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166.    Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167.    The deception of the plaintiff and other HRT consumers was in violation of Massachusetts's General Law c.93A.

168.    In addition, Defendant's knowing and willful unfair methods of competition

28

and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and unreasonably restrain trade with regard to the sale of round thermostats in the Commonwealth of Massachusetts in violation of common law and M.G.L. c. 93, §§4, 5, and 6.

169.    Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170.    Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of M.G.L. c. 93A, §2.

171.    By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition.  Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round

thermostats; and restraining trade and preventing competition in the relevant market violative of M.G.L. c. 93A, §2 and §9(3).

172.    Massachusetts indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to Government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of M.G.L. c. 93A, §9(2).

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the Commonwealth and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

30

177.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way.  They are simply unfair methods of competition and unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER M.G.L. C. 93A

178.    Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Massachusetts consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the Commonwealth.

179.    Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180.    As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the

31

relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

181. Defendant's control of the round thermostat market in Massachusetts and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

182. Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the Commonwealth. This conduct violated M.G.L. c. 93A, §2.

## COUNT I

## VIOLATIONS OF M.G.L. c. 93A, §2 and §9

183. Plaintiffs incorporate herein by reference the allegations contained in the foregoing paragraphs, above.

184. Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and

reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of M.G.L. c. 93A, §2.

185.   As a direct and proximate result of Defendant's violations of M.G.L. c. 93A, §2, members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186.   Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of M.G.L. c. 93A.

187.   Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the Commonwealth of Massachusetts. Each consumer class member suffered actual harm in an amount determinable per can purchased.

33

order notice of such finding to all members of the class of petitioners in accordance with the law;

    C.    In the alternative, preliminarily and finally certify the plaintiff class pursuant to Mass.R.Civ.P. 23;

    D.    Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing competition in manufacturing, making, transportation, sale or purchase of round thermostats.

    E.    Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of M.G.L. c. 93A, §2;

    F.    Award plaintiffs and members of the class their actual damages or in the alternative the statutory damages provided under M.G.L. c. 93A, §9(3) in an amount deemed fair, reasonable and just under the law.

    G.    Find that Defendants violated M.G.L. c. 93A, §2 and 93A, §9(3) because the use and employment of the unfair and deceptive act or practice alleged was a willful violation §2 and double or treble any award;

    H.    Find that Defendants violated M.G.L. c. 93A, §2 and 93A, §9(3) because their refusal to grant relief upon demand was made in bad faith with knowledge or

35

reason to know that the act or practice complained of violated §2 and double or treble any award;

I.    Allow the class to recover its reasonable attorneys' fees and costs as authorized by M.G.L. c. 93A, §9(4);

J.    Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

K.    Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under M.G.L. c. 93A, §9(1) and/or §9(3), or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future; and

L.    Grant other appropriate equitable relief, including but not limited to disgorgement of profits obtained

Dated: November 9, 2004.                    Respectfully submitted,


The plaintiffs
By their Attorneys

Robert J Bonsignore BBO 547880
Robin Brewer BBO # 639506
Bonsignore and Brewer
23 Forest Street
Medford, Mass. 02155
(781) 391-9496
(781) 391-9496 Fax

36

Jill S. Abrams, Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

THE MOGIN LAW FIRM, P.C.
Daniel J. Mogin
110 Juniper Street
San Diego, CA 92101-1502
Telephone: (619) 687-6611

Shaheen & Gordon
D. Michael Noonan, Esquire
140 Washington Street, 2nd Floor
PO Box 977
Dover, NH 03821-0977
Telephone: (603) 749-5000

37



RECEIVED
CLERK'S OFFICE

2004 DEC 17 A 11: 40

PANEL ON
DISTRICT
LITIGATION

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

---

IN RE CIRCULAR THERMOSTAT LITIGATION                MDL Docket No. _____

---

## MOTION OF HONEYWELL INTERNATIONAL INC. TO TRANSFER AND CONSOLIDATE FOR PRETRIAL PROCEEDINGS

Honeywell International Inc. ("Honeywell" or "Defendant") respectfully moves the Judicial Panel on Multidistrict Litigation for an order: (a) transferring two virtually identical purported class actions (filed in New York and California state courts and removed by Defendant to the Southern District of New York and the Northern District of California, respectively) to a single district court; and (b) coordinating the pretrial proceedings in all of these actions pursuant to 28 U.S.C. § 1407. Both complaints, brought on behalf of statewide classes of consumers, allege violations of state antitrust and other laws based on claims of monopolization and other allegedly anti-competitive or deceptive acts with respect to the sale of circular thermostats. Both have been removed to their respective federal courts by Defendant pursuant to 28 U.S.C. § 1441(a) based on federal question jurisdiction (pursuant to 28 U.S.C. § 1331), as follows:

