UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

VINCENT FAGAN and ANTHONY
GIANASCA, Individually and as Putative Class
Representatives,

          Plaintiffs,

     v.

HONEYWELL INTERNATIONAL INC.,

          Defendant.

Civil Action No. 05cv10119 DPW

**DEFENDANT HONEYWELL INTERNATIONAL INC.'S OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

Defendant Honeywell International Inc. ("Honeywell") hereby files this opposition in response to Plaintiffs Vincent Fagan and Anthony Gianasca ("Plaintiffs'") Motion to Remand. From the face of the Complaint, it is undeniable that the Complaint itself places in issue a substantial question of federal law, one that is necessary to the resolution of this lawsuit: Plaintiffs assert that Honeywell improperly obtained a federal trademark for a round thermostat design, then utilized those trademark rights to obtain and maintain an illegal monopoly over the purported round thermostat market, as a result of which Plaintiffs and putative class members overpaid for their round thermostats. (*See* Pls.' Br. at 11.) Adjudication of Plaintiffs' claim thus requires resolution of a substantial question of federal trademark law. In fact, apparently recognizing this, the United States District Court for the District of Vermont has denied without prejudice Plaintiff's Motion to Remand in this proceeding's Vermont counterpart. (*See* Ex. 1.) Accordingly, federal jurisdiction exists under 28 U.S.C. § 1338(a) and the Court should deny Plaintiffs' Motion to Remand.

## INTRODUCTION

Plaintiffs' Motion to Remand is based on a fundamental misunderstanding of the law of federal question jurisdiction. Plaintiffs argue that because they have alleged a claim for violation of the Massachusetts Consumer Protection Statute (M.G.L. c.93A), as opposed to a claim for violation of the federal antitrust laws (Section 2 of the Sherman Act, 15 U.S.C. § 2), no federal question jurisdiction exists and remand to Suffolk Superior Court is appropriate. That is not the law. Rather, it is well established that federal jurisdiction exists where, as here, resolution of plaintiff's claim (even a state law-based claim) necessitates the resolution of a substantial question of federal law. *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983) (federal question jurisdiction exists where "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims.").[1]

Here, although Plaintiffs bring a state law-based claim under M.G.L. c.93A, their allegations of anticompetitive conduct by Honeywell are predicated on the assertion that Honeywell fraudulently "acquired its trademark [for its round thermostat design] by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO." (Compl. ¶ 5.) Simply put, as noted above, the Complaint itself places in issue Honeywell's conduct before a federal agency, the PTO. Accordingly, although Plaintiffs are required to make additional showings to prevail on their claim under M.G.L. c.93A, an adjudication on the validity of Honeywell's federal trademark for its round thermostat design is a necessary element of Plaintiffs' M.G.L. c.93A claim. If Honeywell did not commit fraud upon the PTO and validly obtained its registration, then Honeywell's actions in protecting its trademark rights were entirely

---

[1] The "substantial federal question" doctrine has its origins in the Supreme Court's decision in *Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180 (1921). There, the Court held that the ostensible state law-based suit fell within the federal question jurisdiction because the plaintiffs' right to relief turned on a predicate determination about whether the creation of the Federal Land Banks complied with the federal constitution. *See id.* at 198-99.

proper, and Plaintiffs cannot prevail on their state law claim in this lawsuit.  Because

adjudicating the validity of a federal trademark registration clearly constitutes a substantial

question of federal trademark law, the Complaint itself confirms jurisdiction under 28 U.S.C. §

1338(a).  Plaintiffs' Motion to Remand should be denied.

## <u>ARGUMENT</u>

**I.     FEDERAL JURISDICTION EXISTS OVER PLAINTIFFS' STATE LAW
         CLAIM BECAUSE IT REQUIRES THE ADJUDICATION OF THE
         VALIDITY OF A FEDERAL TRADEMARK.**

Federal jurisdiction exists under 28 U.S.C. § 1338(a) over any claim that necessitates the

resolution of a substantial question of federal patent, copyright, or trademark law.  *See*

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).  Plaintiffs concede

this.  (Pls.' Br. at 7.)  Accordingly, where, as here, adjudicating a state law claim requires a court

to determine a substantial question of federal intellectual property law, a finding of federal

jurisdiction under § 1338(a) is appropriate.

Decisions of the Supreme Court and other courts around the country confirm this

jurisdictional principle.  *See, e.g.*, *Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 345 (9th Cir. 1996)

("Even where, as here, state law creates the cause of action, and no federal law completely

preempts it, federal jurisdiction may still lie if 'it appears that some substantial, disputed question

of federal law is a *necessary* element of one of the well-pleaded state claims [.]'") (quoting

*Franchise Tax Bd.,* 463 U.S. at 13).  It is true that the presence of a federal issue that is merely

"collateral" or "peripheral" to the asserted state-law claims is not a "substantial federal question"

that confers federal removal jurisdiction.  *See, e.g.*, *Merrell Dow Pharm., Inc. v. Thompson*, 478

U.S. 804, 813 n.11 (1986).  Indeed, Plaintiffs refer the Court to its decision in *McGonagle v.*

*Nestle Waters North American Inc.*, No. 03-11370-DPW, at *2 (D. Mass. September 30, 2003)

(order granting remand), in which the Court noted that the "mere existence of question of federal law in the case is not sufficient to confer federal question jurisdiction." However, Plaintiffs err in contending (and nothing in the Court's ruling in *McGonagle* suggests) that a federal private right of action must exist for an ostensible state law claim to present a substantial federal question.[2] (*See* Pls' Br. at 7-8.) On the contrary, *Merrell Dow* "reserve[s] a wide discretion to tailor the 'arising under' jurisdiction to the practical needs of the particular situation." Richard H. Fallon et al., *Hart & Wechsler's The Federal Courts & The Federal System* 931 (4th ed. 1996).

Numerous cases confirm that where adjudication of a state law claim involves a determination of a substantial question of intellectual property law, federal jurisdiction exists under § 1338(a). For example, in *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*, 986 F.2d 476, 478 (Fed. Cir. 1993) the Federal Circuit found that federal jurisdiction existed under 28 U.S.C. § 1338(a) over a business disparagement claim brought under Texas law because "Flowdata's allegedly disparaging statement was its accusation that Adcon infringed the '318 patent." Because a plaintiff must prove the falsity of the defendant's allegedly disparaging statement to prevail on a business disparagement claim, the Federal Circuit concluded that "Adcon must show that its product [did] not infringe the '318 patent" to win its case. *Id.*

Similarly, in *Scherbatskoy v. Halliburton Co.*, 125 F.3d 288, 291 (5th Cir. 1997) the Fifth Circuit determined that federal jurisdiction existed over a lawsuit asserting state law breach of contract and breach of fiduciary duty claims because "determining whether [defendant's

---

[2]     Plaintiffs' reference to *Illinois Brick*'s bar on "indirect purchasers" bringing damages actions under section 4 of the Clayton Act is of no moment to the Court's jurisdictional analysis. Specifically, the fact that the Supreme Court ruled in *Illinois Brick Co. v Illinois*, 431 U.S. 720 (1977) that indirect purchasers lack standing to assert damages claims under section 4 of the Clayton Act says nothing as to the question before this Court: whether Plaintiffs' state law-based claim under M.G.L. c.93A requires determination of a substantial question of federal law. Because the answer to that question is yes, federal question jurisdiction obtains. Nothing in the Supreme Court's ruling in *Illinois Brick* changes this result.

subsidiary] infringed the Scherbatskoys' patents is a necessary element to . . . a finding that

Halliburton breached the Patent License Agreement."  And in *U.S. Valves, Inc. v. Dray*, 190 F.3d

811, 814 (7th Cir. 1999), the Seventh Circuit concluded that federal jurisdiction over an Indiana

breach of contract claim was appropriate because "whether a breach occurred depends on

whether Dray infringed the licensed patents."  *See also 84 Lumber Co. v. MRK Techs., Ltd.*, 145

F. Supp. 2d 675, 680 (W.D. Pa. 2001) (finding federal question jurisdiction because "Plaintiff

seeks indemnification, under the Pennsylvania statute, because Lemelson asserted a rightful

claim of patent infringement against it.  Thus plaintiff's claims cannot be resolved without also

deciding a substantial issue of federal patent law, namely, that there was an adequate basis for

Lemelson's assertion that defendants' products infringed his patents."); *Regents of the Univ. of

Minn. v. Glaxo Wellcome, Inc.*, 58 F. Supp. 2d 1036, 1038 (D. Minn. 1999) ("Determining

whether declaratory relief is warranted in this case requires an analysis of whether defendant

infringed the Vince patents, as infringement is a necessary precursor to a finding that defendant

has breached the parties' license agreement.  Plaintiff's right to relief therefore depends on

resolution of a substantial question of federal patent law." (citation omitted)).

Although most cases involving § 1338(a) jurisdiction are predicated on circumstances in

which the underlying substantial question is whether a federal intellectual property right has been

infringed, challenges to the validity or enforceability of federal intellectual property rights also

raise substantial issues of federal intellectual property law.  *See Conroy v. Fresh Del Monte

Produce Inc.*, 325 F. Supp. 2d 1049, 1055 (N.D. Cal. 2004) ("Challenges to the validity or

enforceability of a patent, however, raise a federal question in the same way that an infringement

claim otherwise would."); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330

(Fed. Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*,

175 F.3d 1356, 1359 (Fed. Cir. 1999) ("***In keeping with our precedent, we treat validity and enforceability the same as infringement***. . . . ***Each of these issues is substantial in the federal scheme***, for they are essential to the federally created property right: one determines whether there is a property right, another whether that right is enforceable, and the third what is the scope of that right.") (emphasis added).

      Even outside the realm of intellectual property, courts consistently have held that state-law based claims that require the resolution of a substantial question of federal law are subject to federal jurisdiction.  For example, *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799 (4th Cir. 1996), demonstrates how a complaint (like the instant one) that does not explicitly plead a cause of action under federal law can nevertheless raise a substantial federal question.  In *Ormet*, a manufacturer brought a claim against an electrical utility company for damages arising out of the utility's alleged violation of a tradable emissions permit contract issued pursuant to the federal Clean Air Act.  The manufacturer filed the action in federal court on the assumption that Section 408(j) of the Clean Air Act created a private right of action to enforce such contracts.  Disagreeing with this analysis, the district court construed the claim as a state-law contract action and dismissed the case for lack of subject matter jurisdiction.  A unanimous panel of the Fourth Circuit reversed--not because the federal Clean Air Act created a private right of action for the manufacturer, but because this state law-based "private commercial dispute" nonetheless implicated substantial questions of federal law.  *See id.* at 804.

      The Fourth Circuit reasoned that, while "in the 'vast majority' of cases where federal-question jurisdiction exists, federal law creates the plaintiff's cause of action," ***a class of cases exists "where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under***

*federal law within the meaning of 28 U.S.C. § 1331."* *Id.* at 806 (emphasis added). The court's determination as to whether a substantial federal question arises in a complaint that nominally asserts only state law claims "should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic." *Id.* at 807 (citations omitted). In particular, "[w]here the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts." *Id.* (citing *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 347-48 (1816)). *Ormet's* analysis of the need for uniformity in the resolution of federal issues is particularly fitting here: Plaintiffs are inviting six courts to opine as to whether Honeywell's conduct before the PTO conformed to PTO disclosure policies and procedures and federal trademark law. This case is the poster-child for inviting multiple state courts to reach inconsistent conclusions on what plainly is a federal question, namely what was Honeywell required by federal law to disclose to the PTO and did Honeywell in fact satisfy that federal standard.

Here, the adjudication of Plaintiffs' state law claim requires a determination of the validity and enforceability of Honeywell's federal intellectual property right. Accordingly, federal jurisdiction exists under 28 U.S.C. § 1338(a). Nevertheless, Plaintiffs attempt to argue that "[r]emand is still proper even assuming this Court finds some patent issues in need of resolution" as "[s]tate courts are not forbidden from deciding collateral patent issues." (Pls.' Br. at 13.) As Plaintiffs recognize, however, the *exclusive* test for whether removal to federal court is appropriate is if the district court possesses original jurisdiction, *i.e.*, whether Plaintiffs' claim could have been filed in federal court in the first instance. (*See* Pls.' Br. at 6-7; *see also*

*Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (explaining that "[o]nly state court actions that originally could have been filed in federal court may be removed to federal court").) Therefore, the issue of whether a state court is able to decide collateral patent issues is irrelevant to whether removal is appropriate. Likewise, Plaintiffs' reliance on *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998) and *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999), is misplaced. (*See* Pls.' Br. at 13-15.) Honeywell does not contend that a Massachusetts state court generally lacks jurisdiction over collateral patent issues or that Plaintiffs' claim is preempted by federal patent law. Rather, because a substantial question of federal trademark law exists, Plaintiffs' claim is properly removed as it falls within this Court's original jurisdiction pursuant to 28 U.S.C. § 1338(a).

## II.    PLAINTIFFS' CLAIM IS SUBJECT TO FEDERAL JURISDICTION.

Plaintiffs do not contest (nor could they under well established law) that federal jurisdiction exists over this proceeding if success of their claim "necessitates" the resolution of a substantial question of federal trademark law.[3] (Pls.' Br. at 7-10.) But they claim that it is not necessary to decide the trademark issues, asserting that they can prevail on their claim without assessing the validity and scope of Honeywell's trademark. Plaintiffs are incorrect. A simple reading of the Complaint confirms this: Plaintiffs' allegations of anticompetitive conduct (not only in this action, but in the virtually identical boilerplate actions Plaintiffs' counsel have filed in five other states) are predicated on the assertion that Honeywell fraudulently obtained its trademark for the Honeywell round thermostat design. (*See* Compl. ¶¶ 76-77 (stating that

---

[3]    Plaintiffs' citation to *McGonagle v. Nestle Waters North America, Inc.*, No. 03-11370-DPW, *2 (D. Mass. Sept. 30, 2003), which states that "[t]he mere existence of questions of federal law in the case is not sufficient to confer federal question jurisdiction," is therefore inapposite. (*See* Pls.' Br. at 2.) As Plaintiffs recognize, this Court has jurisdiction where a claim "necessitate[s] the resolution of a 'substantial question' of federal patent, . . . , copyright or trademark law." (Pls.' Br. at 7 (citing *Christianson*, 486 U.S. at 809).)

Honeywell "acquire[d] and maintain[ed] its monopoly on the Relevant Market" by: (1) "threatening and coercing rival thermostat manufacture[r]s into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation"; (2) "deceiving the PTO into believing no competition existed for the [Honeywell Round Thermostat], something Honeywell knew to be false, and thereby securing a registered trademark"; (3) "combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application"; and (4) "purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.").)[4]  Absent a showing that Honeywell's trademark was fraudulently obtained, none of Honeywell's alleged actions could possibly qualify as anticompetitive.  *See LucasArts Entm't Co. v. Humongous Entm't Co.*, 870 F. Supp. 285, 290 (N.D. Cal. 1993) (finding that exercise of valid copyright to exclude other parties from using copyright work did not violate the state antitrust law); *cf. Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1182 (1st Cir. 1994) (holding that the exercise of a valid copyright is "a presumptively legitimate business justification for the author's refusal to license to competitors" under the Sherman Act). Adjudicating the validity of Honeywell's federal trademark for its round thermostat design is necessary to resolving the claims at issue in this matter, as the Complaint itself makes clear. Accordingly, federal jurisdiction pursuant to 28 U.S.C. § 1338(a) obtains here.[5]

---

[4]    Similar allegations are contained in the analogous complaints that have been filed in New York (*Fullam v. Honeywell Int'l Inc.*, Complaint, ¶ 29 (attached as Ex. 2)), California (*Brock v. Honeywell Int'l Inc.*, Complaint, ¶¶ 76-77 (attached as Ex. 3)), Vermont (*Wright v. Honeywell Int'l Inc.*, Complaint, ¶¶ 76-77 (attached as Ex. 4)), Tennessee (*Bailey v. Honeywell Int'l Inc.*, Complaint, ¶¶ 76-77 (attached as Ex. 5)), and Maine (*McKinnon v. Honeywell Int'l Inc.*, Complaint, ¶¶ 76-77 (attached as Ex. 6)).

[5]    Of course, Plaintiffs must do more than simply show fraud on the PTO to prevail on their claims.  Other issues that must be determined in adjudicating this lawsuit include, but are not limited to: (1) whether Plaintiffs' purported "relevant market" is legally cognizable; (2) whether Honeywell possesses "monopoly power" as alleged here in any "relevant market"; (3) whether there are "barriers to entry" in any "relevant market" alleged here; and (4) whether the alleged conduct by Honeywell resulted in anticompetitive effects, that is, in higher prices or reduced

The cases cited by Plaintiffs perfectly illustrate this point. In *Conroy*, the court specifically observed that claims based on fraud on the PTO, including claims of sham litigation predicated on a contention of fraud on the PTO, necessarily required resolution of a federal intellectual property right. 325 F. Supp. 2d at 1055-56 ("Throughout the Complaint, Plaintiff has alleged that ***Defendants committed fraud upon the PTO . . . . Generally, such allegations necessarily involve questions of patent law, including what information the patent applicant had a duty to disclose and what information was material to the patent application***. . . . Also, an allegation of sham litigation requires the court to determine whether the targeted litigation was 'objectively baseless. . . .'") (citation omitted) (emphasis added). The *Conroy* court found that federal jurisdiction was lacking in that proceeding because the *Conroy* plaintiff could "prevail on ***all*** of her causes of action without needing to prove fraud on the PTO" because of additional allegations of anticompetitive conduct that she had made. *Id.* at 1056 (emphasis added). But the court essentially accepted the proposition that federal jurisdiction was appropriate if proving fraud on the PTO was necessary for a plaintiff to prove any of his or her claims. *See id.* at 1055-56; *see also Coker v. Purdue Pharma Co.*, 314 F. Supp. 2d 777, 782 (W.D. Tenn. 2004) (stating "[t]he alleged submission of material misrepresentations to the PTO in the prosecution of patents necessarily involves questions of patent law"). Simply put, the *Conroy* court recognized both that allegations of fraud on the PTO necessarily require an examination of the application process for the intellectual property right in question and that such an examination carries federal jurisdiction with it. *Conroy*, 325 F. Supp. 2d at 1055-56. Accordingly, if a court must undergo such an analysis in adjudicating a state law claim, then federal jurisdiction under § 1338(a) attaches.

---

output in the "relevant market." Proving fraud on the PTO is a necessary, but not sufficient, predicate for Plaintiffs to prevail.

Unlike *Conroy*, the Complaint here contains no allegations of misconduct that do not derive from, and depend upon a showing of, Honeywell's alleged fraud on the PTO.[6]  Plaintiffs nonetheless attempts to invoke *Conroy*, arguing that their claim does not depend on the validity of Honeywell's trademark because the validity of Honeywell's trademark is not an element of Plaintiffs' claim.  But Plaintiffs misstate the appropriate test.

A state law claim need not have a federal intellectual property issue as an element of the cause of action for federal jurisdiction to obtain under 28 U.S.C. § 1338(a).  None of the claims mentioned in the cases listed above, where federal jurisdiction was recognized – the business disparagement claim in *Additive Controls*, the breach of contract and breach of fiduciary duty claims in *Scherbatskoy*, the breach of contract claim in *U.S. Valves* – had a federal intellectual property issue as an element of the claim.  Rather, the standard is whether, given a plaintiff's allegations, he or she can prove all of his or her claims without adjudicating a substantial issue of federal intellectual property law.  *See Coker*, 314 F. Supp. 2d at 782 ("Plaintiff refers to two types of misconduct by Defendants: (1) that Defendants made material misrepresentations to the PTO in prosecuting their patents, and (2) that Defendants' lawsuit against Endo was 'sham' litigation.  These allegations are the basis of Plaintiffs' state law claims, *i.e.*, that Defendants engaged in that misconduct to obtain and enforce a monopoly and to restrain trade.  Were these two theories Plaintiffs' only avenues of proving his claims, then Defendants would have the

---

[6]     Although Plaintiffs make no mention of this argument in their opening brief, Plaintiffs' counsel have contended in their reply briefs in parallel motions to remand that their allegations regarding Honeywell's acquisition of Quad Six (Compl. ¶¶ 87, 121-122) satisfies the *Conroy* standard.  This contention, however, is wholly off base. As Plaintiffs' Complaint makes clear, the allegations regarding Quad Six do not represent (as they must under *Conroy*) an independent theory of recovery under M.G.L. 93A.  Rather, they are merely a part of Plaintiffs' overarching allegations regarding Honeywell's alleged fraud on the PTO.  Indeed, as Plaintiffs themselves note, "[t]he purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and ***keep the PTO from learning of such competition during the 108 Trademark Application.***" (Compl. ¶ 122 (emphasis added).)  In short, Plaintiffs' allegations regarding Honeywell's purchase of Quad Six are wholly bound up in its theory of Honeywell's fraud on the PTO, and therefore those allegations cannot provide for remanding this proceeding.

better of these [jurisdictional] arguments.") (record citation omitted).  Because Plaintiffs cannot

prevail in this litigation on their claim without first proving the invalidity of Honeywell's round

thermostat design trademark, federal jurisdiction over this litigation plainly exists under 28

U.S.C. § 1338(a).[7]

## CONCLUSION

For the foregoing reasons, Honeywell respectfully requests that Plaintiffs' Motion to

Remand be denied.

Respectfully submitted,
HONEYWELL INTERNATIONAL INC.,
Defendant,
By its attorneys,

/s/ David M. Osborne
William H. Kettlewell (BBO # 270320)
David M. Osborne (BBO #564840)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, Massachusetts 02210

Richard G. Parker
Ian Simmons
Benjamin G. Bradshaw
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
(202) 383-5300

Dated: February 18, 2005

---

[7]       For example, for Plaintiffs to prevail on their "sham litigation" claim, they would need to demonstrate that Honeywell had no probable cause for bringing claims to enforce its trademark rights – an inquiry which wholly turns on both the scope and the validity of Honeywell's round thermostat design trademark.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62-63 (1993).  Thus, Plaintiffs' "sham litigation" claim necessarily demands the resolution of a substantial issue of federal intellectual property law.  *See Coker*, 314 F. Supp. 2d at 782 n.7 ("Given the U.S. Supreme Court's holding that the subjective intent of a party accused of filing sham litigation is relevant only if the litigation is first shown to be objectively meritless, allegations of an 'impure heart' do not alleviate the requirement that the objective merits of the targeted suit – here, a patent infringement suit – be addressed first.") (citation omitted).