- *Thomas Fullam v. Honeywell International Inc.*; originally filed in the Supreme Court of the State of New York, County of New York, on November 9, 2004; removed by Defendant to the United States District Court for the Southern District of New York on December 16, 2004, Civil Action No. 04-CV-9871; currently before the Honorable P. Kevin Castel.

- *Brian Brock v. Honeywell International Inc.*; originally filed in the Superior Court for the State of California, County of San Francisco, on November 10, 2004; removed by Defendant to the United States District Court for the Northern District of California on December 16, 2004, Civil Action No. C-04-5328 WHA; currently before the Honorable William H. Alsup.

Honeywell has filed responsive pleadings in these matters and will be moving for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) once the cases are assigned to a single MDL court. No discovery has been conducted in these actions. In addition to these pending complaints, demand letters based on identical allegations have been received with respect to consumers in Massachusetts and Maine, and it is anticipated that complaints ultimately will be filed in those states as well.

In support of the transfer and consolidation, Defendant avers the following, as more fully set forth in the accompanying memorandum:

1.    Transfer and consolidation of these actions in the Southern District of New York is necessary and proper pursuant to 28 U.S.C. § 1407(a) because these actions "involv[e] one or more common questions of fact." These substantially similar actions allege virtually identical antitrust and other violations occurring with respect to the same product over substantially overlapping relevant time periods, making consolidation in one jurisdiction proper and judicially efficient. Each action alleges, among other things that Honeywell:

- Allegedly possesses "monopoly" power in purported antitrust relevant market of "round thermostats."

- Allegedly engaged in acquisitions in order to injure competition.

2

- Allegedly deterred other competitors from producing and selling "round" thermostats.

- allegedly misled the Patent and Trademark Office in securing a trademark on its "round" thermostats

- Engaged in "sham" litigation.

2.      In multiple respects, the proposed transfer and consolidation "will be for the convenience of parties and witnesses and will promote the just and efficient conduct" of the actions. 28 U.S.C. § 1407(a).

3.      For example, consolidation of the actions before a single court will eliminate duplicative discovery (particularly multiple depositions of the same witnesses), prevent duplicative and conflicting pretrial rulings, conserve judicial resources, reduce the costs of litigation, and will allow the cases to proceed efficiently to trial or other disposition.

4.      Defendant respectfully suggests that the U.S. District Court for the Southern District of New York would be an appropriate transferee forum. The Southern District of New York, in the state where the first of these actions was filed, is closest to Honeywell's corporate headquarters in New Jersey, and is therefore most convenient for Defendant and the New York plaintiff, two of the three parties involved. Accordingly, Defendant hereby moves that the Judicial Panel on Multidistrict Litigation order the transfer and consolidation in the Southern District of New York of the New York action listed above filed by Thomas Fullam, and of the California action listed above filed by Brian Brock, together with any similar actions subsequently filed, removed, or of which Defendant becomes aware.

5.      This Motion is based on the Memorandum in Support of this Motion to Transfer and Consolidate filed by Honeywell, the pleadings and papers on file herein and such other

matters as may be presented to the Panel at the time of hearing.

Respectfully submitted,

Dated:  December 17, 2004

By: _[signature]_

John H. Beisner
Richard G. Parker
Ian Simmons
Benjamin G. Bradshaw
Matthew R. Cosgrove*

O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 383-5163
Facsimile: (202) 383-5414
* Admitted in New York only.