# EXHIBIT 1

CM/ECF - U.S. District Court - Vermont (LIVE) - Display Receipt

Page 1 of 1

RECEIVED

FEB 17 2005

DINSE, KNAPP &
McANDREW, P.C.

```
MIME-Version:1.0
From:cmecfhelpdesk@vtd.uscourts.gov
To:Courtmail@vtd.uscourts.gov
Bcc:david_legere@vtd.uscourts.gov,kris_long@vtd.uscourts.gov,mnoonan@shaheengordon.c
Message-Id:<76210@vtd.uscourts.gov>
Subject:Activity in Case 1:05-cv-00001-jgm Wright v. Honeywell International, Inc. "
```

Content-Type: text/html

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Vermont

Notice of Electronic Filing

The following transaction was received from kbl, entered on 2/16/2005 at 2:09 PM EST and filed on 2/16/2005

| | |
|---|---|
| **Case Name:** | Wright v. Honeywell International, Inc. |
| **Case Number:** | 1:05-cv-1 |
| **Filer:** | |
| **Document Number:** | 19 |

**Docket Text:**
ORDER granting [4] Motion to Stay, denying without prejudice [9] Motion to Remand to State Court, granting [16] Motion to Withdraw as Attorney. Attorney Arend Richard Tensen terminated. Signed by Judge J. Garvan Murtha on 2/16/2005. (This is a text only Order.) (kbl, )

The following document(s) are associated with this transaction:

**1:05-cv-1 Notice will be electronically mailed to:**

D. Michael Noonan     mnoonan@shaheengordon.com, pattikretschmar@shaheengordon.com

**1:05-cv-1 Notice will be delivered by other means to:**

Karen McAndrew
Dinse, Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988

# EXHIBIT 2

Summons with notice Supreme Court, personal or substituted service. 1-93

© 1993 BY JULIUS BLUMBERG, INC.,
PUBLISHER, NYC. 10013

**Supreme Court of the State of New York**

**County of** New York

Index No. 04-603748

Date purchased  11/9/04

Plaintiff(s) designate(s)

New York
County as the place of trial.

The basis of the venue is

NY General Business Law
§349

| | |
|---|---|
| THOMAS FULLAM | |
| | *Plaintiff(s)* |
| *against* | |
| HONEYWELL INTERNATIONAL, INC. | |
| | *Defendant(s)* |

**Summons**

Plaintiff(s) reside(s) at
c/o Abbey Gardy, LLP
212 E. 39th St., NY, NY 10016
County of

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within       days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated,  November 9, 2004

Defendant's address:

Honeywell International, Inc.
101 Columbia Road
Morristown, New Jersey  07962

ABBEY GARDY, LLP
Attorney(s) for Plaintiff
Office and Post Office Address
212 E. 39th Street
New York, New York  10016
(212) 889-3700

NOT COPIED
WITH COPY FILED

NOV 0 9 2004

NEW YORK
COUNTY CLERK'S OFFICE

NOV 0 9 2004

**RECEIVED**

NOV 2 3 2004

**M. JOHNSON**

Index No. 04-603748
Supreme Court of the State of New York
County of New York

THOMAS FULLAM

*against*

Plaintiff(s)

HONEYWELL INTERNATIONAL, INC.

Defendant(s)

**Summons**

ACTION NOT BASED UPON A
CONSUMER CREDIT TRANSACTION

ABBEY GARDY, LLP

Attorney(s) for Plaintiff(s)

Office, Post Office Address and Tel. No.

212 E. 39th Street
New York, NY  10016
212-889-3700

| DESCRIPTION USE WITH 1, 2 or 3 | | |
|---|---|---|
| ☐ Black Hair | ☐ 51-65 Yrs. | |
| ☐ Brown Hair | ☐ Over 65 Yrs. | |
| ☐ Blonde Hair | | |
| ☐ Gray Hair | ☐ Under 5' | |
| ☐ Red Hair | ☐ 5'0"-5'3" | |
| ☐ White Hair | ☐ 5'4"-5'8" | |
| ☐ Balding | ☐ 5'9"-6'0" | |
| ☐ Male | ☐ Mustache | ☐ Over 6' |
| ☐ Female | ☐ Beard | ☐ Under 100 Lbs. |
| ☐ White Skin | ☐ Glasses | ☐ 100-130 Lbs. |
| ☐ Black Skin | ☐ 14-20 Yrs. | ☐ 131-160 Lbs. |
| ☐ Yellow Skin | ☐ 21-35 Yrs. | ☐ 161-200 Lbs. |
| ☐ Brown Skin | ☐ 36-50 Yrs. | ☐ Over 200 Lbs. |
| ☐ Red Skin | | |

Other identifying features:

Sworn to before me on

.........................................
Print name beneath signature

---

**AFFIDAVIT OF SERVICE**

State of New York, County of                    ss:

The undersigned, being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at

That on                    19        at                    on

deponent served the within summons                    defendant

**INDIVIDUAL 1.** ☐ by delivering a true copy of *each* to said defendant personally; deponent knew the person so served to be the person described as said defendant therein.

**CORPORATION 2.** ☐ a                    corporation.
by delivering there at a true copy of *each* to

personally, deponent knew said corporation so served to be the corporation described in said summons as said defendant and knew said individual to be                    thereof.

**SUITABLE AGE PERSON 3.** ☐ by delivering there at a true copy of *each* to
a person of suitable age and discretion. Said premises is defendant's—actual place of business—dwelling place—usual place of abode—within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐ by affixing a true copy of *each* to the door of said premises, which is defendant's—actual place of business—dwelling place—usual place of abode—within the state. Deponent was unable, with due diligence, to find defendant or a person of suitable age and discretion thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known residence, at

and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class postpaid envelope properly addressed to defendant at defendant's actual place of business, at

in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

SUPREME COURT, CIVIL BRANCH, NEW YORK COUNTY

INDEX PURCHASE COVER SHEET

INDEX #:    04-603748

NATURE OF ACTION OR PROCEEDING (check ONE box only and enter on Index Purchase Form)

**MATRIMONIAL**

[ ] Contested   - CM
[ ] Uncontested - UM

**COMMERCIAL**

[ ] Contract      - CONT
[X] Corporate     - CORP
[ ] Insurance     - INS
[ ] Other Commercial - OC
   (Other than Contract)
[ ] UCC (including but not
   limited to Sales,
   Negotiable Instruments
   etc.)

**TORTS**

[ ] Asbestos         - ASB
[ ] Breast Implant  - BI
[ ] Dental Malpractic   - DM
[ ] Medical/Podiatric Malpractice -MM
[ ] Other Professional Malpractice
                        - OPM
[ ] Motor Vehicle - MV
[ ] Negligence      - OTN
[ ] Other Tort      - OT (including
   but not limited to Intentional
   Tort, Environmental, Toxic,
   Airline, Seaman, etc.)
[ ] Products Liability  -  PL

**REAL PROPERTY**

[ ] Condemnation   - COND
[ ] Foreclosure    - FOR
[ ] Landlord/Tenant - ORP
[ ] Other  Real Property-ORP
[ ] Tax Certiorari - TAX

**SPECIAL PROCEEDINGS**

[ ] Article 75 (Arbitration) - ART 75
[ ] Article 77 (Trusts)      - ART 77
[ ] Article 78    - ART 78
[ ] Incompetency   - INC
[ ] Guardianship  - GUARD
[ ] Other Mental Hygiene-MHYG
[ ] Other Special Proceeding - OSP

NEW YORK
COUNTY CLERK'S OFFICE

NOV 0 9 2004

**OTHER ACTIONS**

[ ] Election  - ELEC
[X] Other     - OTH

WITH COPY FILED

Check "YES" or "NO" for each of the following questions.

Is this action/proceeding against a

YES  NO
[ ] [X] Municipality:

YES  NO
[ ] [X]  Public Authority:

(specify _____)  (specify _____)

YES  NO
[X] [ ] Does this action/proceeding seek equitable relief?
[ ] [X] Does this action/proceeding seek recovery for personal injury?
[ ] [X] Does this action/proceeding seek recovery for property damage?

B-383

SUPREME COUT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

NEW YORK
COUNTY CLERK'S OFFICE

NOV 0 9 2004

NOT COMPARED
WITH COPY FILED

---

THOMAS FULLAM,

Plaintiff,

v.

HONEYWELL INTERNATIONAL, INC.,

Defendant.

---

Civil Action No. 04-603748

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff, by and through counsel, brings this class action lawsuit in response to the illegal, unfair and deceptive business practices in which Honeywell International, Inc ("Honeywell" or the "Company") engaged in connection with the manufacture and sale of its circular thermostats in New York. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (the "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition. Plaintiff now seeks redress for the damage to himself and other purchasers of Honeywell circular thermostats ("HRT") as a result of Honeywell's deceptive practices, and to enjoin Honeywell from continuing the illegal business practices described herein.

## JURISDICTION AND VENUE

1.    The claims asserted herein arise under §349 of New York's General Business Law (NY CLS Gen. Bus. §349 (2004)).

2.    This Court has jurisdiction over the subject matter of this action pursuant to §302 of the New York's Civil Practice Law and Rules ("CPLR"). Honeywell sells its circular thermostats to residential customers throughout New York and many of the unlawful acts and transactions alleged herein occurred in this judicial district.

3.    Venue is proper in this judicial district, which plaintiff has chosen pursuant to §509 of the CPLR.

## PARTIES

4.    Plaintiff Thomas Fullam is a resident of the State of New York and a purchaser of Honeywell 'round' thermostats (hereinafter referred to as "HRTs")at a supra-competitive price and therefore suffered injury.

5.    Defendant Honeywell is a multifaceted, multinational manufacturer of commercial and household products (including thermostats). According to the Company's website, Honeywell manufactures products for the aerospace, automotive, power generation and chemical industries, including thermostats. It is organized into four main reporting segments: Aerospace, Automation and Control Solutions, specialty materials and Transportation Systems. Honeywell employs over 100,000 people in 95 countries. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware. Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across New York.

## CLASS ACTION ALLEGATIONS

6.      Plaintiff brings this action as a class action pursuant to §§ 901, et seq. of the CPLR on behalf of a class the ("Class") consisting of all those who purchased HRTs in New York between June 30, 1986 and the filing of this Action (the "Class Period") for their own use and who were damaged thereby.  Excluded from the Class are the defendant, its officers and directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendant has or had a controlling interest.

7.      Numerosity:  The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of class members is unknown to plaintiffs at this time, based upon the amount of trade and commerce in HRT, plaintiffs are informed and believe that more than 1.5 million HRTS are sold annually in the United States to hundreds of thousands of consumers. Joinder of all members of the Class is not practicable.

8.      Common Questions Predominate:  Common questions lf law and fact exist as to all members of the plaintiff Class and predominate over any questions, which affect only individual members of the class.  These common questions of law and fact include, without limitation:

        a      Whether defendants violated New York Business and Professions Law;

        b      The effect upon and the extent of injuries sustained by plaintiff and each member of the Class and the appropriate type and/or measure of damages; and

3

c        The appropriate nature of class wide equitable relief.

Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole

9.      Typicality:  Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because plaintiff and each member of the Class purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

10.     Adequacy:  Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class.  Plaintiff resides in New York, is an indirect purchaser of HRT and purchased, in New York, HRT during the Class Period for their own use and not for resale, and thus are adequate representatives of the Class.  He has no interests that are adverse to the interests of absent class members.  Plaintiff has retained counsel with substantial experience in the prosecution of complex class action antitrust and consumer protection litigation.

11.     Superiority:  A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impracticable.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Furthermore, as the monetary injuries suffered by each individual member of the Class may be relatively small, the expenses and burden of

4

individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.   Additionally, an important public interest will be served by addressing the matter as a class action.   The cost to the court system of adjudication of such individualized litigation would be substantial.   Individualized litigation would also present the potential for inconsistent or contradictory judgments.

12.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## DEFENDANT'S CONTINUING ILLEGAL AND DECEPTIVE PRACTICES

13.     Honeywell makes thermostats, among other products.  In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).  The HRT is the biggest selling thermostat in the United States.  In fact, according to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world." Honeywell has sold more than 85 million HRTs and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.  Honeywell ahs spent over $70 million to advertise HRT.  The HRT is the only circular thermostat sold in New York.  Honeywell has a 100% monopoly over circular thermostats in New York.  Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market so that the only round thermostat consumers could purchase would be  the HRT, causing them to spend far more that if Honeywell had not squelched all competition  in the round thermostat market.

14.    Honeywell represents that it is "the world's leading manufacturer of thermostats". Thermostats are distinct from other types devices used for controlling air temperature in homes. Electromechanical thermostats are not electronic and are not programmable.

15.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference. According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world" and "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for." On May, 19 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

16.    As a result of the acts and practices complained of herein, Honeywell has acquired and maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and New York.

17.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT and spent more than $70 million to advertise HRT.

18.    Current annual sales of HRTS are approximately 1.5 million to 2.5 million units, or $40 million.

19.    The HRT is virtually the only circular thermostat sold in New York. Honeywell has a 100% monopoly over circular thermostats in the United States and New York. A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is due to its absolute monopolization of the circular thermostat market.

6

## A.    Background

20.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

21.    Honeywell has worked hard to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

22.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent"). According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

23.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent"). The HRT Design Patent expired in 1970.

## B.    The Rejected 1968 Trademark Application.

24.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

25.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition. A trademark can be any word, name, symbol, device, slogan, package design (or combination of these), which serves to identify and

7

distinguish a specific product from others in the market place or in trade. However, with a few exceptions (not relevant to the HRT), functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large. Functionality is especially critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights. Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

26.      The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent). The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

27.      Honeywell appealed the examiner's decision. The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark. The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be

produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

28.     Therefore, by the end of the 1970, neither patent nor trademark protected the HRT and over Honeywell's objections, the law had declared an end to Honeywell's monopoly of circular style thermostats. Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in New York. Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat"). In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat"). In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat"). In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

        C.      Honeywell engaged in deceptive business practices to illegally
                monopolize the market for circular thermostats.

29.     Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive business practices with the intent to acquire and maintain its monopoly on the relevant market. Those practices have inured to the detriment of Plaintiff and the Class The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be

9

false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

30.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the relevant market and caused the price of its HRTs to be inflated, thereby harming those persons or entities, including Plaintiff and the members of the Class, who purchased HRTs during that period. As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at inflated prices throughout the relevant market during the Class Period.

31.    Rival thermostat manufacturer (ECO who Honeywell has also attempted to coerce into not competing in the circular thermostat market) has described to the media how Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    The Pattern of Sham and Baseless Litigation

32.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell. However, Honeywell owned

no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968. Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat. Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market. Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

33.    Honeywell learned of the competing Hunter Fan Thermostat in 1986. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell. Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat. Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987. However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968. Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark

infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

34.    As was intended by Honeywell, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

35.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the relevant market. In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market." The District Court also commented that:

> The evidence before this court also shows that whenever Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (emphasis added)

E.    Deception of the PTO

36.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application"). The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional. As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

37.    Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the

12

functionality of the HRT.  Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

38.    Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.  When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.  According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.  The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

39.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).  The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

40.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.  Honeywell

13

thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

41.     As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.  The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market.  Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.  The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.  However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.  Honeywell did not describe the Quad Six Thermostat in the application.  The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.  Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

42.     The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.  The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the relevant market and keep the PTO from learning of such competition during the 108 Trademark Application.

14

43.    Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending. Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application). The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

44.    Pursuant to the 108 Trademark Application, Honeywell published the application for opposition. Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections. If no opposition is filed within a designated period of time (e.g. one month) the application is registered. A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats. However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB. As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

15

45.     The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition .The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.  As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.  Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

>> *Despite the apparent availability of the rounded thermostat cover since that time* [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

46.     The TTAB granted the 108 Trademark Application in 1988.

F.      The ECO Thermostat.

16

47.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat"). The ECO Thermostat is circular and would compete with the HRT in the relevant market. ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs. In May 2003, Daniels was quoted in the Indianapolis Business Journal as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

48.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement. ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell. The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation"). Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured. Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses. Two of the statutory defenses available to

17

incontestability are functionality and fraudulent procurement of a trademark registration. The two parties conducted expedited discovery and presented evidence.

49.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

50.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970. The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

51.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with

18

the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

52.     Honeywell appealed the District Court's holding.  The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.  As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

## COUNT I

(for violations of §349
New York's General Business Law)

53.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

54.     As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of §349 of New York's General Business Law.

55.     Honeywell coerced rival thermostat manufacturers into not competing with the HRTs by threatening such rivals with sham trademark infringement litigation. Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape.   The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as

19

Honeywell intended, allowed Honeywell to monopolize the relevant market and charge high prices for HRTs and was in violation of §349 of New York's General Business Law.

56.    During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

57.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in New York. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats and violated §349 of New York's General Business Law.    Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application process that would provide evidence to the TTAB of circular thermostats directly competing with the HRT. The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the

20

Relevant Market, all in violation of §349 of New York's General Business Law. Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of §349 of New York's General Business Law.

58.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of §349 of New York's General Business Law.

59.    Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

60.    Independent of monopolization or the aforesaid trust, defendants further engaged in business acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

61.    Honeywell misled plaintiff and other purchasers of HRTs in the Relevant Market, in that said purchasers believed the prices they paid for the HRTs were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein. The deception of the plaintiff and other HRT consumers was in violation of §349 of New York's General Business Law.

62.    Pursuant to the provisions §349 of New York's General Business Law plaintiff seeks: 1) to recover the actual damages sustained by plaintiff (plus interest) and

each member of the proposed Class, from defendant Honeywell; 2) injunctive relief to prevent Honeywell from continuing the violations of §349 of New York's General Business Law as alleged herein; and 3) reasonable costs and attorney fees.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and plaintiff's counsel as Lead Counsel under §§ 901 and 902 of the CPLR;

Awarding plaintiff and members of the proposed Class damages in the manner described above;

Granting appropriate equitable relief, including but not limited to restitution and enjoining the defendant from further illegal activity;

Awarding to plaintiff reasonable costs and attorney fees; and

Such other and further relief as is just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: November 9, 2004

ABBEY GARDY, LLP

By: _____
Jill S. Abrams, Esq.
Stephen T. Rodd, Esq.
Henry J. Young, Esq.
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700

Dan Mogin, Esq.
The Mogin Law Firm, P.C.
110 Juniper Street
San Diego, CA  92101
Telephone:  619-687-6611

Robert J. Bonsignore, Esq.
Bonsignore & Brewer
23 Forest Street
Medford, MA  02155
Telephone:  781-391-9400

Attorneys for Plaintiff

23

SUPREME COURT, CIVIL BRANCH, NEW YORK COUNTY

INDEX PURCHASE COVER SHEET

INDEX #: _____

NATURE OF ACTION OR PROCEEDING (check <u>ONE</u> box only <u>and</u> enter on Index Purchase Form)

MATRIMONIAL

[ ] Contested   - CM
[ ] Uncontested - UM

COMMERCIAL

[ ] Contract     -   CONT
[x] Corporate    -   CORP
[ ] Insurance    -   INS
[ ] Other Commercial - OC
    (Other than Contract)
[ ] UCC (including but not
    limited to Sales,
    Negotiable Instruments
    etc.)

TORTS

[ ] Asbestos        -   ASB
[ ] Breast Implant  -   BI
[ ] Dental Malpractic   -   DM
[ ] Medical/Podiatric Malpractice -MM
[ ] Other Professional Malpractice
                        -   OPM
[ ] Motor Vehicle   -   MV
[ ] Negligence      -   OTN
[ ] Other Tort      -   OT (including
    but not limited to Intentional
    Tort, Environmental, Toxic,
    Airline, Seaman, etc.)
[ ] Products Liability  -   PL

REAL PROPERTY

[ ] Condemnation   - COND
[ ] Foreclosure    - FOR
[ ] Landlord/Tenant - ORP
[ ] Other  Real Property-ORP
[ ] Tax Certiorari - TAX

SPECIAL PROCEEDINGS

[ ] Article 75 (Arbitration) - ART 75
[ ] Article 77 (Trusts)      - ART 77
[ ] Article 78     - ART 78
[ ] Incompetency   - INC
[ ] Guardianship   - GUARD
[ ] Other Mental Hygiene-MHYG
[ ] Other Special Proceeding - OSP

OTHER ACTIONS

[ ] Election  - ELEC
[x] Other     - OTH

Check "YES" or "NO" for each of the following questions.

Is this action/proceeding against a

YES  NO                          YES    NO
[ ] [x] Municipality:            [ ]    [x]  Public Authority:

(specify _____)  (specify _____)

YES  NO
[x] [ ] Does this action/proceeding seek equitable relief?
[ ] [x] Does this action/proceeding seek recovery for personal
        injury?
[ ] [x] Does this action/proceeding seek recovery for property
        damage?

B-383

# EXHIBIT 3

G2



**CORPORATION SERVICE COMPANY'**

RXT / ALL
**Transmittal Number: 3759411**
**Date Processed: 11/18/2004**

# Notice of Service of Process

**Primary Contact:**    Meg  Johnson-Law Dept- AB-2
Honeywell International Inc.
101 Columbia Rd.
Morristown, NJ 07962

| | |
|---|---|
| **Entity:** | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc |
| **Title of Action:** | Brian Brock vs. Honeywell International, Inc |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court:** | San Francisco County Superior Court , California |
| **Case Number:** | CGC-04-436205 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 11/18/2004 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | Daniel J Mogin |
| | 619-687-6611 |

**RECEIVED**

NOV 2 3 2004

**M. JOHNSON**

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It
does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscinfo.com

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

HONEYWELL INTERNATIONAL, INC. and DOES 1 - 100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

BRIAN BROCK, on behalf of himself and all others similarly situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.   There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta.   Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

San Francisco Superior Court
400 McAllister Street
San Francisco, California 94102

CASE NUMBER:
*(Número del Caso):*   04 - 436205

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Daniel J. Mogin/ THE MOGIN LAW FIRM, P.C.
110 Juniper Street/ San Diego, CA 92101        Telephone: (619) 687-6611

| DATE:<br>*(Fecha)* | NOV 1 0 2004 | GORDON PARK-LI | Clerk, by<br>*(Secretario)* | MARY ANN MORAN | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* HONEYWELL INTERNATIONAL, INC.

under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: <br> Daniel J. Mogin (SBN 95624)/ THE MOGIN LAW FIRM, P.C. <br> 110 Juniper Street <br> San Diego, CA 92101 <br> TELEPHONE NO.: (619) 687-6611    FAX NO.: (619) 687-6610 <br> ATTORNEY FOR *(Name)*: Plaintiffs Brian Brock, et al. | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME:

CASE NAME:
Brock, et al. v. Honeywell International, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: CGC - 04 - 436205 |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder <br> Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | | JUDGE: <br> DEPT.: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
[✓] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental /Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel      e. [✓] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve            in other counties, states or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence      f. [✓] Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply)*:
   a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action *(specify)*: 3
5. This case [✓] is [ ] is not a class action suit.
Date: November 8, 2004

Daniel J. Mogin
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-010 [Rev. July 1, 2003] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 201.8, 1800–1812; <br> Standards of Judicial Administration, § 19 <br> www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers**

If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must check all five items on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. You do not need to submit a cover sheet with amended papers. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 201.8(c) and 227 of the California Rules of Court.