*Counsel for Honeywell International Inc.*

4

**SCHEDULE OF ACTIONS**

RECEIVED
CLERK'S OFFICE

2004 DEC 17  A 11: 40

. . . L PANEL ON
. . . 'IDISTRICT
. . . 'TIGATION

Pursuant to Rule 7.2(a)(ii) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, Defendants submit the following schedule of related actions:

| Name of Action | District Where Pending | Civil Action No. | Judge | Date Filed |
|---|---|---|---|---|
| Thomas Fullam v. Honeywell International Inc. | Southern District of New York | 04-CV-9871 | Hon. P. Kevin Castel | filed in state court November 9, 2004; removed to U.S. District Court December 16, 2004 |
| Brian Brock, on behalf of himself and all others similarly situated, v. Honeywell International Inc. | Northern District of California | C-04-5328 WHA | Hon. William H. Alsup | filed in Superior Court of the State of California, County of San Francisco, on November 10, 2004; removed to U.S. District Court for the Northern District of California, December 16, 2004 |



RECEIVED
CLERK'S OFFICE

2004 DEC 17 A 11: 40

... PANEL ON
... DISTRICT
... ATION

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE CIRCULAR THERMOSTAT LITIGATION

MDL Docket No. _____

**MEMORANDUM IN SUPPORT OF HONEYWELL INTERNATIONAL INC.'S
MOTION TO TRANSFER AND CONSOLIDATE FOR COORDINATED PRETRIAL
PROCEEDINGS**

**INTRODUCTION**

Pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure for the Judicial

Panel on Multidistrict Litigation, Defendant Honeywell International Inc. ("Honeywell" or

"Defendant" ) respectfully submits this Memorandum in Support of Its Motion for Transfer and

Coordination or Consolidation in the Southern District of New York, for Pretrial Proceedings, of

Related Class Actions.  Defendant seeks transfer of two virtually identical class actions currently

pending in the Southern District of New York and the Northern District of California, to which

they have been removed from their respective state courts by Defendant, to an MDL proceeding

in the Southern District of New York so that the cases, and anticipated future complaints,[1] may

---

[1]   Honeywell has received demand letters based on identical allegations on behalf of consumers in Massachusetts
and Maine.  It is anticipated that class action complaints ultimately will be filed in these states.

1

be coordinated or consolidated for pretrial proceedings. Consolidation of these matters, both of which relate to the sale of circular thermostats, in the Southern District of New York is appropriate under 28 U.S.C. § 1407(a), which permits transfer and consolidation of cases: (1) that "involv[e] one or more common questions of fact;" (2) where transfer will further "the convenience of parties and witnesses;" and (3) where transfer "will promote the just and efficient conduct of [the] actions."

All three requirements specified in § 1407(a) are satisfied here. As set forth in greater detail below, these substantially similar purported class actions allege identical state antitrust and other state law violations occurring with respect to the same product over virtually the same relevant period. As a result, transfer and consolidation of all circular thermostat actions will substantially increase the convenience of the litigation for all parties, will eliminate the need for duplicative discovery and pretrial proceedings, and will avoid the possibility of inconsistent rulings in each case, thereby promoting the just and efficient conduct of the actions. Further, because New York City is very convenient for two of the parties involved in the cases and readily accessible to the third, the Southern District of New York is a logical forum in which to consolidate these actions.

## BACKGROUND

Honeywell was served on November 19, 2004 with the first of these actions, which was filed on November 9, 2004 in the Supreme Court of the State of New York, County of New York (attached as Exhibit 1). The case was removed to federal court on December 16, 2004 and is currently pending in the Southern District of New York before the Honorable P. Kevin Castel. On November 18, 2004, Honeywell was served with the second of these actions, which was filed on November 10, 2004 in the Superior Court of the State of California, County of San Francisco (attached as Exhibit 2). This case was also removed to federal court on December 16, 2004 and

2

is currently pending in the Northern District of California before the Honorable William H. Alsup. At approximately the same time, Honeywell also received demand letters in Massachusetts (attached as Exhibit 3) and Maine (attached as Exhibit 4) containing substantially similar allegations and requests for relief.

Both of these actions allege virtually identical violations of state antitrust and consumer protection laws stemming from alleged monopolistic and other activities relating to the sale of circular thermostats. For example, each action alleges, among other things that Honeywell:

- allegedly possesses "monopoly" power in purported antitrust relevant market of "round thermostats."

- allegedly engaged in acquisitions in order to injure competition.