**To Parties in Complex Cases**

In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 1800 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
　　Damage/Wrongful Death
Uninsured Motorist (46) *(if the
　　case involves an uninsured
　　motorist claim subject to
　　arbitration, check this item
　　instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
　　Asbestos Property Damage
　　Asbestos Personal Injury/
　　　　Wrongful Death
Product Liability *(not asbestos or
　　toxic/environmental)* (24)
Medical Malpractice (45)
　　Medical Malpractice–
　　　　Physicians & Surgeons
　　Other Professional Health Care
　　　　Malpractice
Other PI/PD/WD (23)
　　Premises Liability (e.g., slip
　　　　and fall)
　　Intentional Bodily Injury/PD/WD
　　　　(e.g., assault, vandalism)
　　Intentional Infliction of
　　　　Emotional Distress
　　Negligent Infliction of
　　　　Emotional Distress
　　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
　　Practice (07)
Civil Rights (e.g., discrimination,
　　false arrest) *(not civil
　　harassment)*(08)
Defamation (e.g., slander, libel)
　　(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　　Legal Malpractice
　　Other Professional Malpractice
　　　　*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　　Breach of Rental/Lease
　　　　Contract *(not unlawful detainer
　　　　or wrongful eviction)*
　　Contract/Warranty Breach–Seller
　　　　Plaintiff *(not fraud or negligence)*
　　Negligent Breach of Contract/
　　　　Warranty
　　Other Breach of Contract/Warranty
Collections (e.g., money owed, open
　　book accounts) (09)
　　Collection Case–Seller Plaintiff
　　Other Promissory Note/Collections
　　　　Case
Insurance Coverage *(not provisionally
　　complex)* (18)
　　Auto Subrogation
　　Other Coverage
Other Contract (37)
　　Contractual Fraud
　　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
　　Condemnation(14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　　Writ of Possession of Real Property
　　Mortgage Foreclosure
　　Quiet Title
　　Other Real Property *(not eminent
　　domain, landlord/tenant, or
　　foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
　　drugs, check this item; otherwise,
　　report as Commercial or
　　Residential.)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　　Writ–Administrative Mandamus
　　Writ–Mandamus on Limited Court
　　　　Case Matter
　　Writ–Other Limited Court Case
　　　　Review
Other Judicial Review (39)
　　Review of Health Officer Order
　　Notice of Appeal–Labor
　　　　Commissioner Appeals

**Provisionally Complex Civil
Litigation (Cal. Rules of Court Rule
1800–1812)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Toxic Tort/Environmental (30)
Insurance Coverage Claims
　　*(arising from provisionally
　　complex case type listed above)*
　　(41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　　Abstract of Judgment (Out of
　　　　County)
　　Confession of Judgment *(non-
　　　　domestic relations)*
　　Sister State Judgment
　　Administrative Agency Award
　　　　*(not unpaid taxes)*
　　Petition/Certification of Entry of
　　　　Judgment on Unpaid Tax
　　Other Enforcement of Judgment
　　　　Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
　　above)* (42)
　　Declaratory Relief Only
　　Injunctive Relief Only *(non-
　　　　harassment)*
　　Mechanics Lien
　　Other Commercial Complaint
　　　　Case *(non-tort/non-complex)*
　　Other Civil Complaint
　　　　*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
　　Governance (21)
Other Petition *(not specified above)*
　　(43)
　　Civil Harassment
　　Workplace Violence
　　Elder/Dependent Adult
　　　　Abuse
　　Election Contest
　　Petition for Name Change
　　Petition for Relief from Late
　　　　Claim
　　Other Civil Petition

**CIVIL CASE COVER SHEET**

ENDORSED
FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

2004 NOV 10  AM 11: 22

GORDON PARK-LI, CLERK

BY: MARY ANN MORAN
DEPUTY CLERK

1 | Daniel J. Mogin (95624)
Lisa J. Frisella (216504)
2 | Chad M. McManamy (225205)
THE MOGIN LAW FIRM, P.C.
3 | 110 Juniper Street
San Diego, CA 92101-1502
4 | Telephone: (619) 687-6611
Facsimile: (619) 687-6610
5 |
Stephen T. Rodd
6 | Jill S. Abrams
Henry J. Young
7 | ABBEY GARDY, LLP
212 East 39th Street
8 | New York, New York 10016
Telephone: (212) 889-3700
9 | Facsimile: (212) 684-5191
10 |

**CASE MANAGEMENT CONFERENCE SET**

**PLAN 1    APR 1 5 2005  9:00 AM**

**DEPARTMENT 212**

11 | Attorneys for Plaintiff Brian Brock
and the Proposed Plaintiff Class
12 | (Additional Counsel Appear on Signature Page)

13 |

14 | SUPERIOR COURT FOR THE STATE OF CALIFORNIA

15 | COUNTY OF SAN FRANCISCO

16 | (UNLIMITED JURISDICTION)

17 |

| | |
|---|---|
| 18  BRIAN BROCK, on behalf of himself and all others similarly situated, | Case No. |
| 19 | **CGC - 04 - 436205** |
| 20  Plaintiffs, | **CLASS ACTION** |
| 21  v. | **COMPLAINT** [Cartwright Act, Common Law Monopolization and Unfair Competition Law] |
| 22  HONEYWELL INTERNATIONAL, INC. and DOES 1-100, inclusive, | |
| 23 | **JURY TRIAL DEMAND** |
| 24  Defendants. | |

25 |

26 |     Plaintiff BRIAN BROCK, on behalf of himself and all others similarly situated, and

27 | demanding trial by jury, complain and allege upon information and belief as follows:

28 | ///

CLASS ACTION COMPLAINT

<u>**SUMMARY OF CASE**</u>

1.    Plaintiffs bring this Cartwright Act (Bus. & Prof. Code Section 16700, et seq.) Unfair Competition Law (Bus. & Prof. Code Section 17200, et seq.) and Common Law Monopolization case individually and as a class action on behalf of a consumer or end-user class consisting of all persons who purchased, in California, for their own use and not for resale Honeywell International, Inc. ("Honeywell") circular thermostats, known as "rounds," indirectly from defendants during the Class Period (as defined below).

2.    Honeywell has engaged in anticompetitive practices to exclude potential competitors from manufacturing and selling circular thermostats. Honeywell misrepresented that it had a proper trademark for the thermostats and engaged in a pattern of threatening rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell had acquired its trademark by deceiving the U.S. Patent Office (the "PTO") and withholding material information from the PTO. Honeywell also made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions taken to suppress competition.

3.    Honeywell thereby monopolized virtually 100% of the market for circular thermostats in the United States, including in California, and sold those thermostats at artificially inflated or supra-competitive prices.

4.    Honeywell's practices only recently came to light as a result of a rival manufacturer's legal challenge to Honeywell's round thermostat trademark, resulting in and a judicial finding of Honeywell's unlawful acts.

5.    Plaintiffs seek redress for the injury to their business or property and to all other similarly situated purchasers of Honeywell circular thermostats, and to enjoin Honeywell from continuing the illegal business practices described herein.

///

CLASS ACTION COMPLAINT

2

## DEFINITIONS

6.    References made herein to any business entity include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of that entity.

7.    As used herein, "Honeywell Round Thermostats" or "HRT" means circular thermostats produced by Honeywell that are round in shape, have a circular base, a round convex cover and round dial in the center of the cover, including, but not limited to, what is currently referred to as the T87 model.

8.    As used herein, "person" or "persons" have the same meaning as set forth in Business and Professions Code sections 16702 and 17201.

9.    As used herein, "Honeywell" means defendant Honeywell International, Inc. and each of its successors, predecessors, divisions, subsidiaries and affiliates.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under §16700, *et seq.* of the Cartwright Act for treble damages, attorney's fees and other relief pursuant to California Business & Professions Code Section 16750(a).

11.    Plaintiffs' claims also arise and are brought pursuant to Business and Professions Code Sections 17203 and 17204 for restitution, disgorgement and other remedial and equitable remedies as a result of defendants' unlawful, unfair or fraudulent business practices alleged herein, as prohibited by Business and Professions Code Section 17200 *et. seq.*, the Unfair Competition Law ("UCL"). Defendant's violations of the UCL include business acts and practices constituting violations of the UCL that are distinct and independent of the violations of the Cartwright Act.

12.    Plaintiffs' claims also arise and are brought for violations of the common law of monopolization for injunctive relief, compensatory and punitive damages.

13.    This Court has jurisdiction over the subject matter of this action pursuant to Business & Professions Code Section §16750(a) (Cartwright Act) and Business & Professions Code Section §17203 (UCL). Jurisdiction may also be exercised over defendant by virtue of the California long-arm statute, Code of Civil Procedure Section 410.10. Defendant's

1    anticompetitive acts, practices, policies and facilitating devices as alleged herein occurred within

2    the State of California and affected commerce therein.

3        14.  Defendant resides or is found, or its agents reside or are found, within this county.

4        15.  This complaint is not based on federal law and does not arise under, or relate to

5    federal law and plaintiff's right to relief does not depend upon resolution of any substantial

6    questions of federal law.   The amount in controversy for each named class representative does

7    not exceed $75,000.

8        16.  Venue is proper in this judicial district pursuant to Business and Professional Code

9    Section 16750(a) and Sections 395(a) and 395.5 of the California Code of Civil Procedure.

10   Honeywell maintains significant corporate offices in San Diego, California and the illegal acts

11   and transactions alleged herein had a direct or indirect effect on consumers within the State of

12   California.  As a result of the sale of circular thermostats to consumers throughout the State of

13   California, defendant obtained the benefit of the laws of the State of California and the California

14   market for circular thermostats.

15   **PARTIES**

16   **Plaintiffs**

17       17.  Plaintiff Brian Brock is a resident of the State of California who, during the Class

18   Period, indirectly purchased Honeywell 'round' thermostats, for their own use and not for resale,

19   paying supra-competitive prices and thereby suffering injury.  The damages or losses as to each

20   plaintiff individually do not exceed $75,000, however calculated, and no federal questions are

21   asserted herein.

22   **Defendants**

23       18.  Defendant Honeywell International, Inc. is a multinational diversified technology

24   and manufacturing company, involved in aerospace, control, sensing and security technologies

25   for buildings, homes and industry, automotive products, specialty chemicals, fibers, and

26   electronic and advanced materials, including thermostats which are organized into four main

27   reporting segments: Aerospace, Automation and Control Solutions, Specialty Materials and

28   Transportation Systems.  Honeywell maintains significant corporate offices in the State of

CLASS ACTION COMPLAINT

4

1  California, is the largest seller of thermostats in the United States and sells approximately 1.5

2  million HRT in the United States annually.

3      19.  The true names and capacities, whether individual, corporate, associate,

4  representative, or otherwise of defendants named herein as DOES 1-100 are unknown to

5  plaintiffs at this time, and they are therefore sued by such fictitious names pursuant to Code of

6  Civil Procedure section 474.  Plaintiffs will amend this Complaint to allege the true names and

7  capacities of DOES 1 through 100 when plaintiffs know them.  Each of DOES 1-100 is in some

8  manner legally responsible for the violations of law alleged herein.

9  ## AGENCY, JOINT VENTURE, ALTER EGO AND CO-CONSPIRATORS

10      20.  Each of the defendants named herein, including DOES 1-100, acted as the agent,

11  joint venturer, alter ego, or co-conspirator of or for the other defendants, named or unnamed,

12  with respect to the acts, violations, and common course of conduct alleged herein.

13      21.  The acts charged in this Complaint as having been accomplished by defendant and

14  the DOE defendants were authorized, ordered, ratified or accomplished by their officers, agents,

15  employees, or representatives, while actively engaged in the management of the defendants'

16  businesses or affairs.

17  ## CLASS ACTION ALLEGATIONS

18      22.  Plaintiffs bring this action, on behalf of themselves and all others similarly situated,

19  as a class action pursuant to section 382 of the California Code of Civil Procedure.  The class

20  (hereinafter "Plaintiff Class"), which plaintiffs seek to represent, is composed of and defined as

21  follows:

22          All persons residing in California who purchased Honeywell round
23          thermostats, indirectly from defendants, in California from June
            30, 1986, through the date of Class Notice (hereinafter "Class
24          Period") for their own use and not for resale.  Specifically
            excluded from the Plaintiff Class are the defendants herein;
25          officers, directors, or employees of any defendants; any entity in
            which any defendant has a controlling interest; the affiliates, legal
26          representatives, attorneys, heirs or assigns of any defendant.  Also
            excluded are any federal, state or local governmental entity, and
27          any judge, justice, or judicial officer presiding over this matter and
            the members of their immediate families and judicial staffs.
28

CLASS ACTION COMPLAINT

23. This action has been brought and may properly be maintained as a class action, pursuant to the provisions of Code of Civil Procedure section 382 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

24. Numerosity: The Plaintiff Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of class members is unknown to plaintiffs at this time, based upon the amount of trade and commerce in HRT, plaintiffs are informed and believe that more than 1.5 million HRTS are sold annually in the United States to hundreds of thousands of consumers. Joinder of all members of the Plaintiff Class is not practicable.

25. Common Questions Predominate: Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions which affect only individual members of the class. These common questions of law and fact include, without limitation:

    a. Whether defendants violated California Business and Professions Code section 16720;

    b. Whether defendant engaged in monopolization;

    c. Whether defendants violated the Unfair Competition Law;

    d. The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understands, trusts and course of conduct alleged herein;

    e. The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

    f. The appropriate nature of class wide equitable relief.

Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole.

26. Typicality: Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because plaintiffs and each member of the Plaintiff Class purchased, indirectly, HRT, for

CLASS ACTION COMPLAINT

1   their own use and not for resale, paying supra-competitive prices and suffering injury thereby as

2   a result of defendants' common course of conduct in violation of law as alleged herein.

3       27.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the members

4   of the Plaintiff Class.  Plaintiffs reside in California, are indirect purchasers of HRT and

5   purchased, in California, HRT during the Class Period for their own use and not for resale, and

6   thus are adequate representatives of the Plaintiff Class. They have no interests that are adverse to

7   the interests of absent class members.  Plaintiffs have retained counsel with substantial

8   experience in the prosecution of complex class action antitrust and consumer protection

9   litigation.

10      28.  Superiority: A class action is superior to other available means for the fair and

11  efficient adjudication of this controversy since individual joinder of all members of the Plaintiff

12  Class is impracticable.  Class action treatment will permit a large number of similarly situated

13  persons to prosecute their common claims in a single forum simultaneously, efficiently, and

14  without the unnecessary duplication of effort and expense that numerous individual actions

15  would engender.  Furthermore, as the monetary injuries suffered by each individual member of

16  the class may be relatively small, the expenses and burden of individual litigation would make it

17  difficult or impossible for members to individually redress the wrongs done to them.

18  Additionally, an important public interest will be served by addressing the matter as a class

19  action.  The cost to the court system of adjudication of such individualized litigation would be

20  substantial.  Individualized litigation would also present the potential for inconsistent or

21  contradictory judgments.

22      29.  Plaintiffs are unaware of any difficulties that are likely to be encountered in the

23  management of this action that would preclude its maintenance as a class action.

24  ## RELEVANT MARKET AND DEFENDANTS' MONOPOLY POWER

25      30.  One Relevant Market consists of electromechanical thermostats for residential use in

26  the United States and California.  Another relevant market consists of circular thermostats for

27  residential use in the United States and California.

28

CLASS ACTION COMPLAINT

7

31.  Honeywell represents that it is "the worlds leading manufacturer of thermostats". Thermostats are distinct from other types devices used for controlling air temperature in homes. Electromechanical thermostats are not electronic and are not programmable.

32.  Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference. According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world" and "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for." On May, 19 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

33.  As a result of the acts and practices complained of herein, Honeywell has acquired and maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and California.

34.  The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT and spent more than $70 million to advertise HRT.

35.  Current annual sales of HRTS are approximately 1.5 million to 2.5 million units, or $40 million.

36.  The HRT is virtually the only circular thermostat sold in California. Honeywell has a 100% monopoly over circular thermostats in the United States and California. A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is due to its absolute monopolization of the circular thermostat market.

///
///
///
///

**DEFENDANTS' CONTINUING ILLEGAL,
UNFAIR, AND MONOPOLISTIC PRACTICES**

**A.    Background**

37.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

38.    Honeywell has worked hard to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

39.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent"). According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial. The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

40.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent"). The HRT Design Patent expired in 1970.

**B.    The Rejected 1968 Trademark Application.**

40.    In 1968, prior to the expiration of the HRT Design Patent, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

41.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition. A trademark can be any word, name, symbol, device, slogan or package design (or combination of these) which serves to identify and distinguish a specific product from others in the market place or in trade. However, with a few exceptions (not

1  relevant to the HRT), functional or utilitarian characteristics cannot be trademarked because of

2  the benefit they offer to the public at large.  Honeywell's trademark application was found futile

3  due to the functional qualities of the HRT's circular shape and by the Company's receipt of the

4  HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

5       42.    The PTO's examining attorney denied the HRT Trademark Application

6  reasoning that trademark protection would improperly extend the monopoly enjoyed by

7  Honeywell (via the HRT Design Patent).  The examining attorney declared that an extension of

8  Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent

9  law."

10       43.    Honeywell appealed the examiner's decision.  The appellate body, the

11  Trademark Trial and Appeal Board (the "TTAB"), declared that the circular shape of the HRT

12  was functional and therefore could not be protected by trademark.

13  **C.**    **Exclusionary Acts**

14       44.    Therefore, by the end of the 1970s, neither patent nor trademark protected the

15  HRT.  Following the end of the Honeywell monopoly, thermostat manufactures other than

16  Honeywell sought to compete in the circular thermostat market, including in California.

17         a.    Between 1969 and 1979, a company called Penn Controls manufactured

18         and sold a thermostat with a circular and convex cover that closely resembled the HRT

19         (the "Penn Controls Round Thermostat").

20         b.    In 1985, a company called Quad Six began manufacturing and selling a

21         circular thermostat that was designed to be compatible with the base of the HRT (the

22         "Quad Six Round Thermostat").

23         c.    In 1986, a company called the Hunter Fan Company began manufacturing

24         and selling a circular thermostat (the "Hunter Fan Round Thermostat").

25         d.    In 2003, a company called ECO Manufacturing introduced a circular

26         thermostat that does not use mercury (the ECO Round Thermostat).

27

28

CLASS ACTION COMPLAINT

45.    Since the beginning of the Class Period, Honeywell has engaged in anticompetitive practices to acquire and maintain its monopoly in the circular thermostat market, including:

a.    threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation;

b.    deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark;

c.    combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and

d.    purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

46.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition and caused the price of its HRT to be inflated, thereby harming those persons or entities, including plaintiffs and the proposed Class, who purchased HRT during that period. As a result of Honeywell's illegal deceptive business practices, Honeywell has: 1) excluded competitors from the circular thermostat market; and 2) sold the HRT at supra-competitive prices during the Class Period.

47.    QUAD SIX: As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Round Thermostat that was designed to be compatible with the base of the HRT. The Quad Six Round Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT. In 1985, Honeywell threatened Quad Six with expensive litigation and claimed that Quad Six violated trademark rights owned by Honeywell. However, Honeywell owned no trademark rights in the circular shape of the HRT and its attempts to register such rights had been rejected in 1968. And, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT due to its functionality. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six

11

1   with expensive trademark infringement litigation should Quad Six continue to sell the Quad Six

2   Round Thermostat. Shortly thereafter in late 1985 Honeywell and Quad Six entered into

3   negotiations that resulted in Honeywell's acquisition of Quad Six which removed the Quad Six

4   Round Thermostat from the market.  Honeywell concealed information from the TTAB that

5   Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell

6       48.   HUNTER FAN:  Honeywell learned of the competing Hunter Fan Round

7   Thermostat in 1986.  The Hunter Fan Round Thermostat had the same purpose as the HRT, was

8   interchangeable with the HRT and competed with the HRT.  Honeywell sent a 'cease and desist'

9   letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Round Thermostat infringed

10   on trademark rights owned by Honeywell.  Honeywell also threatened Hunter Fan with

11   expensive litigation unless it ceased to market the Hunter Fan Round Thermostat.  Hunter Fan

12   and Honeywell then exchanged terse letters concerning the Hunter Fan Round Thermostat until

13   sometime near the end of 1987.  However, Honeywell knew that it owned no trademark rights in

14   the circular shape of the HRT and that its attempts to register such rights had been rejected in

15   1968.  Honeywell also knew that because the circular shape of the HRT was functional,

16   Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the

17   HRT.  Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened

18   Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with

19   its plans to produce the Hunter Fan Round Thermostat.

20       49.   As was intended by Honeywell, by coercing rival thermostat manufacturers into

21   not competing in the circular thermostat market, Honeywell was able to monopolize that market

22   and sell HRT at supra-competitive prices.

23       50.   The coercion of Quad Six and Hunter Fan, as described above, prevented

24   competition in the sale of circular thermostats and formed part of a pattern of sham and baseless

25   litigation against rival thermostat manufacturers who attempted to compete against Honeywell.

26   In subsequent court proceedings, the District Court for the Southern District of Indiana ("District

27   Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the

28   intimidating power of Honeywell in the market."  The District Court also commented that:

---

CLASS ACTION COMPLAINT

12

The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright.    (Emphasis added.)