- allegedly deterred other competitors from producing and selling "round" thermostats.

- allegedly misled the Patent and Trademark Office in securing a trademark registration for its "round" thermostat design

- allegedly engaged in a pattern of sham and baseless litigation over violations of those trademark rights.

All are brought on behalf of "indirect purchasers" (*i.e.*, purchasers who did not buy round thermostats directly from Honeywell), and the periods covered by the actions are substantially overlapping, with both class periods beginning on June 30, 1986 and extending at least through November 9, 2004 (the California suit extends further, to the date of class notice).

Notwithstanding that both cases involve indirect purchasers and are brought under state laws, their removal was in each case predicated on federal question jurisdiction, pursuant to 28 U.S.C. § 1331, because resolution of plaintiffs' complaints will involve decisions on the scope of

3

trademark law, Noerr-Pennington immunity and First Amendment protection.

## ARGUMENT

**I.    THE CIRCULAR THERMOSTAT CLASS ACTIONS FILED AND REMOVED IN NEW YORK AND CALIFORNIA SHOULD BE TRANSFERRED AND COORDINATED OR CONSOLIDATED FOR PRETRIAL PROCEEDINGS TO AN MDL PROCEEDING IN THE SOUTHERN DISTRICT OF NEW YORK**

Section 1407(a) provides that "civil actions involving one or more common questions of fact . . . may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Transfer and consolidation are appropriate where they "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of [the] actions." *Id.* As explained below, the circular thermostat-related class actions currently pending in the Southern District of New York and the Northern District of California meet these criteria.

### A.    The Actions Involve One or More Common Questions of Fact

For transfer to be proper under § 1407(a), the cases at issue must first "involv[e] one or more common questions of fact." This requirement is satisfied here, where the actions at issue contain identical allegations of price-fixing, monopolization, fraudulent trademark application and sham litigation to deter competition, all relating to circular thermostats, occurring over substantially identical time periods, and brought on behalf of indirect purchasers of that product. For example, the New York complaint alleges that "Defendants[2] and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels." (NY Compl. ¶ 59) (Ex. 1). The California complaint alleges the same, word-for-word. (CA Compl. ¶ 65) (Ex. 2).

Both complaints bring the same allegations of monopoly, fraudulent trademark

4

application and sham litigation. In substance, the allegations in the New York and California complaints are identical. Accordingly, there are numerous common questions of fact including, *inter alia*:

    a.    Whether Honeywell conspired or otherwise agreed to fix, raise, or stabilize the prices of circular thermostats;

    b.    When and where any alleged agreement or agreements took place and the duration of any such agreement;

    c.    Which entities were parties to the alleged agreement or agreements;

    d.    Whether Honeywell attempted to monopolize the purported circular thermostat market;

    e.    Whether Honeywell committed made fraud in the prosecution of its trademark registration application for its round thermostat design;

    f.    Whether Honeywell threatened rivals with sham litigation to deter competition;

    g.    Whether Honeywell's alleged conduct had the effect of setting the relevant prices of circular thermostats above competitive levels; and

    h.    Whether any named plaintiff suffered any injury in fact as a result of Honeywell's alleged conduct.

There are also many questions of law that are amenable to resolution in a single, joint pretrial proceeding, including but not limited to:

    i.    Whether the plaintiffs have sustained an antitrust injury proximately caused by Defendant's alleged actions as required by both New York's General Business Law § 349 and California's Business and Professions Code §§ 16720, *et seq.*;

    j.    Whether Defendant reached an agreement or agreements, as alleged in NY Compl. ¶ 59 and CA Compl. ¶ 65, to fix the prices of the circular thermostats allegedly purchased by plaintiffs over the course of the putative class period in violation of both New York's General Business Law § 349 and California's Business and Professions Code §§ 16720, *et seq.*;

    k.    Whether the defendant's market share represented an unlawful monopoly; and

    l.    Whether the plaintiffs' claims are barred by the applicable statutes of limitation.

---

[2] Notwithstanding the use of the plural in the New York complaint, only Honeywell is a defendant; the California complaint alone includes unknown defendants Does 1-100.