### D.    Deception of the PTO

51.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application"). The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional. As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

52.    Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT. Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

53.    Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the <u>utility</u> of the HRT's circular design. When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970. According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years…but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application. The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

54.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would

1   demonstrate a desire by competitors to manufacture such thermostats). The TTAB relied on

2   Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

3       55.      Contrary to its representations to the TTAB, as described above, Honeywell knew

4   of competing circular thermostats at the time of the 108 Trademark Application, and had entered

5   into an agreement with a rival manufacturer to suppress competition. Honeywell thus deceived

6   the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of

7   competition in the circular thermostat market.

8       56.      Pursuant to the 108 Trademark Application, Honeywell published the application

9   for opposition. Pursuant to patent and trademark law, a proposed trademark is published in a

10  recognized journal to solicit objections. If no opposition is filed within a designated period of

11  time (e.g. one month) the application is registered. A major competitor of Honeywell, Emerson

12  Electric objected to the 108 Trademark application and offered to inform the TTAB of

13  competing circular thermostats existing in the marketplace and of evidence it had that Honeywell

14  had threatened competitors with litigation if they marketed competing circular thermostats.

15  However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric

16  would not offer its testimony to the TTAB. As part of the agreement with Honeywell, Emerson

17  Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not

18  consider the evidence initially offered by Emerson Electric.

19      57.      As the District Court of Indiana found in subsequent trademark litigation:

20          It is equally clear that the false statements about the absence of
21          competing round thermostats were material to the application and
            the TTAB's decision. The examining attorney repeatedly asked for
22          detailed information about competitors' designs and even
            settlement agreements regarding competing round designs. The
23          TTAB expressly relied upon Honeywell's false statements in
            deciding to issue the '108 registration. First, despite the earlier
24          denial of registration for the round design, the TTAB decided not
25          to apply the doctrine of *res judicata* because of Honeywell's
            evidence of the absence of competing round designs in the
26          intervening years.   Second, in applying [the third factor]
            addressing the availability of alternative designs to competitors,
27          the TTAB emphasized Honeywell's evidence:
28

---

CLASS ACTION COMPLAINT                            14

1      *Despite the apparent availability of the rounded*
2      *thermostat cover since that time* [1976], *an*
3      availability that provided more than the usual
     degree of certainty that the design did not enjoy
4      either patent or trademark protection, *the Examining*
5      *Attorney has been unable to provide evidence of the*
     *use of a rounded circular cover configuration by*
6      *any party other than applicant and its related*
     *companies.* On the contrary, applicant has provided
7      extensive evidence of its competitors' various
     thermostat designs and in none of the various
8      catalogues and other literature are there any
9      thermostats having a circular cover. *The mere fact*
     *that the number of alternative designs is limited is*
10      *not a per se bar to the registration of a particular*
     *configuration, but must be viewed in the context of*
11      *the entire record presented.*

12    **E.**     **The ECO Thermostat.**

13      58.     ECO introduced the ECO Round Thermostat at a trade show in January 2003.

14 Eco expected to sell ECO Round Thermostats for approximately 50% of the price of the HRT,

15 but with more technology and without the environmentally unsound mercury utilized in the

16 HRT.

17      59.     After Honeywell learned of the ECO Round Thermostat, Honeywell threatened to

18 sue ECO for trademark infringement. ECO filed an action in the District Court seeking a

19 declaration that the ECO Thermostat would not infringe on any trademark rights that might be

20 owned by Honeywell (the "ECO Litigation"). Honeywell responded by seeking a preliminary

21 injunction to prevent the ECO Thermostat from being manufactured. Honeywell contended that

22 they had a registered U.S. trademark, the 108 registration had become "incontestable", and that is

23 to say the trademark had been registered in the federal system for a period of five years and

24 therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject

25 to certain statutory defenses. Two of the statutory defenses available to incontestability are

26 functionality and fraudulent procurement of a trademark registration.

27      60.     The District Court denied Honeywell's motion for preliminary injunction and held

28 that:

---

CLASS ACTION COMPLAINT

1        a.     the circular shape of the HRT was functional and could not be protected

2 by a valid trademark;

3        b.     the circular shape of the HRT was the subject of a long expired utility

4 patent; and

5        c.     ECO and other competitors are entitled to copy the "useful and functional

6 [circular] shape".

7      61.     The District Court determined that the TTAB had improperly granted the 108

8 Trademark because it had been materially deceived by Honeywell during the 108 Trademark

9 application process and had not been provided with information about competing circular

10 thermostats in the market place since 1970.  The District Court also denied Honeywell's motion

11 for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex*

12 *parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard

13 to determine functionality; and had misread evidence from the HRT Utility Patent by not

14 considering the functionality of the HRT circular design.

15      62.     The District Court was highly critical of Honeywell and declared that the

16 Company had:

17        a.     made wrongful factual assertions and "false statements" to the TTAB

18 when informing the TTAB of a lack of competition in the circular thermostat market, and

19 that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark;

20        b.     issued information to the TTAB related to Quad Six Round Thermostats

21 that while being "literally correct", "seems to have been designed to leave the wrong

22 impression";

23        c.     made at least one statement about the Quad Six competition that was

24 "inconsistent with the true facts"; and

25        d.     used "careful phrasing and hedging" to steer the TTAB away from

26 evidence relating to the Hunter Fan Thermostat.

27      63.     Honeywell appealed the District Court's holding.  The United States Court of

28 Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that

1  functional aspects of a product cannot be trademarked. As a result of the findings of the federal

2  courts, the matter of Honeywell's trademark rights, if any, have been determined and such that

3  plaintiff's right to relief does not depend upon resolution of any substantial questions of federal

4  law.

5       64.    As stated above, Honeywell has acquired and maintained their monopoly through

6  pervasive practices of misrepresenting its patent and trademark rights and instituting or

7  threatening to institute sham and baseless legal proceedings foo the purpose of excluding rivals

8  form the thermostat markets.

9       65.    Defendants and others engaged in a concert of action, combination, trust,

10  agreement or understanding, the purpose of which was to fix and raise, elevate and maintain the

11  prices of circular thermostats at supra-competitive levels.

12       66.    Independent of monopolization or the aforesaid trust, defendants further engaged

13  in business acts and practices that were unlawful, unfair or deceptive and inured consumers by

14  limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

15  ## THE INJURY TO COMPETITION AND CONSUMERS

16       67.    Honeywell's conduct harmed consumers because consumers were forced to pay

17  supra-competitive prices and their choices were limited.

18  ## VIOLATIONS ALLEGED

19  ### FIRST CAUSE OF ACTION

20  **Violations of the Cartwright Act,**

21  **California Business & Professions Code §16720,** *et seq.*

22  **(Against All Defendants)**

23       68.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 67 above, as

24  fully set forth herein.

25       69.    Beginning at a time presently unknown to plaintiffs, and continuing thereafter to

26  the present, defendant and others presently unknown entered into and engaged in a continuing

27  unlawful trust in restraint of the trade and commerce described above in violation of California

28  Business and Professions Code section 16720.

     70.    The aforesaid violations of California Business and Professions Code section

CLASS ACTION COMPLAINT

16720 consisted, without limitation, of a continuing combination, trust, agreement, understanding, and concert of action among the defendants, and others, concerning the sale or distribution of thermostats including circular thermostats, in California.

71.    For the purpose of forming and effectuating the aforesaid unlawful trust, the defendants and others have done those things to which they agreed, combined, and conspired as described herein.

72.    The aforesaid unlawful trust has had the following effects, among others, including the effects described above:

a.    Competition in the sale of thermostats, including circular thermostats, has been suppressed, restrained, or eliminated;

b.    Prices of thermostats, including circular thermostats paid by plaintiffs and other members of the Plaintiff Class have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels.

73.    During the period covered by this Complaint, plaintiffs and the other members of the Plaintiff Class purchased thermostats, including circular thermostats, indirectly from the defendants.   By reason of the alleged violations of the antitrust laws, plaintiffs and other members of the Plaintiff Class paid more for thermostats, including circular thermostats than they would have paid in the absence of the illegal trust, have had their choices limited and, as a result, have been injured in their business and property and have suffered damages in an amount according to proof at trial.

## SECOND CAUSE OF ACTION

### Common Law Monopolization
### (Against All Defendants)

74.    Plaintiffs incorporate by reference and reallege paragraphs 1-67 above, as though fully set forth herein.

75.    Defendants, through the exercise of monopoly power, have engaged in acts and practices as described above without justification that operate to exclude competition in the thermostat and circular thermostat markets and to acquire, maintain, and increase their monopoly

1    power.    Both the purpose and the effect of these acts and practices have been to restrain

2    competition in the relevant markets for thermostats and circular thermostats, thereby enabling

3    Honeywell to maintain a monopoly of that market and to charge supra-competitive prices.

4        76.    By engaging in such acts of exclusion, defendants have engaged in unlawful

5    monopolization.

6        77.    These exclusionary acts and practices lack legitimate business justification, are

7    not reasonably necessary to further any legitimate procompetitive purpose, and impair

8    competition in an unnecessarily restrictive way.

9        78.    The defendants' exclusionary and restrictive practices described herein have

10    caused significant harm to class members by increasing the prices they have paid for thermostats

11    including circular thermostats above competitive levels and by denying them a free choice in a

12    competitive market.    As a result of the exclusionary and restrictive practices it has imposed on

13    others, including those described herein, defendants have succeeded in raising and reinforcing

14    barriers to market entry so as to forestall the development of actual competition in the relevant

15    markets.    The resultant monopoly power has enabled the defendants to price their circular

16    thermostats virtually without regard to the prices of competing products.    Distributors and

17    contractors have passed these monopoly prices on to consumers, including particularly to the

18    class members.

19        79.    As a direct and proximate result of defendants' acts of monopolization as alleged

20    herein, plaintiffs and the members of the Plaintiff Class have suffered actual damages in an

21    amount to be proven at trial.

22        80.    Defendants' acts of monopolization as described herein were intended to

23    monopolize and suppress competition in the relevant markets and to injure consumers.

24    Defendants' acts of monopolization were and included acts of fraud, malice and oppression and

25    were done with conscious disregard of the rights upon consumers, including plaintiffs and the

26    Plaintiff Class.    Accordingly, an award of punitive damages is justified in order to make an

27    example of defendants, to punish defendants, and to deter defendants, and others, from engaging

28    in the same or similar conduct.    Plaintiffs, and the members of the Plaintiff Class, seek an award

19

CLASS ACTION COMPLAINT

of punitive damages in an amount according to proof at trial.

**THIRD CAUSE OF ACTION**

**Unfair Competition Law**
**California Business & Professions Code §17200, *et seq.***
**(Against all Defendants)**

81.    Plaintiffs incorporate by reference and reallege paragraphs 1-80 above, as though fully set forth herein.

82.    This Complaint is filed and these proceedings are instituted, pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution, and other available remedies from defendants for acts and business practices, as alleged herein, in violation of section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

83.    The conduct alleged herein violates California Business and Professions Code Section 17200. Independent of the other violations of law alleged herein, the acts and business practices described herein constituted and constitute a common course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200, *et seq.*, including, but in no way limited to, the following:

    A.    <u>Unlawful</u>:

        1.    violations of California Business and Professions Code section 16720, *et seq.*;

        2.    violations of the Sherman and Clayton Acts; and

        3.    violations of section 5 of the Federal Trade Commission Act (15 U.S.C., §45(a)); and

    B.    <u>Unfair</u>:

        1.    incipient violation of antitrust law;

        2.    violation of the spirit of antitrust laws because the effects are the same as or comparable to violation of the antitrust laws;

        3.    threat or harm to competition and consumers.

CLASS ACTION COMPLAINT

C.    Fraudulent:

    1.    false and deceptive statements to rivals regarding the validity of trademarks and associated rights;

    2.    false and deceptive statements to the United States PTO and the TTAB.

84.    Plaintiffs and the Plaintiff Class are entitled to full restitution and other equitable remedies as a result of such business acts or practices.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray:

1.    This Court certify the Plaintiff Class;

2.    This Court declare that defendants have engaged in combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of merchandise or a commodity, and preventing competition in manufacturing, making, transportation, sale or purchase of merchandise, products, or a commodity, in violation of the common law (monopoly), the Cartwright Act (California Business and Professions Code section 16720 *et seq.*) and unfair competition and unlawful and unfair business acts and practices in violation of the California Unfair Competition Act (California Business and Professions Code section 17200 *et seq.*);

3.    On the First Cause of Action (Cartwright Act): Plaintiffs and the members of the Class recover their actual damages, in an amount to be determined at trial, and said amount be trebled pursuant to California Business and Professions Code section 16750;

4.    On the Second Cause of Action (Monopolization): Plaintiffs and the members of the Class recover their actual damages, in an amount to be determined at trial, and punitive damages in an amount to be determined at trial;

5.    On the Third Cause of Action (Unfair Competition Law): This Court order

CLASS ACTION COMPLAINT

1    defendants to make full restitution to the class members who have been and

2    continue to be injured by defendants' violations of section 17200, pursuant to

3    Business and Professions Code section 17203 and section 17204;

4    6.    That the sale of thermostats including circular thermostats not be in a manner that

5    tends to lessen competition or create a monopoly;

6    7.    That defendants be ordered to engage in other remedial actions due to their unfair

7    competition pursuant to California Business and Professions Code sections 17203

8    and 17204;

9    8.    That plaintiffs and the members of the Class recover their reasonable attorneys'

10    fees and costs of suit;

11    9.    That plaintiffs and the members of the Class recover pre-judgment and post-

12    judgment interest on the above sums at the highest rate allowed by law; and

13    10.    That plaintiffs and the members of the Class be granted such other and further

14    relief as this Court deems to be just and equitable.

15    Dated: November 8, 2004                    Respectfully submitted,

16
                                      Daniel J. Mogin (95624)
17                                    Lisa J. Frisella (216504)
                                      Chad M. McManamy (225205)
18                                    THE MOGIN LAW FIRM, P.C.
                                      110 Juniper Street
19                                    San Diego, CA 92101
                                      Telephone: (619) 687-6611
20                                    Facsimile: (619) 687-6610

21

22                                    By:_____
                                      Daniel J. Mogin
23
                                      Stephen T. Rodd
24                                    Jill S. Abrams
                                      Henry J. Young
25                                    ABBEY GARDY, LLP
                                      212 East 39th Street
26                                    New York, New York 10016
                                      Telephone: (212) 889-3700
27                                    Facsimile: (212) 684-5191

28

CLASS ACTION COMPLAINT

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robin E. Brewer (161502)
BONSIGNORE & BREWER
770 L Street, Suite 1200
Sacramento, CA 95814
Telephone: (916) 442-6902
Facsimile: (916) 442-7734


Attorneys for Plaintiff Brian Brock
and the Proposed Plaintiff Class

---

CLASS ACTION COMPLAINT

1

2                                    **JURY TRIAL DEMAND**

3        Plaintiffs hereby demand a trial by jury.

4   Dated: November 8, 2004                    Respectfully submitted,

5
                                              Daniel J. Mogin (95624)
6                                             Lisa J. Frisella (216504)
                                              Chad M. McManamy (225205)
7                                             THE MOGIN LAW FIRM, P.C.
                                              110 Juniper Street
8                                             San Diego, CA 92101
                                              Telephone: (619) 687-6611
9                                             Facsimile: (619) 687-6610

10

11                                     By: _____
                                          Daniel J. Mogin
12
                                          Stephen T. Rodd
13                                        Jill S. Abrams
                                          Henry J. Young
14                                        ABBEY GARDY, LLP
                                          212 East 39th Street
15                                        New York, New York 10016
                                          Telephone: (212) 889-3700
16                                        Facsimile: (212) 684-5191
17

18                                        Robin E. Brewer (161502)
                                          BONSIGNORE & BREWER
19                                        770 L Street, Suite 1200
                                          Sacramento, CA 95814
20                                        Telephone: (916) 442-6902
21                                        Facsimile: (916) 442-7734

22
                                          Attorneys for Plaintiff Brian Brock
23                                        and the Proposed Plaintiff Class

24

25

26

27

28

_____

CLASS ACTION COMPLAINT

## NOTICE TO PLAINTIFF

This case is assigned to Plan I. A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **APR-15-2005** |
| **TIME:** | **9:00AM** |
| **PLACE:** | **Department 212** |
| | **400 McAllister Street** |
| | **San Francisco, CA 94102-3680** |

All parties must appear and comply with Local Rule 3.

---

CRC 212 (g)(1) requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management conference. (CRC 212 (b)(2))

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

> **IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.** (SEE LOCAL RULE 3)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for civil matters; each program is described below:

1) Judicial arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called <u>judicial arbitration</u>. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through <u>private arbitration</u>. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

## Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

### Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

### Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## *Voluntary Early Mediation*   (effective 9/2/03)

The Voluntary Early Mediation program is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Voluntary Early Mediation program rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-8913

## *Judicial Mediation*

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

*Cost*

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Voluntary Early Mediation program provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

*Description*

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

*Operation*

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

## Cost

All parties must submit a $200 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 982-1600.

* * * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution Coordinator,
400 McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3870

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:          FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

   STREET ADDRESS:

   MAILING ADDRESS:

   CITY AND ZIP CODE:

   BRANCH NAME:

   PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000)    ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**

Date:        Time:        Dept.:        Div.:        Room:

Address of court *(if different from the address above):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   - a. ☐ This statement is submitted by party *(name):*
   - b. ☐ This statement is submitted jointly by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   - a. The complaint was filed on *(date):*
   - b. ☐ The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   - a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   - b. ☐ The following parties named in the complaint or cross-complaint
     - (1) ☐ have not been served *(specify names and explain why not):*
     - (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*
     - (3) ☐ have had a default entered against them *(specify names):*
   - c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. **Description of case**
   - a. Type of case in ☐ complaint    ☐ cross-complaint    *(describe, including causes of action):*

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [New July 1, 2002] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rule 212 |
|---|---|---|

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages.  *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings.  If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial  ☐ a nonjury trial     *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐ The trial has been set for *(date):*
b.  ☐ No trial date has been set.  This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐ days *(specify number):*
b.  ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐ Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
a.  Counsel  ☐ has  ☐ has not     provided the ADR information package identified in rule 201.9 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*



# Superior Court of California
## County of San Francisco

# Voluntary Early Mediation Program

## Introducing a new court alternative dispute resolution program providing three hours of free mediator time

The Voluntary Early Mediation Program (VEM) is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF). It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements and have agreed to provide one hour of preparation and two hours of session time at no charge. While the goal of the program is to provide service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

After submission of the signed Stipulation to Alternative Dispute Resolution form included in the court ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, a mediator, qualified in the appropriate area of law will be assigned from the list of court approved mediation providers. Parties will be provided with a biography and fee schedule of the assigned mediator. Should the mediator be unacceptable to the parties, another will be assigned, until one is found that is agreeable to all parties. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected.

A copy of the Voluntary Early Mediation Program Procedures can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-982-1600 for a copy.

## Superior Court Alternative Dispute Resolution
### 400 McAllister, Rm. 103, San Francisco, CA 94102
### (415)551-3876

# Alternative Dispute Resolution (ADR) Information Package

# You Don't Have to Sue ---

# Here are some other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint.  (CRC 201.9(c))

**Superior Court of California**
**County of San Francisco**

ADR-1  7/03  (bc)

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can be speedier.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can permit more participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR can be flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- ***ADR can reduce stress.*** There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- ***ADR can be more satisfying.*** For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

# Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.



# Superior Court of California
## County of San Francisco

## Judicial Mediation Pilot Program

### Introducing a new court alternative dispute resolution program that provides judicial mediation of complex civil cases

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable Paul H. Alvarado | The Honorable James J. McBride |
| The Honorable Ellen Chaitin | The Honorable Kevin M. McCarthy |
| The Honorable John J.Conway | The Honorable John E. Munter |
| The Honorable Robert L. Dondero | The Honorable Charlene Padovani Mitchell |
| The Honorable Ernest H.Goldsmith | The Honorable A. James Robertson, II |
| The Honorable Patrick J. Mahoney | The Honorable Alex Saldamando |
| The Honorable Tomar Mason | The Honorable Lillian K. Sing |
| | The Honorable James L. Warren |

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

07/31/03

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**10. d.** The party or parties are willing to participate in *(check all that apply):*

- (1) ☐ Mediation
- (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 1612)
- (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 1612)
- (4) ☐ Binding judicial arbitration
- (5) ☐ Binding private arbitration
- (6) ☐ Neutral case evaluation
- (7) ☐ Other *(specify):*

**e.** ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

**f.** ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

**g.** ☐ This case is exempt from judicial arbitration under rule 1600.5 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

**a.** ☐ Insurance carrier, if any, for party filing this statement *(name):*

**b.** Reservation of rights: ☐ Yes ☐ No

**c.** ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**14. Related cases, consolidation, and coordination**

**a.** ☐ There are companion, underlying, or related cases.

- (1) Name of case:
- (2) Name of court:
- (3) Case number:
- (4) Status:

☐ Additional cases are described in Attachment 14a.

**b.** ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

    a. ☐ The party or parties have completed all discovery.

    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

        Party                Description              Date

    c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic Litigation**

    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 212 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 212 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Case management orders**

    Previous case management orders in this case are *(check one)*: ☐ none ☐ attached as Attachment 21.