Such an extensive overlap in the questions of fact and law presented by these rubber chemicals-related actions make transfer and consolidation of these cases not only permissible, but particularly appropriate. *See In re Beef Indus. Antitrust Litig.*, 419 F. Supp. 720, 721 (J.P.M.L. 1976) (common factual issues concerning alleged antitrust conspiracy necessitated transfer); *In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. 935, 936 (J.P.M.L. 1977) ("As is often true in multidistrict antitrust litigation, the private actions raise common questions of fact concerning the existence, scope and effect of the alleged conspiracy.").

**B.      Transfer and Coordination or Consolidation for Pretrial Proceedings Will Further the Convenience of Parties and Witnesses**

Transfer and coordination or consolidation for pretrial proceedings of these actions will also serve "the convenience of the parties and witnesses" in accordance with the second requirement of § 1407(a). Plaintiffs' nearly identical allegations will require duplicative discovery and pretrial proceedings unless these cases are consolidated for pretrial purposes in one district. In each case, the parties will seek discovery of the same body of documents (*i.e.*, those related to the various parties' sale or purchase of circular thermostats), and will seek to depose the same individuals (*i.e.*, those with responsibilities related to circular thermostats). There is no reason to require the parties on both sides to respond to multiple discovery requests seeking the same or similar information. Further, as noted above, in addition to discovery and scheduling issues, there are many common legal issues that can be jointly resolved at the pretrial stage, such as various motions testing the sufficiency of the plaintiffs' claims. There is no reason to require the parties to respond to multiple motions and other procedural matters or to require the parties and other witnesses to criss-cross the United States to appear in multiple proceedings on the East and West Coasts. Transfer and consolidation will solve these problems because they will permit the transferee judge to formulate a single, unified pretrial program that minimizes the

6

inconvenience and overall expense for all parties and witnesses. *See In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1229 (J.P.M.L. 1978) (consolidation appropriate where centralization of complex actions with international aspects would prevent duplicative discovery and inconsistent pretrial rulings).

### C.    Transfer and Coordination or Consolidation for Pretrial Proceedings Will Promote Just and Efficient Conduct of These Actions

Transfer and coordination or consolidation for pretrial proceedings of these actions will satisfy the requirement in § 1407(a) that transfer "promote the just and efficient conduct of [the] actions." Because each complaint contains substantially identical factual allegations, many of the same pretrial issues are likely to arise in each case, such as issues concerning the nature and scope of discovery and disputes related to the sufficiency of the plaintiffs' allegations. If the district courts in both jurisdictions were forced to resolve these issues in separate pretrial proceedings, scarce judicial resources would be wasted needlessly. Moreover, there also would be a substantial likelihood that such duplicative proceedings might result in inconsistent rulings, in particular on the important issue of class certification. Transfer and consolidation will avoid all these problems, thereby promoting "the just and efficient conduct of [these] actions." *See In re A.H. Robins Co. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406 F. Supp. 540, 542 (J.P.M.L. 1975) (transfer necessary to prevent duplication of discovery and eliminate possibility of conflicting pretrial rulings); *In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. at 936 (consolidation of five actions was necessary "in order to prevent duplication of discovery, eliminate the possibility of inconsistent pretrial rulings, and streamline the rest of the pretrial proceedings as well").

## II.    THE PANEL SHOULD TRANSFER THESE CASES TO AN MDL PROCEEDING IN THE SOUTHERN DISTRICT OF NEW YORK

The Southern District of New York is the most appropriate jurisdiction for this litigation

7

for two principal reasons. The first is that the County of New York was chosen by the first of the plaintiffs to file one of these putative class actions related to circular thermostats. The second is that the Southern District of New York is convenient. Defendant's counsel in this action have offices in New York City, as does one of the three plaintiff's counsel (plaintiffs in both cases are represented by the same three law firms), and Defendant's corporate headquarters is located nearby in Morristown, New Jersey, making it convenient for all parties to coordinate the production of many of the relevant witnesses and documents and, not least, their attendance at hearings. *See In re Union Carbide Corp., Gas Plant Disaster at Bhopal, India in December, 1989*, 601 F. Supp. 1035, 1036 (J.P.M.L. 1985). Additionally, New York is readily accessible to the California plaintiff, with a well-developed support system for legal services, ample office and hotel accommodations, and three easily accessible airports served by major airlines. *See In re Worldcom, Inc., Sec. & ERISA Litig.*, 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002) (noting that "a litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well developed support system for legal services").