**22. Total number of pages attached** *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____   ▶  _____
(TYPE OR PRINT NAME)            (SIGNATURE OF PARTY OR ATTORNEY)

_____   ▶  _____
(TYPE OR PRINT NAME)            (SIGNATURE OF PARTY OR ATTORNEY)

                              ☐ Additional signatures are attached

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
### 400 McAllister Street, San Francisco, CA 94102-4514

|  |  |
|---|---|
| **Plaintiff** <br><br> v. <br><br><br> **Defendant** | Case No. _____ <br><br> **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |

**The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:**

☐ **Private Mediation**          ☐ **Voluntary Early Mediation**          ☐ **Judicial Mediation**
☐ **Binding arbitration**                                                           Judge _____
☐ **Non-binding judicial arbitration**                                              Judge _____
☐ **BASF Early Settlement Program**
☐ **Other ADR process (describe)** _____

**Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____


_____     _____     _____
Name of Party Stipulating                  Name of Party or Attorney Executing Stipulation      Signature of Party or Attorney

☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant          Dated: _____


_____     _____     _____
Name of Party Stipulating                  Name of Party or Attorney Executing Stipulation      Signature of Party or Attorney

☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant          Dated: _____


_____     _____     _____
Name of Party Stipulating                  Name of Party or Attorney Executing Stipulation      Signature of Party or Attorney

☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant          Dated: _____


☐ *Additional signature(s) attached*

---

### STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION

# EXHIBIT 4

6²



CORPORATION SERVICE COMPANY

RLG / ALL
Transmittal Number: 3797234
Date Processed: 12/16/2004

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Meg Johnson-Law Dept- AB-2<br>Honeywell International Inc.<br>101 Columbia Rd.<br>Morristown, NJ 07962 |

| | |
|---|---|
| **Entity:** | Honeywell International Inc.<br>Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc. |
| **Title of Action:** | Alfred T. Wright vs. Honeywell International, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Trademark / Copyright / Patent |
| **Court:** | Orange Superior Court , Vermont |
| **Case Number:** | 201-11-04 Oecv |
| **Jurisdiction Served:** | Vermont |
| **Date Served on CSC:** | 12/15/2004 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | D. Michael Noonan, Esq.<br>603-749-5000 |

RECEIVED

DEC 17 2004

M. JOHNSON

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

STATE OF VERMONT                          SUPERIOR COURT
Orange, ss


        Civil Action, Docket Number _201-11-04 Oecv_


Alfred T. Wright, Plaintiff
P.O. Box 166
S. Strafford, VT  05070
        County of Orange


vs.


Honeywell International, Inc.
101 Columbia Road
Morristown, NJ  07962
        County of Morris



To the above-named Defendant:

        You are hereby summoned and required to serve upon D.
Michael Noonan, Esquire, plaintiff's attorney, whose address
is P.O. Box 977, 140 Washington St., Dover, NH  03821-0977, an
answer to the complaint which is herewith served upon you,
within 20 days after service of this summons upon you,
exclusive of the day of service.  If you fail to do so,
judgment by default will be taken against you for the relief
demanded in the complaint.  Your answer must also be filed
with the court.  Unless otherwise provided in Rule 13(a), your
answer must state as a counterclaim any related claim which
you may have against the plaintiff, or you will thereafter be
barred from making such claim in any other action.  **YOUR
ANSWER MUST STATE SUCH A COUNTERCLAIM WHETHER OR NOT THE
RELIEF DEMANDED IN THE COMPLAINT IS FOR DAMAGE COVERED BY A
LIABILITY INSURANCE POLICY UNDER WHICH THE INSURER HAS THE
RIGHT OR OBLIGATION TO CONDUCT THE DEFENSE.**  If you believe
that the plaintiff is not entitled to all or part of the claim
set forth in the complaint, or if you believe that you have a

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

counterclaim against the plaintiff, you may wish to consult an
attorney.  If you feel that you cannot afford to pay an
attorney's fee, you may ask the clerk of the court for
information about places where you may seek legal assistance.

Date: *11-10-04*

*D. Michael Noonan*

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH  03821-0977
(603) 749-5000

Served on    *12-15-04*
                                        Date

*Tom Rouelle*

Deputy Sheriff

STATE OF VERMONT

FILED

NOV 1 2 2004

ORANGE SUPERIOR COURT

Orange County, ss.                                              Superior Court

Alfred T. Wright, on behalf of          )
himself and all others similarly        )
situated,                               )
    Plaintiffs                          )
                                        )
v.                                      )     Civil Action, Docket # _201-11-04 Oecv_
                                        )     COMPLAINT & REQUEST FOR
Honeywell International, Inc.            )     JURY TRIAL
    Defendant                           )

## COMPLAINT

Plaintiff, upon information and belief, brings this Class Action Complaint against

Defendant Honeywell International, Inc. (hereinafter individually and/or collectively

"Honeywell", "Company" or "Defendant"), on behalf of himself and all other similarly

situated persons residing in the State of Vermont who suffered similar injury as a result

of Defendants' violations of the Vermont Consumer Fraud Act, (VCFA), 9 V.S.A. s. 2451

et seq. Each Plaintiff expressly disclaims any damages in excess of $75,000 and

expressly places a nominal value of under $25.00 on the actual loss per purchase that

they suffered. Plaintiffs bring this claim exclusively under 9 V.S.A s. 2451 et seq. and

not under either § 4 and/or 6 of the Clayton Act, 15 U.S.C. §15 and/or §26 or §1 of the

Sherman Act, 15 U.S.C. §1. or any other federal statute, regulation, or law.

## JURISDICTION AND VENUE

1.    Brought pursuant to 9 V.S.A. s. 2451 et seq. this putative class action

1

seeks recoupment of economic damages and nominal damages under 9 V.S.A. s. 2451 et seq. and to enjoin Honeywell from continuing the illegal business practices described herein.

2.    The single count complaint advanced mandates that this action be heard in a Vermont state forum.

3.    Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the State of Vermont. Honeywell sold its circular thermostats to residential customers throughout the State of Vermont during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.    Named plaintiff's individual damages do not equal or exceed $75,000. Each Plaintiff expressly disclaims any damages in excess of $75,000 and expressly places a nominal value of under $25.00 on the actual loss per purchase that they suffered.

## NATURE AND BACKGROUND OF CASE

5.    Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Vermont.    Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market.    However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S.

2

Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.  Plaintiff Alfred Wright is a natural person and resident of the State of Vermont.  During the class period, plaintiff and each member of the putative class indirectly purchased in the State of Vermont Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices.  Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Vermont and a purchaser of a round thermostat during the class period.

7.  Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the State of Vermont. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware.  Honeywell has places of business at La Motte and Colchester Vermont.

8.  Defendant Honeywell is the largest seller of thermostats in the United States.  Its circular thermostats are sold and used in residences across Vermont.

3

9.    Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10. For purposes of this complaint, the term Defendant shall apply to all Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the State of Vermont, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11. Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demanded that Honeywell make them known. Honeywell has failed to address this request.

12. The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's

4

businesses or affairs. They directly affected members of this Vermont consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

### EQUITABLE TOLLING

13. The Defendants and its co-conspirators fraudulently concealed the acts and practices alleged herein. Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

### CLASS ACTION ALLEGATIONS

14. Plaintiff brings this action exclusively under 9 V.S.A. s. 2451 <u>et seq.</u> on behalf of himself and the following class:

> All similarly situated consumer purchasers residing in the State of Vermont (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present.

15. The number of potential class members is so numerous that joinder is impracticable. Plaintiff's claims are typical of those of the class. Numerous questions of law and fact are common to the class, including, but not limited to:

> a. Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 <u>et seq.</u> ;
>
> b. Whether Honeywell has engaged, and/or has combined with others to engage, in conduct that violates 9 V.S.A. s. 2451 et seq.

5

c.  Whether the pass through overcharge per purchase exceeded $25:

d.  Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in the State of Vermont;

e.  The existence, duration and illegality of the conduct alleged herein;

f.  The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

g.  The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

h.  Whether the class is entitled to the statutory damages and other relief requested. Whether defendant engaged in monopolization;

i.  Whether defendants acted unlawfully as prohibited by 9 V.S.A. s. 2451 et seq.;

j.  The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

k.  The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

l.  The appropriate nature of class wide equitable relief.

6

16.    Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of Plaintiff are coincident with, and not antagonistic to, those of the class members. He has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. He likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.    Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such individualized litigation

7

would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Vermont law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF 9 V.S.A. s. 2451 ET SEQ.

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

27.    In the 1940s, when the Company was known as the Minneapolis

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977   603-749-5000

Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the <u>only</u> circular thermostat sold in Vermont.

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Vermont.    During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

### <u>RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER</u>

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Vermont. Another relevant market consists of circular thermostats for residential use in the United States and Vermont.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

9

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

10

A.    **Background**

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats. Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

11

The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint." The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

B.    **The Rejected 1968 Trademark Application.**

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

12

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had

13

come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Vermont.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Vermont consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something

14

Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    The Pattern of Sham and Baseless Litigation

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

15

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

16

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

97.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

17

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

98.   The District Court also commented that:

The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright.  (emphasis added)

E.   <u>Deception of the PTO</u>

99.   In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application").

100.   The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional.

101.   As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

102.   Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT.

103.   Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

104.   Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the <u>utility</u> of the HRT's circular design.

18

105.    When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

106.    According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

107.    The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

108.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

109.    The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

110.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

111.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

112.   As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

113.   The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

114.   The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

115.   However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

116.   Honeywell did not describe the Quad Six Thermostat in the application.

117.   The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

118.   Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

119.   The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977   603-749-5000

120.    The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

121.    Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

122.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

123.    Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

124.    The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

125.    Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

126.    Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

127.    If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

21

128.   A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

129.   However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

130.   As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

131.   The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

132.   The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

133.   As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

22

> *Despite the apparent availability of the rounded thermostat cover since that time* [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

134.    The TTAB granted the 108 Trademark Application in 1988.

**F.    The ECO Thermostat.**

135.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

136.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

137.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

138.    In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO

23

Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

139.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

140.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

141.    The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

142.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

143.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

144.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

145.    The two parties conducted expedited discovery and presented evidence.

146.    The District Court denied Honeywell's motion for preliminary injunction and held that:   1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a

24

long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

147.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

148.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

149.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

150.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

25

151. As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that Plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

152. As described above, defendant Honeywell engaged in illegal, unfair and deceptive practices to suppress the competition in the relevant market in violation of 9 V.S.A. s. 2451 et seq.

153. Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

154. Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of 9 V.S.A. s. 2451 et seq.

155. During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant

26

Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

156.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Vermont.    The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark.  The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of 9 V.S.A. s. 2451 et seq.

157.    Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of 9 V.S.A. s. 2451 et seq. .

158.    Honeywell maintained its unlawful monopoly in violation of 9 V.S.A. s. 2451. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT. ·

159.    The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of 9 V.S.A. s. 2451 et seq.

27

160.   Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of 9 V.S.A. s. 2451 et seq.

161.   Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of 9 V.S.A. s. 2451 et seq.

162.   Defendant and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

163.   Independent of monopolization or the aforesaid trust, Defendant further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

164.   Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

165.   The deception of the Plaintiff and other HRT consumers was in violation of 9 V.S.A. s. 2451 et seq.

166.   In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and unreasonably

28

restrain trade with regard to the sale of round thermostats in the State of Vermont in violation of common law and 9 V.S.A. s. 2451 et seq.

167. Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

168. Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of 9 V.S.A. s. 2451 et seq.

169. By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of 9 V.S.A. s. 2451 et seq.

170. Vermont indirect consumer purchasers of round thermostats have suffered

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0877  603-749-5000

related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

171.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of 9 V.S.A. s. 2451 et seq.

172.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

173.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the State of Vermont and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

174.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

175.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable. These exclusionary restrictions are not reasonably

30

necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way. They are simply unfair methods of competition and unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER 9 V.S.A. S. 2451 ET SEQ.

176. Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Vermont consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Vermont.

177. Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

178. As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

31

179. Defendant's control of the round thermostat market in Vermont and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

180.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State of Vermont. This conduct violated 9 V.S.A. s. 2451 et seq.

## COUNT I

## VIOLATIONS OF 9 V.S.A. S. 2451 ET SEQ.

181. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 180 above.

182.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round

32

thermostats, all in violation of 9 V.S.A. s. 2451 et seq.

183. As a direct and proximate result of Defendant's violations of 9 V.S.A. s. 2451 et seq. members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

184. Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of 9 V.S.A. s. 2451 et seq.

185. Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Vermont. Each consumer class member suffered actual harm in an amount determinable per purchase.

## RELIEF REQUESTED

186. As a result of defendant's unfair and deceptive conduct, individual Vermont consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are

33

J.    Grant other appropriate equitable relief, including but not limited to

disgorgement of profits obtained.

Respectfully submitted,

Alfred T. Wright, on behalf of himself and
All others similarly situated,
By their Attorneys,

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH 03821-0977
(603) 749-5000

36

STATE OF VERMONT

Orange County, ss.                                                    Superior Court

Alfred T. Wright, on behalf of          )
himself and all others similarly        )
situated,                               )
      Plaintiffs          )
                                        )
v.                                      )       Civil Action, Docket # 201-11-04 Oecv
                                        )       FIRST AMENDED COMPLAINT &
Honeywell International, Inc.            )       REQUEST FOR JURY TRIAL
      Defendant           )


## FIRST AMENDED COMPLAINT

    Plaintiff, upon information and belief, brings this Class Action Complaint against

Defendant Honeywell International, Inc. (hereinafter individually and/or collectively

"Honeywell", "Company" or "Defendant"), on behalf of himself and all other similarly

situated persons residing in the State of Vermont who suffered similar injury as a result of

Defendants' violations of the Vermont Consumer Fraud Act, (VCFA), 9 V.S.A. s. 2451 et

seq. Each Plaintiff expressly disclaims any damages in excess of $75,000. Plaintiffs bring

this claim exclusively under 9 V.S.A s. 2451 et seq. and not under either § 4 and/or 6 of the

Clayton Act, 15 U.S.C. §15 and/or §26 or §1 of the Sherman Act, 15 U.S.C. §1. or any

other federal statute, regulation, or law.


## JURISDICTION AND VENUE

    1.    Brought pursuant to 9 V.S.A. s. 2451 et seq. this putative class action

seeks recoupment of damages under 9 V.S.A. s. 2451 et seq. and to enjoin Honeywell from

continuing the illegal and deceptive business practices described herein.

    2.    The single count complaint advanced mandates that this action be heard

1

in a Vermont state forum.

3.    Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the State of Vermont. Honeywell sold its circular thermostats to residential customers throughout the State of Vermont during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district

4.    Named plaintiff's individual damages do not equal or exceed $75,000. Each Plaintiff expressly disclaims any damages in excess of $75,000.

## NATURE AND BACKGROUND OF CASE

5.    Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Vermont. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.    Plaintiff Alfred Wright is a natural person and resident of the State of

2

Vermont. During the class period, plaintiff and each member of the putative class indirectly purchased in the State of Vermont Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices. Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests.

7. Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the State of Vermont. Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware. Honeywell has places of business at La Motte and Colchester, Vermont.

8. Defendant Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across Vermont.

9. Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10. For purposes of this complaint, the term Defendant shall apply to all

3

Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the State of Vermont, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

11.  Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demanded that Honeywell make them known.  Honeywell has failed to address this request.

12.  The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's businesses or affairs. They directly affected members of this Vermont consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13.  The Defendants and its co-conspirators fraudulently concealed the acts

4

and practices alleged herein. Plaintiff and those similarly injured and situated could not

have discovered the identity, nature or extent of the unfair methods of competition and

unfair and deceptive acts and practices complained of through even the most diligent good

faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

### CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action exclusively under 9 V.S.A. s. 2451 et seq. on behalf

of himself and the following class:

> All similarly situated consumer purchasers residing in the State of Vermont
> (excluding governmental entities, Defendants, and subsidiaries and affiliates of
> Defendants) who indirectly purchased from the Defendants, for their own use and
> not for resale, round thermostats between June 30, 1986 and the present.

15.    The number of potential class members is so numerous that joinder is

impracticable. Plaintiff's claims are typical of those of the class. Numerous questions of

law and fact are common to the class, including, but not limited to:

> a.  Whether Honeywell has engaged, and has combined with others to engage, in
>
>     conduct that violates 9 V.S.A. s. 2451 et seq. ;
>
> b.  Whether Honeywell has engaged, and/or has combined with others to
>
>     engage, in conduct that violates 9 V.S.A. s. 2451 et seq.
>
> c.  Whether Honeywell's unfair methods of competition and unfair and
>
>     deceptive acts and practices have caused legally cognizable injury to the class,
>
>     by increasing the prices the class members have paid for round thermostats
>
>     above the prices that would have prevailed in a competitive market and
>
>     limited product choice to consumers in the State of Vermont;
>
> d.  The existence, duration and illegality of the conduct alleged herein;

5

e.  The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

f.  The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

g.  Whether the class is entitled to the statutory damages and other relief requested.

h.  Whether defendant engaged in monopolization;

i.  Whether defendants acted unlawfully as prohibited by 9 V.S.A. s. 2451 et seq.;

j.  The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

k.  The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

l.  The appropriate nature of class wide equitable relief.

16.  Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of Plaintiff are coincident with, and not antagonistic to, those of the class members. He has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. He likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

6

17.    Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.    Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the

7

Court with individual litigation.

23.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Vermont law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF 9 V.S.A. s. 2451 ET SEQ.

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTS are sold to hundreds of thousands of consumers.

26.    Honeywell makes thermostats, among other products.

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Vermont.

8

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Vermont.   During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Vermont. Another relevant market consists of circular thermostats for residential use in the United States and Vermont.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

9

40.     As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United States and Vermont.

41.     As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Vermont.

42.     The HRT is the biggest selling thermostat in the United States.  Honeywell has sold more than 85 million HRT.

43.     Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.     Honeywell has spent over $70 million to advertise HRT.

45.     A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

A.     **Background**

46.     In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.     Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.     In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

10

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.    Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.  The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."  The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

**B.    The Rejected 1968 Trademark Application.**

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

11

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

12

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Vermont.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

13

75.    In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.    Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Vermont consumers.

77.    The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

14

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

D.    **The Pattern of Sham and Baseless Litigation**

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

15

88.    Honeywell concealed information from the TTAB that Quad Six had been

sell the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was

interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986

insisting that the Hunter Fan Thermostat infringed on trademark rights owned by

Honeywell.

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it

ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the

Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular

shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was

functional, Honeywell had no opportunity to legally obtain trademark rights in the circular

shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell

threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan

persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat

manufacturers into not competing in the circular thermostat market, Honeywell was able to

monopolize that market and sell HRT at supra-competitive prices.

16

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

100.    The District Court also commented that:

> The evidence before this court also shows that whenever Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (emphasis added)

E.    Deception of the PTO

101.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application").

102.    The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional.

103.    As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

104.    Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT.

105.    Relying on the false and misleading information supplied to it by

17

Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

106. Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.

107. When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108. According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109. The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

110. Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111. The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112. Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

18

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

114.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116.    The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117.    However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118.    Honeywell did not describe the Quad Six Thermostat in the application.

119.    The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

120.    Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121.    The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

19

122.   The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123.   Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124.   The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125.   Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126.   The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

127.   Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

128.   Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.   If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

20

130.    A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131.    However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132.    As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134.    The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

135.    As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

21

> *Despite the apparent availability of the rounded thermostat
> cover since that time* [1976], *an availability that provided
> more than the usual degree of certainty that the design
> did not enjoy either patent or trademark protection, the
> Examining Attorney has been unable to provide evidence of the
> use of a rounded circular cover configuration by any party other
> than applicant and its related companies.* On the contrary,
> applicant has provided extensive evidence of its
> competitors' various thermostat designs, and in none of
> the various catalogues and other literature are there any
> thermostats having a circular cover. *The mere fact that the
> number of alternative designs is limited is not a per se bar to the
> registration of a particular configuration, but must be viewed in
> the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

**F.    The ECO Thermostat.**

137.    Eco Manufacturing LLC ("ECO") is a company developing a new
thermostat that does not utilize mercury to determine room temperature (the "ECO
Thermostat").

138.    The ECO Thermostat is circular and would compete with the HRT in the
relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003.
ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs
competition for the HRTs.

140.    In May 2003, Daniels was quoted in the <u>Indianapolis</u> <u>Business</u> <u>Journal</u> as
saying, "Right now, if you want to get a circular thermostat, you are going to get the
technology that was on your grandfather's wall, and you are going to have to pay a
premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats

22

for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.    The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

145.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.    The two parties conducted expedited discovery and presented evidence.

148.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility

23

patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

151.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

24

153.   As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that Plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.   As described above, defendant Honeywell engaged in illegal, unfair and deceptive practices to suppress the competition in the relevant market in violation of 9 V.S.A. s. 2451 et seq.

155.   Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

156.   Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of 9 V.S.A. s. 2451 et seq.    157.   During    the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers

25

would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

158.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Vermont. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of 9 V.S.A. s. 2451 et seq.

159.    Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of 9 V.S.A. s. 2451 et seq.

160.    Honeywell maintained its unlawful monopoly in violation of 9 V.S.A. s. 2451. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

161.    The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of 9 V.S.A. s. 2451 et seq.

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

162. Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of 9 V.S.A. s. 2451 et seq.

163. Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of 9 V.S.A. s. 2451 et seq.

164. Defendant and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165. Independent of monopolization or the aforesaid trust, Defendant further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166. Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167. The deception of the Plaintiff and other HRT consumers was in violation of 9 V.S.A. s. 2451 et seq.

168. In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and

27

unreasonably restrain trade with regard to the sale of round thermostats in the State of Vermont in violation of common law and 9 V.S.A. s. 2451 et seq.

169. Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170.    Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of 9 V.S.A. s. 2451 et seq.

171.    By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition.  Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of 9 V.S.A. s. 2451 et seq.

172. Vermont indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive

28

agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of 9 V.S.A. s. 2451 et seq.

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the State of Vermont and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

177.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any

29

legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way. They are simply unfair methods of competition and unfair or deceptive acts and practices.

### CONSUMER INJURY UNDER 9 V.S.A. S. 2451 ET SEQ.

178. Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Vermont consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Vermont.

179. Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180. As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

30

181. Defendant's control of the round thermostat market in Vermont and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.

182. Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State of Vermont. This conduct violated 9 V.S.A. s. 2451 et seq.

## COUNT I

## VIOLATIONS OF 9 V.S.A. S. 2451 ET SEQ.

183. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 182 above.

184. Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of

31

9 V.S.A. s. 2451 et seq.

185. As a direct and proximate result of Defendant's violations of 9 V.S.A. s. 2451 et seq. members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186. Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of 9 V.S.A. s. 2451 et seq.

187. Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Vermont. Each consumer class member suffered actual harm in an amount determinable per purchase.

## RELIEF REQUESTED

188. As a result of defendant's unfair and deceptive conduct, individual Vermont consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are therefore entitled to actual damages, interest, attorney fees and costs. Because their conduct was

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

willful and knowing and they failed to reasonably settle the class is entitled to damages

WHEREFORE, the putative plaintiff class, through its representatives, prays that this Court:

A. Preliminarily find that pursuant to Vermont Rule of Civil Procedure 23 and 9 VSA 2451 et seq., the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such action to the unnamed petitioners in the most effective practicable manner;

B. Pursuant to Vermont Rule of Civil Procedure 23 and 9 VSA 2451, et seq., enter a final finding that the use or employment of the unfair or deceptive act or practice alleged by the named plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such finding to all members of the class of petitioners in accordance with the law;

C. Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing

33

competition in manufacturing, making, transportation, sale or purchase of round thermostats.