Accordingly, equity, efficiency, and convenience favor the Southern District of New York.

## CONCLUSION

For the above reasons, Defendant respectfully requests that the Panel transfer to an MDL proceeding in the Southern District of New York, for coordinated or consolidated pretrial proceedings, the two circular thermostat class actions currently pending in the Southern District of New York and the Northern District of California.

8

Respectfully submitted,

Dated: December 17, 2004

By: _____
John H. Beisner
Richard G. Parker
Ian Simmons
Benjamin G. Bradshaw
Matthew R. Cosgrove*
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: (202) 383-5163
Facsimile: (202) 383-5414
* Admitted in New York only.

*Counsel for Honeywell International Inc.*

9



# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE CIRCULAR THERMOSTAT LITIGATION

MDL Docket No. _____

Pursuant to Rule 5.3(b) of the Judicial Panel on Multidistrict Litigation, Defendant Honeywell International Inc. ("Honeywell") hereby files its corporate disclosure statement and certifies that:

Honeywell has no parent corporation.

Honeywell is a publicly traded corporation.

State Street Bank & Trust owns more than 10% of the outstanding stock of Honeywell.

State Street Bank & Trust is a wholly-owned and principal subsidiary of State Street Corporation, which is a publicly traded company.

Dated this 17th day of December, 2004

By: _____
Ian Simmons
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC  20006-4001

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2004, a true and correct copy of the foregoing Defendant's Motion, and Memorandum in Support of Its Motion for Transfer and Coordination or Consolidation in the Southern District of New York for Pretrial Proceedings of Related Class Actions was served by Facsimile and U.S. Mail to the following:

**Plaintiffs' Counsel:**

THE MOGIN LAW FIRM, P.C.
Daniel J. Mogin, Esq.
Lisa J. Frisella, Esq.
Chad M. McManamy, Esq.
110 Juniper Street
San Diego, California 92101
Telephone:  (619) 687-6611
Facsimile:  (619) 687-6610

BONSIGNORE & BREWER
Robert J. Bonsignore, Esq.
Robin E. Brewer, Esq.
770 L Street, Suite 1200
Sacramento, CA  95814
Telephone: (916) 442-6902
Facsimile:  (916) 442-7734

ABBEY GARDY, LLP
Stephen T. Rodd, Esq.
Jill S. Abrams, Esq.
Henry J. Young, Esq.
212 East 39th Street
New York, 10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

Matthew R. Cosgrove

DC1:607410.9

10

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1/3/05_

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THOMAS FULLAM,

        Plaintiff,

    v.

HONEYWELL INTERNATIONAL INC.,

        Defendant.

Case No. 04 CV 9871 (PKC)

ECF MATTER

**[PROPOSED] ORDER**

On consideration of defendant Honeywell International Inc.'s motion to stay, the filings made in support thereof and ~~in opposition thereto, and the argument of the parties~~, it is hereby ORDERED that defendant's motion is GRANTED;

It is further ORDERED that, in light of the pending motions before the Judicial Panel on Multidistrict Litigation, which seek transfer of this case pursuant to 28 U.S.C. § 1407, all proceedings in this matter are hereby stayed until further order of the Court.

_____
United States District Judge

1-3-05



# O'MELVENY & MYERS LLP

<table>
<tr><td>
BEIJING<br>
CENTURY CITY<br>
HONG KONG<br>
IRVINE<br>
LONDON<br>
LOS ANGELES
</td><td align="center">
1625 Eye Street, NW<br>
Washington, D.C. 20006-4001<br><br>
TELEPHONE (202) 383-5300<br>
FACSIMILE (202) 383-5414<br>
www.omm.com
</td><td align="right">
NEWPORT BEACH<br>
NEW YORK<br>
SAN FRANCISCO<br>
SHANGHAI<br>
SILICON VALLEY<br>
TOKYO
</td></tr>
</table>

January 21, 2005

OUR FILE NUMBER
0394321-00041

WRITER'S DIRECT DIAL
202-383-5106

Mr. Michael J. Beck
Clerk of the Panel
United States Judicial Panel on
Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room G-255, North Lobby
Washington, DC  20002-8004