D.    Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of 9 V.S.A. s. 2451 et seq. ;

E.    Award plaintiffs and members of the class their damages provided under 9 V.S.A. s. 2461 et seq. in an amount deemed fair, reasonable and just under the law.

F.    Find that Defendants violated 9 V.S.A. s. 2451 et seq. because the use and employment of the unfair and deceptive act or practice alleged was a willful, wanton or malicious violation and treble any award;

G.    Allow the class to recover its reasonable attorneys' fees and costs as authorized by 9 V.S.A. s. 2461;

H.    Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

I.    Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under 9 V.S.A. s. 2461 et seq. or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future and;

J.    Grant other appropriate equitable relief, including but not limited to disgorgement of profits obtained.

34

Respectfully submitted,

Alfred T. Wright, on behalf of himself and
All others similarly situated,
By their Attorneys,

D. Michael Noonan, #4050
Shaheen & Gordon
P.O. Box 977
140 Washington Street
Dover, NH 03821-0977
(603) 749-5000

35

# EXHIBIT 5

*Zanfagna!*
*Magill*



**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

**/ ALL**
**Transmittal Number: 3822065**
**Date Processed: 01/04/2005**

**Primary Contact:**     Meg  Johnson-Law Dept- AB-2
Honeywell International Inc.
101 Columbia Rd.
Morristown, NJ 07962

| | |
|---|---|
| **Entity:** | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc. |
| **Title of Action:** | R. Sadler Bailey vs. Honeywell International, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Other |
| **Court:** | Circuit Court for Thirtieth Judicial District at Memphis , Tennessee |
| **Case Number:** | CT-007218-04 |
| **Jurisdiction Served:** | Tennessee |
| **Date Served on CSC:** | 01/04/2005 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | R. Christopher Gilreath |
| | NA |
| **Customer Message:** | Summons lists Circuit Court for theTwentieth Judicial District at Memphis. Class Action Complaint lists Circuit Court for the Thirtieth Judicial District at Memphis, Shelby County. |

**RECEIVED**

**JAN 5 - 2005**

**M. JOHNSON**

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

**CIRCUIT COURT OF TENNESSEE**
**140 Adams Ave., Memphis Tennessee 38103**
**FOR THE TWENTIETH JUDICIAL DISTRICT AT MEMPHIS**
**SUMMONS IN CIVIL ACTION**

NO. *CT-002204* AD DAMNUM   $_____   AUTO ___ OTHER ___

R. Sadler Bailey _____

_____   **Home Address**

_____   6256 Poplar Ave., Memphis, TN 38119

**PLAINTIFF**   **Business Address**

vs.

Honeywell International, Inc. _____

a Delaware Corporation _____   **Home Address**

_____   Corporation Service Co., 2908 Poston Ave., Nashville, TN 37203

**DEFENDANT**   **Business Address**

TO THE DEFENDANT(S): *Honeywell International, Inc. through  its registered agent for service of process, Corporation Service Co., 2908 Poston Ave., Nashville, TN 37203*

_____

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on R. Christopher Gilreath Plaintiff's attorney, whose address is 6256 Poplar Avenue, Memphis, Tennessee 38119, telephone (901) 680-9777 within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service.

If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk
KENNY ARMSTRONG, Clerk & Master

TESTED AND ISSUED *Dec. 22,* 200*4* By _____, D.C.

**TO THE DEFENDANT(S):**

NOTICE: Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you m ay wish to seek the counsel of a lawyer.

**COST BOND**

I hereby acknowledge and bind myself for the prosecution of this action and payment of all costs not to exceed $500.00 in this court which may at any time be adjudged against the plaintiff in the event said plaintiff shall not pay the same.

Witness My Hand this *21st* day of *December* , 20 *04* *R. Christoph Gilreath*
Certification when applicable   Surety

I, JIMMY MOORE, Clerk & Master
of the Circuit Court, Shelby County,
Tennessee, certify this to be a true and
accurate copy as filed this _____
JIMMY MOORE, Clerk & Master

By: _____, D.C.

I, KENNY ARMSTRONG, Clerk of the Chancery
Court, Shelby County, Tennessee, certify
this to be a true and accurate copy as filed
this _____
KENNY ARMSTRONG, Clerk & Master

By: _____, D.C.

IN THE CIRCUIT COURT OF TENNESSEE FOR THE THIRTIETH JUDICIAL
DISTRICT AT MEMPHIS, SHELBY COUNTY

R. SADLER BAILEY, Individually
and on behalf of all others
similarly situated,

                       Plaintiffs,

v.

HONEYWELL INTERNATIONAL, INC.,

                       Defendants.

**JURY DEMANDED**

No. _C7-007218-04_

_Div #5_

---

CLASS ACTION COMPLAINT

---

Plaintiff R. Sadler Bailey brings this Class Action Complaint against Defendants

Honeywell International, Inc. (hereinafter individually and/or collectively "Honeywell",

"Company" or "Defendant"), on behalf of himself and all other similarly situated persons

residing in the State of Tennessee who suffered similar injury as a result of the

Defendant's use or employment of an unfair or deceptive act or practice violative of

either the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.* or the

Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 *et seq.* by engaging

in a continuing combination and conspiracy in an unreasonable restraint of trade or

commerce in the Tennessee thermostat market.   Plaintiff brings this claim exclusively

pursuant to Tennessee law, and not under sections 4 or 6 of the Clayton Act (15 U.S.C.

§§15, 26), or section 1 of the Sherman Act (15 U.S.C. §1) or any other federal statute,

regulation, or law.

## JURISDICTION AND VENUE

1.    The claims asserted herein arise under The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 *et seq.* and the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 *et seq.*    This putative class action seeks to recoup economic damages, mandatory minimum statutory compensation for violations of these Tennessee statutes and to enjoin Honeywell from continuing the illegal business practices described herein.

2.    Plaintiffs claims also arise from Tennessee common law for restitution, disgorgement, money had and received, and other remedial and equitable remedies as a result of Defendant's unlawful, unfair or fraudulent practices prohibited by or contrary to Tennessee law.  Plaintiffs' state law causes of action are not federally preempted.

3.    Defendant's actions and conduct mentioned herein occurred within the State of Tennessee and affected commerce therein.

4.    This complaint is not based on federal law and does not arise under, or relate to federal law, and Plaintiffs' right to relief does not depend on any resolution of any substantial questions of federal law.  Each Plaintiff's individual damages do not equal or exceed $75,000.

## NATURE AND BACKGROUND OF CASE

5.    Plaintiffs bring this class action lawsuit because Honeywell International, Inc. engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Tennessee.  Honeywell

2

misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

## THE PARTIES

6.      Plaintiff R. Sadler Bailey is a natural persons and resident of the State of Tennessee. During the class period, plaintiffs and each member of the putative class indirectly purchased in the State of Tennessee Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices. Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Massachusetts and a purchaser of a round thermostat during the class period.

7.      Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the Commonwealth of

3

Massachusetts. Honeywell's headquarters are located in Morristown, New Jersey and the

Company is incorporated in the State of Delaware. Honeywell has as it's principal place

of business and may be served through it's agent for service of process at Corporation

Service Company, 2908 Poston Avenue, Nashville, TN 37203.

8.    Defendant Honeywell is the largest seller of thermostats in the United

States. Its circular thermostats are sold and used in residences across Tennessee.

9.    Defendant Honeywell operates exclusively through its wholly owned

subsidiaries to manufacture, market, and sell round thermostats. Further, it controls the

acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of

Honeywell in the relevant market during the class period.

## CO-CONSPIRATORS

10.    For purposes of this complaint, the term Defendant shall apply to all

Defendants and their agents, servants, officers, parent companies, partners, subsidiaries,

alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive

acts referenced herein. Each transacted business in the State of Tennessee, benefitted

from our laws, and or caused loss or damage though its acts or omissions. Each conducts

business here on a regular basis and derives substantial revenues from services rendered

or goods used or consumed.

11.    Various other persons and entities may have participated as co-

conspirators with Honeywell and may have performed acts and made statements in

furtherance of the combinations in restraint of trade, unfair methods of competition, and

4

unfair acts and practices alleged herein. When and if their involvement becomes known,

plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants.

At this time, only the Defendants know their exact identity.

12.    The unfair methods of competition and unlawful, unfair or deceptive acts

and practices charged in this complaint as having been done by Honeywell and the co-

conspirators were authorized, ordered or done by their officers, agents, employees or

representatives while actively engaged in the management of the Defendant's businesses

or affairs. They directly affected members of this Tennessee consumer class because each

consumer purchaser directly and proximately paid more for round thermostats than he

would have absent the Defendant's unlawful, unfair or deceptive conduct.

## EQUITABLE TOLLING

13.    The Defendants and its co-conspirators fraudulently concealed the acts and

practices alleged herein.  Plaintiff and those similarly injured and situated could not have

discovered the identity, nature or extent of the unfair methods of competition and unfair

and deceptive acts and practices complained of through even the most diligent good faith

efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action pursuant to the Tennessee Trade Practices Act,

Tenn. Code Ann. §§ 47-25-101 *et seq.*, the Tennessee Consumer Protection Act, Tenn.

Code Ann. §§ 47-18-101 *et seq.*, Tennessee common law, and Rule 23 of the Tennessee

Rules of Civil Procedure on behalf of himself and the following proposed class:

> All similarly situated consumer purchasers residing
> in the State of Tennessee (excluding governmental
> entities, Defendants, and subsidiaries and affiliates
> of Defendants) who indirectly purchased from the
> Defendants, for their own use and not for resale,
> round thermostats between June 30, 1986 and the
> present.

15.    The number of potential class members is so numerous and geographically

dispersed that joinder is impracticable.  The exact number of proposed class members is

unknown to Plaintiff at the present time.

16.    Plaintiff's claims are typical of those of the class.  Plaintiff and all other

proposed class members purchased the same product from Defendant and sustained

damages in the same way arising out of Defendants' uniform course of wrongful conduct,

*i.e.* they have paid and continue to pay an artificial premium for Defendants' round

thermostat resulting from Defendants' illegally perpetuated monopoly, unfair and

deceptive conduct in the manipulation of the thermostat market.

17.    Numerous questions of law and fact are common to the class, including,

but not limited to:

a)    Whether Honeywell has engaged, and has combined with others to engage,

in conduct that violates Tenn. Code Ann. § 47-25-101;

b)    Whether Honeywell has engaged, and/or has combined with others to

engage, in conduct that violates Tenn. Code Ann. § 47-25-102;

6

c)    Whether Honeywell has engaged in conduct that violates Tenn. Code Ann. § 47-18-104;

d)    Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and limited product choice to consumers in Tennessee;

e)    The existence, duration and illegality of the conduct alleged herein;

f)    The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

g)    The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein;

h)    Whether the class is entitled to the statutory damages and other relief requested;

i)    The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

j)    The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

k)    The appropriate nature of class wide equitable relief.

16.    Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of plaintiff are coincident with, and not

7

antagonistic to, those of the class members. Plaintiff has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. They likewise will fairly and adequately represent the interests of the class. An effective and practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of defendants' common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.    Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such

8

individualized litigation would be substantial.  Individualized litigation would also

present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered

in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will

be greatly outweighed by the benefits of the class action procedure, including, but not

limited to, providing claimants with a method for redress of claims that may otherwise

burden the Court with individual litigation.

23.    The questions of law and fact common to the members of the class

predominate over any questions affecting only individual members of the class.  Class

action treatment is a superior method to the alternatives, if any, for the fair and efficient

adjudication of this controversy, in that, among other things, there is no interest by

members of the class in individually controlling the prosecution of separate actions, and it

is desirable to concentrate the litigation of the claims made herein in a single proceeding

to provide small claimants with a forum in which to seek redress for these violations of

Tennessee law.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

24.    More than 1.5 million HRTS are sold annually in the United States.

25.    The HRTs are sold to hundreds of thousands of consumers.

26.    Honeywell manufactures thermostats, among other products.

27.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.    According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.    During the class period, the HRT was virtually the only circular thermostat sold in Massachusetts

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Massachusetts.  During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

31.    Honeywell controls two relevant markets. One relevant market consists of electro mechanical thermostats for residential use in the United States and Tennessee. Another relevant market consists of circular thermostats for residential use in the United States and Tennessee.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33.    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34.    Electro mechanical thermostats are not electronic and are not programmable.

10

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electro mechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Tennessee.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Tennessee.

11

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electro mechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

### A.    Background

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

12

50.     Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.     In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.     The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.     The HRT Utility Patent expired in 1963.

54.     According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.  Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.  The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."  The HRT Utility Patent expired in 1963.

55.     In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.     The HRT Design Patent expired in 1970.

13

**B.**    **The Rejected 1968 Trademark Application.**

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

14

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Tennessee.

15

72.     Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.     In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.     In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").  Hunter is a corporation with its principal headquarters in Shelby County, Tennessee.

75.     In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat.")

### Honeywell Engaged In Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats.

76.     Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Tennessee consumers.

77.     The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be

16

false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.    As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.    As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

**D.    The Pattern of Sham and Baseless Litigation**

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

17

82. The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83. In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84. Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85. Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86. Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

87. Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88. Honeywell concealed information from the TTAB that Quad Six had been selling the Quad Six Round Thermostat in competition with Honeywell.

89. Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91. Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

18

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of

19

litigation as "aggressive lawyering" which reflected, "the intimidating power of

Honeywell in the market."

      100.    The District Court also commented that:

> The evidence before this court also shows that <u>whenever</u>
> Honeywell learned that a competitor was selling or planned
> to sell a round thermostat, it responded with threats of
> expensive litigation, and it managed to eliminate the
> competing design either by settlements or by buying the
> competitor outright.  (emphasis added)

**E.**    **Deception of the PTO**

      101.    In 1986, Honeywell again attempted to register a trademark for its HRT

(the "108 Trademark Application").

      102.    The PTO's examining attorney denied the 1986 application holding that

the circular shape of the HRT was functional.

      103.    As described above, functional or utilitarian characteristics of a product

are virtually certain never to secure trademark protection because of the benefit they offer

to the public at large.

      104.    Honeywell appealed the denial of its application to the TTAB, and

submitted materially false and misleading information to the TTAB concerning the

functionality of the HRT.

      105.    Relying on the false and misleading information supplied to it by

Honeywell, the TTAB approved the 108 Trademark Application and registered the

trademark for the HRT in 1988 (the "108 Trademark").

106.    Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.

107.    When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.    According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years...but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.    The fact that competitors have not used this design and have not been hampered in their competition with Honeywell is convincing proof of the non-functionality of Honeywell's thermostat design."

110.    Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

111.    The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

21

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

114.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116.    The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117.    However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118.    Honeywell did not describe the Quad Six Thermostat in the application.

119.    The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

22

120.    Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121.    The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

122.    The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123.    Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125.    Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126.    The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

23

127.    Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

128.    Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.    If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

130.    A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131.    However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132.    As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134.    The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

24

135.    As the District Court of Indiana makes clear in subsequent trademark

litigation:

It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years.  Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

> *Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

## F.    The ECO Thermostat.

137.    Eco Manufacturing LLC ("ECO") is a company developing a new

thermostat that does not utilize mercury to determine room temperature (the "ECO

Thermostat").

138.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.    In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as saying, "Right now, if you want to get a circular thermostat, you are going to get the technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.    The federal court action was captioned, <u>Eco Manufacturing LLC, v. Honeywell International, Inc.</u>, Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

26

145.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.    The two parties conducted expedited discovery and presented evidence.

148.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

27

151.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that functional aspects of a product cannot be trademarked.

153.    As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

154.    As described above, defendant Honeywell engaged in illegal practices to suppress the competition in the relevant market in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

155.    Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

28

156.    Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

157.    During the Class Period, defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

158.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Massachusetts. The PTO relied on Honeywell's deceitful statements when granting

29

approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

159.   . Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

160.   Honeywell maintained its unlawful monopoly in violation of Tenn. Code Ann. § 47-25-101 and Tenn. Code Ann. § 47-25-102. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

161.   The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. §47-25-102, and Tenn. Code Ann. § 47-18-104.

162.   .Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

163.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

164.    Defendants and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

165.    Independent of monopolization or the aforesaid trust, defendants further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

166.    Honeywell misled plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

167.    The deception of the plaintiff and other HRT consumers was in violation of Tenn. Code Ann. § 47-25-101, Tenn. Code Ann. § 47-25-102, and Tenn. Code Ann. § 47-18-104.

168.    In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress

31

competition, and unreasonably restrain trade with regard to the sale of round thermostats in the State of Tennessee in violation of common law and Tenn. Code Ann. § 47-25-101 and § 47-25-102.

169.    Defendant, through its described unfair methods of competition and unfair and deceptive acts and practices, exercised its monopoly power in the relevant market of round thermostats throughout the class period, has imposed upon others a variety of unfair and deceptive restrictive agreements, and has imposed other practices that operated to exclude competition in the round thermostat market and to reinforce its monopoly position, causing each class representative and class member to suffer economic loss.

170.    Both the purpose and the effect of Defendant's unfair methods of competition and unfair and deceptive acts and practices alleged herein have been to unfairly and deceptively restrain competition in the relevant market for round thermostats, thereby enabling Defendant to maintain a monopoly of that market. Their actions were willful or knowing violations of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

171.    By imposing such restrictive agreements on others, Defendant has engaged in unfair and deceptive acts and practices, including, but not limited to, direct involvement and control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or deceptive combinations of capital, skill and acts with others for the purpose of, and with the intent and effect of, creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; and restraining trade and preventing competition in the relevant market violative of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

32

172.    Tennessee indirect consumer purchasers of round thermostats have suffered related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and practices, which include, but are not limited to, the described wrongful conduct of entering into agreements with others not to disclose outcome determinative evidence to Government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

173.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of Tenn. Code Ann. § 47-25-101, § 47-25-102, and § 47-18-104.

174.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

175.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the state of Tennessee and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

176.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

33

177.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable.  These exclusionary restrictions are not reasonably necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way.  They are simply unfair methods of competition and unfair or deceptive acts and practices.

## CONSUMER INJURY UNDER THE TENNESSEE CONSUMER PROTECTION ACT

178.    Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Tennessee consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Tennessee.

179.    Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

180.    As a result of the numerous unfair methods of competition and willful, unfair and deceptive acts and practices it has imposed on others, including, but not

34

limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.  The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products.  Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

181.    Defendant's control of the round thermostat market in Tennessee and across the United States, its supra-competitive prices and its extraordinary profits is not the result of superior products or competition on the merits.  Defendant's conduct as described herein has been willful and knowing.

182.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in Tennessee.  This conduct violated Tenn. Code Ann. § 47-18-104.

## VIOLATIONS OF THE TENNESSEE TRADE PRACTICES ACT

183.    Plaintiff incorporates herein by reference the allegations contained in the foregoing paragraphs, above.

35

184.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the state of Tennessee; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of Tenn. Code Ann. § 47-25-101 and § 47-25-102.

185.    As a direct and proximate result of Defendant's violations of Tenn. Code Ann. §§ 47-25-101 and 102, members of the class have suffered economic and have been deprived of the benefits of free and fair competition on the merits.

186.    Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq..

187.    Those upon whom Defendant has imposed these restrictive arrangements

36

and practices include consumer purchasers, competitors and potential competitors of

round thermostats, as well as other manufacturers of round thermostats. Defendant's

willful and knowing actions were designed to, and/or had the effect of, inflating the prices

of round thermostats sold indirectly to the plaintiffs and the other members of the

consumer class in the State of Tennessee. Each consumer class member suffered actual

harm in an amount determinable per can purchased.

## RELIEF REQUESTED

188.    As a result of defendant's unfair and deceptive conduct, individual

Tennessee consumer purchasers of Round thermostats suffered the invasion of their

legally protected interests and rights and/or suffered related economic harm. They are

therefore entitled to actual damages, interest, attorney fees and costs.

WHEREFORE, the putative plaintiff class, through its representatives, prays that

this Court:

A.    This court certify the Plaintiff Class;

B.    Declare that Defendant has engaged in unfair methods of competition and

unfair and deceptive acts and practices, including but not limited to restraints of trade and

commerce, discouraging competition, attempting to monopolize, monopolization,

entering into contracts or combinations of capital, skill and acts with others constituting a

trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting

and reducing the production and increasing the price of round thermostats, and preventing

competition in manufacturing, making, transportation, sale or purchase of round thermostats.

C.      Find that by engaging in unfair methods of competition and participating in unlawful, unfair and deceptive business acts and practices, acted in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104.

D.      Award plaintiffs and members of the class their actual damages or in the alternative the statutory damages in an amount deemed fair, reasonable and just under the law.

E.      Find that Defendants violated the Tennessee Consumer Protection Act because of the willful or knowing use and employment of unfair and deceptive acts or practices and award treble damages, attorneys' fees, and costs, pursuant to Tenn. Code Ann. § 47-18-109;

F.      Award plaintiffs and the members of the class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

G.      Find that the Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole and grant such other and further relief as this Court deems to be necessary, proper, just and/or equitable under Tenn. Code Ann. § 47-18-108, or through its inherent powers including but not limited to enjoining the Defendant from engaging in this conduct in the future; and

38

H.    Grant other appropriate equitable relief, including but not limited to

disgorgement of profits obtained, for money had and received, or any other general relief

deemed proper by the Court.