WRITER'S E-MAIL ADDRESS
isimmons@omm.com

> **Re:   *In re Circular Thermostat Antitrust Litigation    MDL Docket No. 1673 Second Notice of "Tag-Along" Action***

Dear Mr. Beck:

Attached at Tab 1 is a copy of the class action complaint and request for jury trial in *Vincent Fagan and Anthony Gianasca v. Honeywell International Inc.*, a tag-along action filed on November 9, 2004 in the Superior Court of the Commonwealth of Massachusetts, Middlesex County, and removed to the United States District Court for the District of Massachusetts on January 19, 2005.  A copy of the notice of removal is attached at Tab 2.  I attach at Tab 3 the Answer of defendant Honeywell International Inc. ("Honeywell").

*Fagan* is virtually identical to two actions presently pending in the United States District Courts for the Northern District of California and the Southern District of New York. These two actions are the subject of *In re Circular Thermostat Antitrust Litigation*, MDL No. 1673, a pending MDL petition (filed on December 17, 2004 by Honeywell) in which Honeywell has moved that the Panel transfer these related actions for coordinated pretrial proceedings to the United States District Court for the Southern District of New York.  (This petition is attached at Tab 4.)  It is also virtually identical to an action

**O'MELVENY & MYERS LLP**

Mr. Michael J. Beck, January 21, 2005 - Page 2

currently pending in the United States District Coourt for the District of Vermont, *Alfred T. Wright v. Honeywell International Inc.*, which is the subject of the Notice of Tag-Along Action that was filed with this Panel on January 5, 2005 (attached at Tab 5, without exhibits).

Accordingly, pursuant to R.P.J.P.M.L. 7.5(e), Honeywell notifies the Panel that *Fagan* is pending in federal court and should be transferred to the Southern District of New York as well, as part of MDL No. 1673.

*Fagan* is closely related to the actions in MDL No. 1673 in a number of respects. **First**, although it seeks relief under Massachusetts state law, this state-law claim is predicated on alleged violations of federal law in connection with a federal trademark registration application -- allegations identical to those made by the MDL plaintiffs. **Second**, the purported consumer class that plaintiff seeks to certify in *Fagan* (a class Honeywell contends cannot be certified) hinges on the very same class certification issues as do the classes proposed by the MDL plaintiffs. **Third**, discovery in *Fagan*, as in the other two actions, would be conducted more efficiently through a coordinated multidistrict process.

If you have any questions, please do not hesitate to call me at the above telephone number.

Respectfully submitted,

Ian Simmons (MCC)

Ian Simmons
of O'Melveny & Myers LLP

Counsel for Honeywell
International Inc.

cc:  All Counsel of Record

Enclosures

DC1:612216.1

O'MELVENY & MYERS LLP

Mr. Michael J. Beck, January 21, 2005 - Page 3

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January, 2005, a true and correct copy of the foregoing Second Notice of Tag-Along Action was served by Facsimile and U.S. Mail to the following:

**Plaintiffs' Counsel:**

| | |
|---|---|
| THE MOGIN LAW FIRM, P.C.<br>Daniel J. Mogin, Esq.<br>Lisa J. Frisella, Esq.<br>Chad M. McManamy, Esq.<br>110 Juniper Street<br>San Diego, California 92101<br>Telephone: (619) 687-6611<br>Facsimile: (619) 687-6610 | BONSIGNORE & BREWER<br>Robert J. Bonsignore, Esq.<br>Robin E. Brewer, Esq.<br>770 L Street, Suite 1200<br>Sacramento, CA 95814<br>Telephone: (916) 442-6902<br>Facsimile: (916) 442-7734 |
| ABBEY GARDY, LLP<br>Jill S. Abrams, Esq.<br>Stephen T. Rodd, Esq.<br>Henry J. Young, Esq.<br>212 East 39th Street<br>New York, 10016<br>Telephone: (212) 889-3700<br>Facsimile: (212) 684-5191 | SHAHEEN & GORDEN, P.A.<br>D. Michael Noonan, Esq.<br>140 Washington Street<br>Dover, NH 03821-0977<br>Telephone: (603) 749-5000<br>Facsimile: (603) 749-1838 |

Matthew R. Cosgrove