R. CHRISTOPHER GILREATH (18667)
SIDNEY W. GILREATH (2000)
Gilreath & Associates
6256 Poplar Avenue
Memphis, TN 38119


Robert J Bonsignore BBO 547880
Robin Brewer BBO # 639506
Bonsignore and Brewer
23 Forest Street
Medford, Mass. 02155
(781) 391-9496

Jill S. Abrams, Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY  10016
Telephone:  (212) 889-3700

THE MOGIN LAW FIRM, P.C.
Daniel J. Mogin
110 Juniper Street
San Diego, CA 92101-1502
Telephone: (619) 687-6611

*Attorneys for Plaintiffs*

39

# EXHIBIT 6





**CORPORATION SERVICE COMPANY®**

PXM / ALL
**Transmittal Number: 3837297**
**Date Processed: 01/14/2005**

# Notice of Service of Process

**Primary Contact:**    Meg  Johnson-Law Dept- AB-2
Honeywell International Inc.
101 Columbia Rd.
Morristown, NJ 07962

| | |
|---|---|
| **Entity:** | Honeywell International Inc. |
| | Entity ID Number 2034040 |
| **Entity Served:** | Honeywell International, Inc. |
| **Title of Action:** | John McKinnon vs. Honeywell International, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Trademark / Copyright / Patent |
| **Court:** | York Superior Court , Maine |
| **Case Number:** | ALFSC-CV-2004-00353 |
| **Jurisdiction Served:** | Maine |
| **Date Served on CSC:** | 01/13/2005 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney :** | D. Michael Noonan |
| | 603-749-5000 |

RECEIVED

JAN 1 7 2005

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It
does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC.**
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

STATE OF MAINE

| SUPERIOR COURT | DISTRICT COURT |
|---|---|
| York , ss. | Location _____ |
| Docket No. _A L F S C - C V - 2 0 0 4 - 0 0 3 5 3_ | Docket No._____ |

John McKinnon
_____ Plaintiff

v.                                        **SUMMONS**

Honeywell International, Inc.
_____ Defendant

101 Columbia Road
_____ Address

_Morristown, NJ  07962_____

     The Plaintiff has begun a lawsuit against you in the (District) (Superior) Court, which holds sessions at (street address)_145 Kennebunk Road_____, in the Town/City of _Alfred____, County of _York_____, Maine. If you wish to oppose this lawsuit, you or your attorney **MUST PREPARE AND SERVE A WRITTEN ANSWER** to the attached Complaint **WITHIN 20 DAYS** from the day this Summons was served upon you. You or your attorney must serve your Answer, by delivering a copy of it in person or by mail to the Plaintiff's attorney, or the Plaintiff, whose name and address appear below. You or your attorney must also file the original of your Answer with the court by mailing it to the following address: Clerk of (District) (Superior) Court, _P O Box 160____ _____, _Alfred____, Maine _0400 2-0160_
       (Mailing Address)           (Town, City)      (Zip)
before, or within a reasonable time after, it is served.

### IMPORTANT WARNING

**IF YOU FAIL TO SERVE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU IN YOUR ABSENCE FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR EMPLOYER MAY BE ORDERED TO PAY PART OF YOUR WAGES TO THE PLAINTIFF OR YOUR PERSONAL PROPERTY, INCLUDING BANK ACCOUNTS AND YOUR REAL ESTATE MAY BE TAKEN TO SATISFY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS LAWSUIT, DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.**

     If you believe the plaintiff is not entitled to all or part of the claim set forth in the Complaint or if you believe you have a claim of your own against the Plaintiff, you should talk to a lawyer. If you feel you cannot afford to pay a fee to a lawyer, you may ask the clerk of court for information as to places where you may seek legal assistance.

(Seal of Court)

Date: _November 12, 2004_

D. Michael Noonan, #7240
Shaheen & Gordon, P. A.
_____
(Attorney for) Plaintiff                    _____ Clerk
_P O Box 977_____
_Dover, NH  03821-0977___  _____ Address
_(603) 749-5000_____  _____ Telephone

CV-030, Rev. 09/97

1·13·05

STATE OF MAINE                          SUPERIOR COURT
YORK, ss.                               CIVIL ACTION
                                        DOCKET NO. ALFSC-CV-2004-00353


John McKinnon, on behalf        )
of himself and all others       )
similarly situated,             )
                    Plaintiffs   )
                                )
vs.                             )
                                )
Honeywell International, Inc.    )
                    Defendant    )


### FIRST AMENDED COMPLAINT

Plaintiff, John McKinnon, upon information and belief, brings this Class Action

Complaint against Defendant Honeywell International, Inc. (hereinafter individually

and/or collectively "Honeywell", "Company" or "Defendant"), on behalf of himself and all

other similarly situated persons residing in the State of Maine who suffered similar injury

resulting from Defendant's violations of the Maine Unfair Trade Practices Act, 5 M.R.S.A.

205-A, et seq. (hereinafter referred to as "Chapter 10 or "UTPA") and 10 M.R.S.A. 1101, et

seq. (hereinafter referred to as Chapter 201).  Plaintiffs bring this claim under Chapters 10

and 201 and not under either § 4 and/or 6 of the Clayton Act, 15 U.S.C. §15 and/or §26 or

§1 of the Sherman Act, 15 U.S.C. §1 or any other federal statute, regulation, or law.

### JURISDICTION AND VENUE

1.      Brought pursuant to Chapter 10 and Chapter 201 this putative class action

seeks recoupment of economic damages, and nominal damages under and to enjoin

Honeywell from continuing the illegal business practices described herein.

1

2.      The single count complaint advanced mandates that this action be heard in a Maine state forum.

3.      Plaintiff's state law claim is not federally preempted. All claims arise from Defendant's conduct herein defined as unfair methods of competition and unfair and deceptive acts and practices against consumers in the State of Maine. Honeywell sold its circular thermostats to residential customers throughout the State of Maine during the class period and many of the unlawful acts and transactions alleged herein occurred in this judicial district.

4.      Named Plaintiff's individual damages do not equal or exceed $75,000. Each Plaintiff expressly disclaims any damages in excess of $75,000.

5.      A Demand Pursuant to Ch. 10, § 213 (1)(A) was issued by the Plaintiff on November 19, 2004 without response by the Defendant. See Attachment "A."

### NATURE AND BACKGROUND OF CASE

6.      Plaintiffs bring this class action lawsuit because Honeywell International, Inc engaged in illegal, unfair, deceptive and unlawfully monopolistic business practices in connection with the sale of its circular thermostats in Maine. Honeywell misrepresented that it had a proper trademark and then threatened rival thermostat manufacturers with litigation so as to discourage such rivals from competing in the circular thermostat market. However, as found by the United States District Court for the Southern District of Indiana, Honeywell acquired its trademark by deceiving the U.S. Patent Office (hereinafter "PTO") and withholding material information from the PTO. Honeywell made secret arrangements with a rival thermostat manufacturer to prevent the PTO from learning of competing circular thermostat products, and took other actions to suppress competition.

2

## THE PARTIES

7.      Plaintiff John McKinnon is a natural persons and resident of the State of Maine.  During the class period, Plaintiff and each member of the putative class indirectly purchased in the State of Maine Honeywell 'round' thermostats (hereinafter referred to as "HRTs") at a supra-competitive price and therefore suffered injury. These thermostats were sold at prices that were artificially inflated as a direct and proximate result of Honeywell's unlawful, unfair, or deceptive methods of competition and unlawful, unfair or deceptive acts and practices.  Plaintiff and members of the putative class were also wrongfully denied the benefits of a free and open competitive marketplace by the Defendant's unlawful, unfair or deceptive conduct and suffered related injury as a result of the invasion of their legally protected interests. Maine and a purchaser of a round thermostat during the class period.

8.      Defendant Honeywell International Inc. is a corporation organized under the laws of the state of Delaware that transacts business in the State of Maine.  Honeywell's headquarters are located in Morristown, New Jersey and the Company is incorporated in the State of Delaware.  Honeywell has a place of business at Westbrook, Maine.

9.      Defendant Honeywell is the largest seller of thermostats in the United States. Its circular thermostats are sold and used in residences across Maine.

10.     Defendant Honeywell operates exclusively through its wholly owned subsidiaries to manufacture, market, and sell round thermostats.  Further, it controls the acts and decisions of its wholly owned subsidiaries that acted as its authorized agents of Honeywell in the relevant market during the class period.

3

## CO-CONSPIRATORS

11.    For purposes of this complaint, the term Defendant shall apply to all Defendants and their agents, servants, officers, parent companies, partners, subsidiaries, alter egos and co-conspirators. Defendant committed the unlawful, unfair or deceptive acts referenced herein. Each transacted business in the State of Maine, benefited from our laws, and or caused loss or damage though its acts or omissions. Each conducts business here on a regular basis and derives substantial revenues from services rendered or goods used or consumed.

12.    Various other persons and entities may have participated as co-conspirators with Honeywell and may have performed acts and made statements in furtherance of the combinations in restraint of trade, unfair methods of competition, and unfair acts and practices alleged herein. When and if their involvement becomes known, plaintiffs may seek to amend this complaint to add such co-conspirators as Defendants. At this time, only the Defendants know their exact identity. Plaintiffs have demanded that Honeywell make them known. Honeywell has failed to address this request.

13.    The unfair methods of competition and unlawful, unfair or deceptive acts and practices charged in this complaint as having been done by Honeywell and the co-conspirators were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of the Defendant's businesses or affairs. They directly affected members of this Maine consumer class because each consumer purchaser directly and proximately paid more for round thermostats than he would have absent the Defendant's unlawful, unfair or deceptive conduct.

4

## EQUITABLE TOLLING

14.     The Defendant and its co-conspirators fraudulently concealed the acts and practices alleged herein. Plaintiff and those similarly injured and situated could not have discovered the identity, nature or extent of the unfair methods of competition and unfair and deceptive acts and practices complained of through even the most diligent good faith efforts and are entitled to the benefit of an equitable tolling of the statute of limitations.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action exclusively under Chapter 10 and Chapter 201 on behalf of himself and the following class:

> All similarly situated consumer purchasers residing in the State of Maine (excluding governmental entities, Defendants, and subsidiaries and affiliates of Defendants) who indirectly purchased from the Defendants, for their own use and not for resale, round thermostats between June 30, 1986 and the present.

16.     The number of potential class members is so numerous that joinder is impracticable. Plaintiff's claims are typical of those of the class. Numerous questions of law and fact are common to the class, including, but not limited to

a)  Whether Honeywell has engaged, and has combined with others to engage, in conduct that violates Chapter 10 and Chapter 201;

b)  Whether Honeywell has engaged, and/or has combined with others to engage, in conduct that violates Chapter 201;

c)  Whether Honeywell's unfair methods of competition and unfair and deceptive acts and practices have caused legally cognizable injury to the class, by increasing the prices the class members have paid for round thermostats above the prices that would have prevailed in a competitive market and

5

limited product choice to consumers in the State of Maine;

d) The existence, duration and illegality of the conduct alleged herein;

e) The nature of and extent of injuries sustained by the class as a result of the unfair methods of competition and unfair and deceptive acts and practices alleged herein;

f) The nature, extent and appropriate measure of damages sustained by the class as a result of conduct alleged herein; and

g) Whether the class is entitled to the statutory damages and other relief requested. Whether defendant engaged in monopolization;

h) Whether defendants acted unlawfully as prohibited by Chapter 10 and Chapter 201;

i) The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of unfair and deceptive conduct alleged herein;

j) The effect upon and the extent of injuries sustained by plaintiffs and each member of the Plaintiff Class and the appropriate type and/or measure of damages; and

k) The appropriate nature of class wide equitable relief.

16.    Plaintiff, as representative of the class, will fairly and adequately protect the interests of the class members. The interests of Plaintiff are coincident with, and not antagonistic to, those of the class members. He has engaged counsel who are experienced and competent in class action litigation and complex antitrust litigation of this type. He likewise will fairly and adequately represent the interests of the class. An effective and

6

practicable manner of notice to such class members can be fashioned by the Court.

17.    Each member of the Plaintiff Class and each class representative purchased, indirectly, HRT, for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendant's common course of conduct in violation of law as alleged herein.

18.    Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. In addition to joinder of all members of the Plaintiff Class being impracticable, class action treatment will permit a large number of similarly situated persons who were similarly injured to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

19.    Because a round thermostat cost under $100 during the class period, the monetary injuries suffered by each individual member of the class are relatively small. The expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them.

20.    Additionally, an important public interest will be served by treating the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

21.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

22.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited

7

to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

23.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is a superior method to the alternatives, if any, for the fair and efficient adjudication of this controversy, in that, among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Maine law.

## UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF CHAPTER 10 AND CHAPTER 201

24.     More than 1.5 million HRTS are sold annually in the United States.

25.     The HRTS are sold to hundreds of thousands of consumers.

26.     Honeywell makes thermostats, among other products.

27.     In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover (the HRT).

28.     According to a recent Honeywell press release, the HRT "can be found on more residential walls than any other thermostat in the world.

29.     Upon information and belief during the class period, the HRT was virtually the only circular thermostat sold in Maine.

8

30.    Honeywell has acquired and maintained a monopoly over circular thermostats in Maine. During the class period, Honeywell employed illegal, and deceptive business practices to maintain its 'lock' on the thermostat market.

## RELEVANT MARKET AND DEFENDANTS' UNLAWFUL MONOPOLY POWER

31.    Honeywell controls two relevant markets. One relevant market consists of electromechanical thermostats for residential use in the United States and Maine. Another relevant market consists of circular thermostats for residential use in the United States and Maine.

32.    Honeywell represents that it is "the worlds leading manufacturer of thermostats".

33,    Thermostats are distinct from other types devices used for controlling air temperature in homes.

34,    Electromechanical thermostats are not electronic and are not programmable.

35.    Circular thermostats are distinct from other types of thermostats due to their unique design and consumer preference.

36.    According to Honeywell, "The Round thermostat can be found on more residential walls than any other thermostat in the world".

37.    According to Honeywell, "The simplicity and elegance of The Round thermostat elevated the thermostat in design and function to a level that, even today, manufacturers around the world strive for."

38.    On May 19, 2003, the *Indiana Business Journal* reported that the CEO of ECO LLC, a rival of manufacturer, said the Honeywell Round thermostat sells for roughly double the price of a square or rectangular thermostat with the same functionality.

39.    The Honeywell Round thermostat did sell for roughly double the price of a square or rectangular thermostat with the same functionality at that time.

9

40.    As a result of the unfair and deceptive methods, acts and practices complained of herein, Honeywell has acquired and/or maintained a monopoly in the market for thermostats with a market share of approximately 70% for residential use; a market share of approximately 70% of electromechanical thermostats for residential use and more particularly, a market share of almost 100% in the market for circular thermostats for residential use in the United States and Maine.

41.    As of this date Honeywell has a market share of almost 100% in the market for circular thermostats for residential use in the United Sates and Maine.

42.    The HRT is the biggest selling thermostat in the United States. Honeywell has sold more than 85 million HRT.

43.    Honeywell has sold more than 85 million HRT's and has current annual sales of the HRT of approximately 1.5 million to 2.5 million units, or $40 million.

44.    Honeywell has spent over $70 million to advertise HRT.

45.    A substantial factor in Honeywell's monopolization of the thermostat and electromechanical thermostat markets is its monopoly of the circular thermostat market.

## DEFENDANTS' CONTINUING UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES AND UNLAWFUL MONOPOLISTIC PRACTICES

### A.    Background

46.    In the 1940s, when the Company was known as the Minneapolis Honeywell Regulator Company, Honeywell designed a form of electro-magnetic thermostat with a circular base, a round/convex cover and a round dial in the center of the cover, which became known as the "The Round" or HRT.

47.    Honeywell has aggressively taken action to exclude other thermostat manufacturers from producing and marketing round thermostats similar to the HRT.

48.    In 1946, Honeywell was issued a United States Utility Patent for its HRT (the "HRT Utility Patent").

10

49.    Honeywell took effort to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.

50.    Honeywell efforts to convince the PTO of the appropriateness of the HRT Utility Patent Following were repeatedly.

51.    In securing the HRT Utility Patent, Honeywell stressed to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.

52.    The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."

53.    The HRT Utility Patent expired in 1963.

54.    According to the opinions of the United States District Court for the Southern District of Indiana and the United States Court of Appeals for the Seventh Circuit, Honeywell struggled to convince the PTO of the appropriateness of the HRT Utility Patent because other thermostat manufacturers had similar thermostats.  Following repeated rejections of its utility patent application, Honeywell secured the HRT Utility Patent by stressing to the PTO the utility of the HRT's circular design, including its lack of protruding edges and ease of temperature setting on a round dial.  The PTO approved the HRT Utility Patent stating that the HRT's circular shape provided "great utility from a safety standpoint."  The HRT Utility Patent expired in 1963.

55.    In 1956, Honeywell secured a design patent for the HRT (the "HRT Design Patent").

56.    The HRT Design Patent expired in 1970.

**B.    The Rejected 1968 Trademark Application.**

57.    In 1968, as the HRT Design Patent was to expire, Honeywell filed a trademark application to register the circular shape of the HRT (the "1968 Trademark Application").

11

58.    A trademark is a distinctive name or symbol used to identify a product or company and build recognition.

59.    A trademark can be any word, name, symbol, device, slogan, package, design (or combination of these), which serves to identify and distinguish a specific product from others in the market place or in trade.

60.    With a few exceptions functional or utilitarian characteristics cannot be trademarked because of the benefit they offer to the public at large.

61.    None of the few exceptions are relevant to the HRT. Functional and utilitarian characteristics cannot be trademarked.

62.    Functionality is critical in cases involving the intellectual property of a product's shape or configuration because of concerns about unwarranted exclusivity rights.

63.    Honeywell's trademark application was rendered futile by the functional qualities of the HRT's circular shape and by the Company's receipt of the HRT Utility Patent, which emphasized the functionality of the HRT's circular design.

64.    The PTO's examining attorney denied the HRT Trademark Application reasoning that trademark protection would improperly extend the monopoly enjoyed by Honeywell (via the HRT Design Patent).

65.    The examining attorney declared that an extension of Honeywell's monopoly on the HRT would be "contrary to the purpose and intent of the patent law."

66.    Honeywell appealed the examiner's decision.

67.    The appellate body, the Trademark Trial and Appeal Board (the "TTAB") declared that the circular shape of the HRT was functional and therefore could not be protected by trademark.

12

68.    The TTAB emphasized the functionality of the HRT's circular design and stated in its denial of the HRT Trademark Application that:

> There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments. This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and cannot detract from the functional character of the configuration here involved.

69.    Therefore, by 1971, over Honeywell's objection neither patent nor trademark protected the HRT.

70.    As a matter of law Honeywell's monopoly of circular style thermostats had come to an end.

71.    Following the end of the Honeywell monopoly, thermostat manufactures other than Honeywell sought to compete in the circular thermostat market, including in Maine.

72.    Between 1969 and 1979, a company called Penn Controls manufactured and sold a thermostat with a circular and convex cover that closely resembled the HRT (the "Penn Controls Thermostat").

73.    In 1985, a company called Quad Six began manufacturing and selling a circular thermostat that was designed to be compatible with the base of the HRT (the "Quad Six Thermostat").

74.    In 1986, a company called the Hunter Fan Company began manufacturing and selling a circular thermostat (the "Hunter Fan Thermostat").

13

75.   In 2003, a company called ECO Manufacturing ("ECO") introduced a circular thermostat that does not use mercury (the "ECO Round Thermostat").

### C.   Honeywell Engaged in Unfair Methods of Competition and Unfair and Deceptive Acts and Practices Illegally Monopolize the Market for Circular Thermostats

76.   Since the beginning of the Class Period, Honeywell has engaged in illegal and deceptive anticompetitive business practices with the intent to acquire and maintain its monopoly on the Relevant Market including Maine consumers.

77.   The illegal and deceptive business practices have included: threatening and coercing rival thermostat manufactures into not producing competing circular thermostats by a pattern of sham and baseless trademark infringement litigation; deceiving the PTO into believing no competition existed for the HRT, something Honeywell knew to be false, and thereby securing a registered trademark; combining with a rival manufacturer to prevent that rival giving unfavorable testimony to the PTO concerning a trademark application; and purchasing at least one rival thermostat manufacturer so as to suppress competition for circular thermostats in the relevant market and to mislead the PTO.

78.   As a result of the above described deceptive and monopolistic business practices engaged in by Honeywell during the Class Period, Honeywell suppressed competition in the Relevant Market and caused the price of its HRT's to be inflated, thereby harming those persons or entities, including plaintiff and each putative class member, who purchased HRT's during that period.

79.   As a result of Honeywell's illegal and deceptive business practices, Honeywell has: 1) removed all competitors in the circular thermostat market; and 2) sold

14

the HRT at unlawfully inflated prices throughout the Relevant Market during the putative class period.

80.    In fact, rival thermostat manufacturer ECO, whom Honeywell unsuccessfully attempted to coerce (into not competing in the circular thermostat market) has made public the fact that Honeywell was able to sell the HRT at "double the price of a square or rectangular thermostat with the same functionality."

### D.    The Pattern of Sham and Baseless Litigation

81.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

82.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

83.    In 1985, Honeywell threatened Quad Six with expensive litigation and claimed Quad Six violated a trademark rights owned by Honeywell.

84.    Notably, Honeywell owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

85.    Because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

86.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Quad Six with expensive trademark infringement litigation should Quad Six persevere with its plans to produce the Quad Six Thermostat.

15

87.    Shortly thereafter, in late 1985, Honeywell and Quad Six entered into negotiations that resulted in Honeywell's acquisition of Quad Six, thus removing the Quad Six Pound Thermostat from the market.

88.    Honeywell concealed information from the TTAB that Quad Six had been sell the Quad Six Round Thermostat in competition with Honeywell.

89.    Honeywell learned of the competing Hunter Fan Thermostat in 1986.

90.    The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market.

91.    Honeywell sent a 'cease and desist' letter to Hunter Fan on June 30, 1986 insisting that the Hunter Fan Thermostat infringed on trademark rights owned by Honeywell.

92.    Honeywell also threatened Hunter Fan with expensive litigation unless it ceased to market the Hunter Fan Thermostat.

93.    Hunter Fan and Honeywell then exchanged terse letters concerning the Hunter Fan Thermostat until sometime near the end of 1987.

94.    However, Honeywell knew that it owned no trademark rights in the circular shape of the HRT and that its attempts to register such rights had been rejected in 1968.

95.    Honeywell also knew that because the circular shape of the HRT was functional, Honeywell had no opportunity to legally obtain trademark rights in the circular shape of the HRT.

96.    Nevertheless, as part of a pattern of sham and baseless litigation, Honeywell threatened Hunter Fan with expensive trademark infringement litigation should Hunter Fan persevere with its plans to produce the Hunter Fan Thermostat.

16

97.    As was knowingly and willfully intended, by coercing rival thermostat manufacturers into not competing in the circular thermostat market, Honeywell was able to monopolize that market and sell HRT at supra-competitive prices.

98.    The coercion of Quad Six and Hunter Fan as described above formed part of a pattern of sham and baseless litigation against rival thermostat manufacturers who attempted to compete in the Relevant Market.

99.    In subsequent court proceedings involving the intellectual property of the HRT, the District Court of Indiana ("District Court") characterized this pattern of litigation as "aggressive lawyering" which reflected, "the intimidating power of Honeywell in the market."

100.    The District Court also commented that:

> The evidence before this court also shows that <u>whenever</u> Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright. (emphasis added)

**E.    Deception of the PTO**

101.    In 1986, Honeywell again attempted to register a trademark for its HRT (the "108 Trademark Application").

102.    The PTO's examining attorney denied the 1986 application holding that the circular shape of the HRT was functional.

103.    As described above, functional or utilitarian characteristics of a product are virtually certain never to secure trademark protection because of the benefit they offer to the public at large.

17

104.   Honeywell appealed the denial of its application to the TTAB, and submitted materially false and misleading information to the TTAB concerning the functionality of the HRT.

105.   Relying on the false and misleading information supplied to it by Honeywell, the TTAB approved the 108 Trademark Application and registered the trademark for the HRT in 1988 (the "108 Trademark").

106.   Honeywell's 108 Trademark Application was severely hampered by the Company's previous receipt of the HRT Utility Patent, which emphasized the utility of the HRT's circular design.

107.   When applying for the 108 Trademark, Honeywell stressed to the PTO that no competitor had utilized a circular design for thermostats, despite being able to do so since the expiration of the HRT Design Patent in 1970.

108.   According to papers filed in subsequent litigation, Honeywell stated to the TTAB that, "Competitors have been free to copy this unprotected round thermostat design for sixteen years…but that no-one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.

109.   The fact that competitors have not used this design and have not been hampered in their competition with [Honeywell] is convincing proof of the non-functionality [sic] of [Honeywell's] thermostat design."

110.   Honeywell also misrepresented to the PTO that the Company had entered into no "settlement agreements" with competitors involving circular shaped thermostats (which would demonstrate a desire by competitors to manufacture such thermostats).

SHAHEEN & GORDON PROFESSIONAL ASSOCIATION
P.O. BOX 977, DOVER, NH 03821-0977  603-749-5000

111.    The TTAB relied extensively on Honeywell's materially false and deceptive comments when it granted the 108 Trademark.

112.    Contrary to its representations to the TTAB, Honeywell knew of competing circular thermostats at the time of the 108 Trademark Application, and had entered into an agreement with a rival manufacturer to suppress competition.

113.    Honeywell thus deceived the TTAB, which granted approval of the log Trademark believing the complete absence of competition in the circular thermostat market.

114.    As described above, in 1985 Quad Six began manufacturing and selling the Quad Six Thermostat complete with a circular thermostat that was designed to be compatible with the base of the HRT.

115.    The Quad Six Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the Relevant Market. Honeywell entered into negotiations with Quad Six and acquired Quad Six in 1985.

116.    The TTAB should have been informed of the competing Quad Six Thermostat when it ruled on the 108 Trademark.

117.    However, despite being asked by the TTAB to produce evidence of competing products, Honeywell failed to inform the TTAB that the Quad Six Thermostat was once a significant competitor, but instead emphasized Quad Six as an affiliated "related" company.

118.    Honeywell did not describe the Quad Six Thermostat in the application.

119.    The only indication given by Honeywell that Quad Six was once a competitor in the thermostat market was a vague footnote surreptitiously dropped into the 108 Trademark Application confirming the purchase of Quad Six by Honeywell subsequent to the filing of the application.

19

120. Honeywell's deceptive approach deceived the TTAB, which granted approval of the 108 Trademark believing the *complete* absence of competition in the circular thermostat market.

121. The purchase by Honeywell of Quad Six effectively removed the Quad Six Thermostat from the market.

122. The purchase of Quad Six by Honeywell was monopolistic in that the purchase was intended to prevent the production of competing circular thermostats in the Relevant Market and keep the PTO from learning of such competition during the 108 Trademark Application.

123. Honeywell learned of the competing Hunter Fan Thermostat immediately after Honeywell filed the 108 Trademark Application.

124. The Hunter Fan Thermostat had the same purpose as the HRT, was interchangeable with the HRT and competed with the HRT in the relevant market. Honeywell knew of the Hunter Fan Thermostat during the time the 108 Trademark Application was pending.

125. Honeywell deceptively represented to the TTAB that it knew of no competing circular thermostat products "as of the date" the 108 Trademark Application (but failed to inform the TTAB that it learnt of the competing Hunter Fan Thermostat just days after filing the application).

126. The TTAB subsequently approved the 108 Trademark believing the *complete* absence of competition with the HRT.

127. Pursuant to the 108 Trademark Application, Honeywell published the application for opposition.

20

128.    Pursuant to patent and trademark law, a proposed trademark is published in a recognized journal to solicit objections.

129.    If no opposition is filed within a designated period of time (e.g. one month) the application is registered.

130.    A major competitor of Honeywell, Emerson Electric objected to the 108 Trademark application and offered to inform the TTAB of competing circular thermostats existing in the marketplace and of evidence it had that Honeywell had threatened competitors with litigation if they marketed competing circular thermostats.

131.    However, Honeywell entered into an agreement with Emerson Electric that Emerson Electric would not offer its testimony to the TTAB.

132.    As part of the agreement with Honeywell, Emerson Electric withdrew its opposition to the 108 Trademark Application and the TTAB did not consider the evidence initially offered by Emerson Electric.

133.    The combination of Honeywell and Emerson Electric deceived the TTAB and created an illegal trust, which, as Honeywell intended, suppressed competition in the Relevant Market.

134.    The false statements issued by Honeywell during the 108 Trademark Application, and the material information omitted by Honeywell as part of the same process were decisive factors in the TTAB approving the 108 Trademark Application.

135.    As the District Court of Indiana makes clear in subsequent trademark litigation:

> It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors'

21

designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. Second, in applying [the third factor] addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

> *Despite the apparent availability of the rounded thermostat cover since that time* [1976], *an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

136.    The TTAB granted the 108 Trademark Application in 1988.

F.    <u>The ECO Thermostat.</u>

137.    Eco Manufacturing LLC ("ECO") is a company developing a new thermostat that does not utilize mercury to determine room temperature (the "ECO Thermostat").

138.    The ECO Thermostat is circular and would compete with the HRT in the relevant market.

139.    ECO introduced the ECO Thermostat at a trade show in January 2003. ECO's CEO Bill Daniels ("Daniels") has stated to the media that Honeywell needs competition for the HRTs.

140.    In May 2003, Daniels was quoted in the <u>Indianapolis Business Journal</u> as saying, "Right now, if you want to get a circular thermostat, you are going to get the

22

technology that was on your grandfather's wall, and you are going to have to pay a premium price to get it. That's simply not right." Daniels expects to sell ECO Thermostats for approximately 50% of the price of the HRT, but with more technology and without the environmentally unsound mercury utilized in the HRT.

141.    After Honeywell learned of the ECO Thermostat, Honeywell threatened to sue ECO for trademark infringement.

142.    ECO filed an action in federal court in Indiana seeking a declaration that the ECO Thermostat would not infringe on any trademark rights that might be owned by Honeywell.

143.    The federal court action was captioned, Eco Manufacturing LLC, v. Honeywell International, Inc., Case NO. 1:03-cv-0170-DFH (S.D.Ind. 2003) (the "ECO Litigation").

144.    Honeywell responded with a preliminary injunction to prevent the ECO Thermostat from being manufactured.

145.    Honeywell contended that they had a registered U.S. trademark that had become "incontestable", that is to say the trademark had been registered in the federal system for a period of five years and therefore provided conclusive evidence of the registrant's exclusive right to use the mark, subject to certain statutory defenses.

146.    Two of the statutory defenses available to incontestability are functionality and fraudulent procurement of a trademark registration.

147.    The two parties conducted expedited discovery and presented evidence.

148.    The District Court denied Honeywell's motion for preliminary injunction and held that: 1) the circular shape of the HRT was functional and could not be protected by a

23

valid trademark; 2) the circular shape of the HRT was the subject of a long expired utility patent; and 3) that ECO and other competitors are entitled to copy the "useful and functional [circular] shape".

149.    The District Court determined that the TTAB had improperly granted the 108 Trademark because it had been materially deceived by Honeywell during the 108 Trademark application process and had not been provided with information about competing circular thermostats in the market place since 1970.

150.    The District Court also denied Honeywell's motion for a preliminary injunction because it found the TTAB had: granted the 108 Trademark in an *ex parte* proceeding (without the benefit of rigorous contest); had applied the wrong legal standard to determine functionality; and had misread evidence from the HRT Utility Patent by not considering the functionality of the HRT circular design.

151.    The District Court was highly critical of Honeywell and declared that the Company had: 1) made wrongful factual assertions and "false statements" to the TTAB when informing the TTAB of a lack of competition in the circular thermostat market, and that the TTAB had relied on such "decisive" falsities when granting the 108 Trademark; 2) issued information to the TTAB related to Quad Six Thermostats that while being "literally correct", "seems to have been designed to leave the wrong impression"; 3) made at least one statement about the Quad Six competition that was "inconsistent with the true facts"; and 4) used "careful phrasing and hedging" to steer the TTAB away from evidence relating to the Hunter Fan Thermostat.

152.    Honeywell appealed the District Court's holding. The United States Court of Appeals for the Seventh Circuit affirmed the District Court's decision and reiterated that

24

functional aspects of a product cannot be trademarked. As a result of the findings of the federal courts, the matter of Honeywell's trademark rights, if any, have been determined such that plaintiff's right to relief does not depend upon resolution of any substantial questions of federal law.

153. As described above, Defendant Honeywell engaged in illegal, unfair and deceptive practices to suppress the competition in the relevant market in violation of Chapter 10 and Chapter 201.

154. Honeywell coerced rival thermostat manufacturers into not competing with the HRTs in the Relevant Market by threatening such rivals with sham trademark infringement litigation.

155. Honeywell knew it had no trademark rights in the circular shape of the HRT, and knew that because of the functional quality of the HRT's circular shape, Honeywell could never legally be granted trademark rights in that circular shape. The coercion of rival manufacturers (via the threatened litigation) as described above, including Quad Six and Hunter Fan, resulted in illegal combinations of business entities and acts, which as Honeywell intended, allowed Honeywell to monopolize the Relevant Market and charge high prices for HRTs and was in violation of Chapter 10 and Chapter 201.

156. During the Class Period, Defendant Honeywell obtained the 108 Trademark by deceiving the TTAB into believing there was a complete lack of competition for circular thermostats, something Honeywell knew to be false. Honeywell disseminated untrue and misleading statements to the TTAB, which became part of the public record and which were known to Honeywell to be untrue and misleading. The untrue and deceptive statements issued by Honeywell to the PTO were intended by Honeywell to obtain the registration of

25

the 108 Trademark and monopolize the Relevant Market. Honeywell intended that rival thermostat manufacturers would be deterred from competing with Honeywell in the circular thermostat market because of the illegally procured 108 Trademark.

157.    The PTO is a public, governmental body, intended by Congress to represent the interests of public consumers in issues of intellectual property, including trademarks. Deceit on the PTO is therefore deceit on consumers, including consumers in Maine. The PTO relied on Honeywell's deceitful statements when granting approval of the 108 Trademark. The deceit of the PTO was a successful attempt by Honeywell to establish monopoly power over circular thermostats in the Relevant Market and was in violation of Chapter 10 and Chapter 201.

158.    Honeywell then failed to inform the PTO of its deception during the Class Period, thus enabling Honeywell to maintain monopoly of circular thermostats in the relevant market throughout the Class Period, in violation of Chapter 10 and Chapter 201.

159.    Honeywell maintained its unlawful monopoly in violation of Chapter 10 and Chapter 201. Honeywell arranged with rival thermostat manufacturer, Emerson Electric that Emerson Electric would not give evidence during the 108 Trademark Application processes that would provide evidence to the TTAB of circular thermostats directly competing with the HRT.

160.    The combination of Honeywell and Emerson Electric, two rival manufacturers and separate legal entities, deceived the TTAB and created an illegal trust which Honeywell intended would suppress competition in the Relevant Market, all in violation of Chapter 10 and Chapter 201.

26

161.    Plaintiff and other members of the proposed Class purchased HRTs at the inflated prices and were therefore directly damaged by Honeywell's violations of Chapter 10 and Chapter 201.

162.    Honeywell purchased at least one rival thermostat manufacturer, Quad Six, so as to suppress competition in the relevant market and so as to provide misleading information to the PTO in order to procure the 108 Trademark. Honeywell's purchase of Quad Six was therefore in violation of Chapter 10 and Chapter 201.

163.    Defendant and others engaged in a concert of action, combination, trust, agreement or understanding, the purpose of which was to unlawfully fix and raise, elevate and maintain the prices of circular thermostats at supra-competitive levels.

164.    Independent of monopolization or the aforesaid trust, Defendant further engaged in methods of competition, and other acts and practices that were unlawful, unfair or deceptive and injured consumers by limiting their choices and forcing them to pay supra-competitive prices for circular thermostats.

165.    Honeywell misled Plaintiff and other purchasers of HRT's in the Relevant Market, in that said purchasers believed the prices they paid for the HRT's were competitive, market prices and not inflated prices caused by Honeywell's deception of the PTO and other monopolistic practices as alleged herein.

166.    The deception of the plaintiff and other HRT consumers was in violation of Chapter 10 and Chapter 201.

167.    In addition, Defendant's knowing and willful unfair methods of competition and unlawful, unfair and deceptive acts and practices were done in such an effective way that Defendant attempted to and did create a monopoly, suppress competition, and

27

unreasonably restrain trade with regard to the sale of round thermostats in the State of

Maine in violation of common law and Chapter 10 and Chapter 201.

168.    Defendant, through its described unfair methods of competition and unfair

and deceptive acts and practices, exercised its monopoly power in the relevant market of

round thermostats throughout the class period, has imposed upon others a variety of unfair

and deceptive restrictive agreements, and has imposed other practices that operated to

exclude competition in the round thermostat market and to reinforce its monopoly position,

causing each class representative and class member to suffer economic loss.

169.    Both the purpose and the effect of Defendant's unfair methods of competition

and unfair and deceptive acts and practices alleged herein have been to unfairly and

deceptively restrain competition in the relevant market for round thermostats, thereby

enabling Defendant to maintain a monopoly of that market. Their actions were willful or

knowing violations of Chapter 10 and Chapter 201.

170.    By imposing such restrictive agreements on others, Defendant has engaged in

unfair and deceptive acts and practices, including, but not limited to, direct involvement and

control of unfair and deceptive competition. Defendant has entered into unlawful, unfair or

deceptive combinations of capital, skill and acts with others for the purpose of, and with the

intent and effect of, creating and carrying out restrictions in trade and commerce; increasing

the price and limiting and reducing the supply of round thermostats; and restraining trade

and preventing competition in the relevant market violative of Chapter 10 and Chapter 201.

171.    Maine indirect consumer purchasers of round thermostats have suffered

related loss because of Defendant's restrictive unlawful, unfair or deceptive agreements and

practices, which include, but are not limited to, the described wrongful conduct of entering

28

into agreements with others not to disclose outcome determinative evidence to government reviewing agencies, entering into agreements to purchase competitors as an unlawful method of eliminating competition, and otherwise engaging in unfair methods of competition and unfair or deceptive acts and practices as referred to herein.

172.    Defendant's unlawful, unfair or deceptive monopolistic and attempted monopolistic behavior, discouraging of competition and other conduct referred to herein was unlawful, unfair or deceptive and violative of Chapter 10 and Chapter 201.

173.    As a result of the numerous methods of unfair competition and unlawful, unfair or deceptive acts and/or exclusionary and restrictive practices Defendant has imposed on others, including those described herein, it has succeeded in unfairly and deceptively raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets.

174.    The resultant monopoly power has enabled Defendant to eliminate product choice to consumers in the State of Maine and price its round thermostats unfairly and deceptively virtually without regard to the prices of competing products.

175.    Distributors and retailers of Defendant's round thermostats passed these monopoly prices onto class members.

176.    If Defendant is allowed to continue to engage in its unlawful, unfair or deceptive combinations to restrain competition in the relevant market so as to perpetuate its monopoly, the harm caused by Defendant to members of the class will be, at once, grave and irreparable. These exclusionary restrictions are not reasonably necessary to further any legitimate pro competitive purpose and impair competition in an unnecessarily restrictive way. They are simply unfair methods of competition and unfair or deceptive acts and

29

practices.

## CONSUMER INJURY UNDER CHAPTER 10 AND CHAPTER 201

177.    Defendant's unfair methods of competition and unfair and deceptive acts and practices described herein have caused significant harm to the Maine consumer class members by violating and invading legally protected rights and interests, increasing the price they had to pay for Defendant's round thermostats above competitive levels, denying them a free choice in a competitive market, and limiting the product choice available to consumer class members in the State of Maine.

178.    Defendant's acts and practices as referred to herein reduced or eliminated consumer choice among competing round thermostats, foreclosed access to better designed round thermostats manufacturers to compete, increased barriers to entry into the relevant round thermostats market, imposed a barrier to competitors attempts to introduce innovation and resulted in loss of competition.

179.    As a result of the numerous unfair methods of competition and unfair and deceptive acts and practices it has imposed on others, including, but not limited to, those described herein, Defendant has also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition in the relevant markets. The resultant monopoly power has enabled Defendant to price its round thermostats virtually without regard to the prices of competing products. Distributors and retailers of Defendant's round thermostats have passed these monopoly prices onto consumers, including particularly to the class members.

180.    Defendant's control of the round thermostat market in Maine and across the United States, its supra-competitive prices and its extraordinary profits is not the result of

30

superior products or competition on the merits.

181.    Defendant has been able, at class members' financial expense, to artificially inflate its profits only by concertedly engaging in a series of unfair methods of competition and unlawful, unfair or deceptive acts and practices, with the purpose and effect of restraining and preventing competition and unlawfully maintaining its monopoly of the relevant market of round thermostats, controlling and unfairly increasing product cost to indirect purchasers, and limiting product choice to consumers in the State of Maine. This conduct violated Chapter 10.

## COUNT I

## VIOLATIONS OF CHAPTER 10 AND CHAPTER 201

182.    Plaintiffs incorporate herein by reference the allegations contained in paragraphs 181, above.

183.    Beginning in at least as early as 1985 and continuing to the present, Defendant has willfully and knowingly engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; increasing the price and limiting and reducing the supply of round thermostats; limiting product choice to consumers in the Commonwealth; allocating market share and restraining trade and preventing competition in the relevant markets of round thermostats, thereby enabling Defendant to attempt to create, create, maintain and perpetuate a monopoly in the market for round thermostats, all in violation of Chapter 10 and Chapter 201.

184.    As a direct and proximate result of Defendant's violations of Chapter 10,

31

members of the class have suffered economic harm and have been deprived of the benefits of free and fair competition on the merits.

185.   Defendant's conduct in engaging in unlawful, unfair and deceptive combinations of capital, skill, and acts individually and with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; its increasing of the price and limiting and reducing the supply of round thermostats; and its restraining of trade and preventing competition in the relevant market of round thermostats constitute and was willful and knowing and constituted unfair methods of competition and unfair and deceptive business acts and practices within the meaning of Chapter 10 and Chapter 201.

186.   Those upon whom Defendant has imposed these restrictive arrangements and practices include consumer purchasers, competitors and potential competitors of round thermostats, as well as other manufacturers of round thermostats. Defendant's willful and knowing actions were designed to, and/or had the effect of, inflating the prices of round thermostats sold indirectly to the plaintiffs and the other members of the consumer class in the State of Maine. Each consumer class member suffered actual harm in an amount determinable per purchase.

## RELIEF REQUESTED

187.   As a result of Defendant's unfair and deceptive conduct, individual Maine consumer purchasers of Round thermostats suffered the invasion of their legally protected interests and rights and/or suffered related economic harm. They are therefore entitled to actual damages, restitution, interest, attorney fees and costs. Because their conduct was willful and knowing and they failed to reasonably settle the class is entitled to damages

32

WHEREFORE, the putative plaintiff class, through its representative, prays that this Court:

A.   Preliminarily find that pursuant to Maine Rule of Civil Procedure 23, the use or employment of the unfair or deceptive act or practice alleged by the named Plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such action to the unnamed petitioners in the most effective practicable manner;

B.   Pursuant to Maine Rule of Civil Procedure 23, enter a final finding that the use or employment of the unfair or deceptive act or practice alleged by the named Plaintiffs caused similar injury to numerous other persons similarly situated and that they adequately and fairly represent such other persons and allow them to bring the action on behalf of themselves and the other similarly injured and situated persons and further order notice of such finding to all members of the class of petitioners in accordance with the law;

C.   Declare that Defendant has engaged in unfair methods of competition and unfair and deceptive acts and practices, including but not limited to restraints of trade and commerce, discouraging competition, attempting to monopolize, monopolization, entering into contracts or combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of round thermostats, and preventing competition in

33

manufacturing, making, transportation, sale or purchase of round

thermostats.

D.   Find that by engaging in unfair methods of competition and participating in

unlawful, unfair and deceptive business acts and practices, acted in violation

of Chapter 10;

E.   Award plaintiffs and members of the class their actual damages or in the

alternative restitution and other damages as provided under Chapter 10 and

Chapter 201 in an amount deemed fair, reasonable and just under the law.

F.   Find that Defendants violated Chapter 10 and Chapter 201 and that because

the use and employment of the unfair and deceptive act or practice alleged

was a willful violation and double or treble any award;

G.   Allow the class to recover its reasonable attorneys' fees and costs as

authorized by Chapter 10 and Chapter 201;

H.   Award plaintiffs and the members of the class pre-judgment and post-

judgment interest on the above sums at the highest rate allowed by law;

I.   Find that the Defendant has acted on grounds generally applicable to the

entire Class, thereby making final injunctive relief and ancillary equitable

relief appropriate with respect to the Class as a whole and grant such other

and further relief as this Court deems to be necessary, proper, just and/or

equitable under Chapter 10 and Chapter 201 or through its inherent powers

including but not limited to enjoining the Defendant from engaging in this

conduct in the future and;

34

J.    Grant other appropriate equitable relief, including but not limited to

disgorgement of profits obtained.

Dated at Dover, New Hampshire, this 27th day of December, 2004.

Respectfully submitted,

John McKinnon, on behalf of
himself and all others similarly
situated
By their Attorneys,

D. Michael Noonan, #7240
Shaheen & Gordon, P.A.
P.O. Box 977
140 Washington St.
Dover, NH  03820
(603) 749-5000

35